# STATE OF VERMONT

**SUPERIOR COURT**           CIVIL **DIVISION**

BENNINGTON    **Unit**       **Docket No.:** _____

---

*Plaintiff(s)* CULINARY HEALTH INVESTORS, LLC VS.   *Defendant(s)* CULINARY HEALTH INNOVATIONS, LLC
et al                             (and RADIUS, SHALETT & McPherson)

       ↳ DERIVATIVELY

## SUMMONS

THIS SUMMONS IS DIRECTED TO   CULINARY HEALTH INNOVATIONS, LLC

1. **YOU ARE BEING SUED.** The plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights.

2. **YOU MUST REPLY WITHIN 20\* DAYS TO PROTECT YOUR RIGHTS.** You must give or mail the Plaintiff **a written response** called an Answer within 20\* days of the date on which you received this Summons. You must send a copy of your Answer to the [Plaintiff][Plaintiff's attorney] located at:   P.O. Box 801, Manchester, VT 05254,

You must also give or mail your Answer to the Court located at:   207 South St., Bennington, VT 05201

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT GIVE YOUR WRITTEN ANSWER TO THE COURT.** If you do not Answer within 20\* days and file it with the Court, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint.

5. **YOU MUST MAKE ANY CLAIMS AGAINST THE PLAINTIFF IN YOUR REPLY.** Your Answer must state any related legal claims you have against the Plaintiff. Your claims against the Plaintiff are called Counterclaims. If you do not make your Counterclaims in writing in your Answer, you may not be able to bring them up at all. Even if you have insurance and the insurance company will defend you, you must still file any Counterclaims you may have.

6. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you cannot afford a lawyer, you should ask the court clerk for information about places where you can get free legal help. **Even if you cannot get legal help, you must still give the Court a written Answer to protect your rights or you may lose the case.**

7. **NOTICE OF APPEARANCE FORM.** THE COURT NEEDS TO KNOW HOW TO REACH YOU SO THAT YOU WILL BE INFORMED OF ALL MATTERS RELATING TO YOUR CASE. If you have not hired an attorney and are representing yourself, in addition to filing the required answer it is important that you file the Notice of Appearance form attached to this summons, to give the court your name, mailing address and phone number (and email address, if you have one). You must also mail or deliver a copy of the form to the lawyer or party who sent you this paperwork, so that you will receive copies of anything else they file with the court.

_____        April 25, 2016
*Plaintiff's Attorney/Court Clerk*             *Dated*

Served on    _____       _____
           *Date*                    *Sheriff*

\* Use 20 days, except that in the exceptional situations where a different time is allowed by the court in which to answer, the different time should be inserted.

RECEIVED
MAY 11 2016
Page 1 of 1
By_____

THE COURT NEEDS TO KNOW HOW TO REACH YOU SO THAT YOU WILL BE INFORMED OF ALL MATTERS RELATING TO YOUR CASE. If you have not hired an attorney and are representing yourself, in addition to filing the required answer it is important that you file the Notice of Appearance form attached to this notice and request, to give the court your name, mailing address and phone number (and email address, if you have one). You must also mail or deliver a copy of the form to the lawyer or party who sent you this paperwork, so that you will receive copies of anything else they file with the court.

I affirm that this request is being sent to you on ___April 25, 2016___

_____
Signature Plaintiff or Plaintiff's Attorney

STATE OF VERMONT

SUPERIOR COURT                                      CIVIL DIVISION

Bennington Unit                                       Docket No.


| | |
|---|---|
| CULINARY HEALTH INVESTORS, LLC, ) | |
| DAVID BOLLINGER ) | |
| JOSEPH SHEPERD ) | |
| DAVID LAUB and ) | **COMPLAINT** |
| HENRY S. SMITH REVOCABLE TRUST ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | |
| ) | |
| CULINARY HEALTH INNOVATIONS, LLC, ) | |
| RADIUS BRAND STRATEGIES, LTD., ) | |
| BRUCE SHALETT and ) | |
| SEAN MACPHERSON ) | |
| ) | |
| Defendants ) | |
| ) | |
| AND DERIVATIVELY FOR ) | |
| CULINARY HEALTH INNOVATIONS, LLC ) | |
| ) | |
| v. ) | |
| ) | |
| RADIUS BRAND STRATEGIES, LTD, ) | |
| BRUCE SHALETT, Individually and ) | |
| SEAN MACPHERSON, Individually ) | |


## **COMPLAINT**


1

Now Come the Plaintiffs, acting through their attorney Stuart Revo, and hereby complain against the Defendants as follows:

## Background

1. Plaintiff Culinary Health Investors, LLC ("CHI Vermont") was formed in Vermont in 2007 to acquire certain intellectual property ("IP") developed and owned by a subsidiary of Campbell Soup Company ("Campbell"). This IP comprised patents, trademarks, formulae, know-how and other technology to manufacture and sell proprietary meals, desserts and snacks for post cardiac patients and diabetics, based upon peer-reviewed, published clinical trials.

2. On March 3, 2011, CHI Vermont organized a subsidiary, Defendant Culinary Health Innovations, LLC (hereafter "Innovations" or "Defendant Innovations"), in Delaware, and until March 13, 2013, CHI Vermont was the sole member and 100% owner.

3. Plaintiffs Joseph Sheperd ("Sheperd"), David Bollinger ("Bollinger"), David Laub ("Laub") and Henry S. Smith Revocable Trust ("Smith Trust") were originally "angel" investors in Plaintiff CHI Vermont.

4. Plaintiff CHI Vermont did acquire ownership of the Campbell's IP, known then and now as "IQ" or "Intelligent Quisine" on March 25, 2011, pursuant to an Asset Purchase Agreement on that date (the "Asset Purchase Agreement"). Upon information and belief, as of such date, Campbell and its subsidiaries had invested over seventy million dollars in development, clinical research and market testing of IQ.

5. In a transaction closing March 13, 2013 (the "Closing"), pursuant to the Reorganization Plan approved by the Bankruptcy Court in Rutland, Vermont, Plaintiff CHI Vermont transferred virtually all of its assets, including the IQ Intellectual Property, into Defendant Innovations.  At the time of the Closing, the angel investors, members of CHI Vermont and the other Plaintiffs had in excess of one million dollars in cash invested in the assets transferred to Defendant Innovations. CHI Vermont retained an approximately 40.26% common membership interest in Defendant Innovations, after such asset transfer. Also at

the Closing, Campbell, through its subsidiary Campbell Investment Company, became a 2% equity holder of Preferred A-1 membership interests in Innovations, and received the right to acquire additional such interests in the future. Campbell is not a party to this Complaint.

6.   At the Closing, and pursuant to such Reorganization Plan, Defendant Innovations issued Class A Preferred Membership Interests to Defendant Radius Brand Strategies, LLC ("Radius") representing an approximately 43.24% interest in the ownership of Defendant Innovations, in exchange for a cash investment by Radius into Innovations.

7.   At the Closing, Radius was owned by New York City investors Bruce Shalett ("Shalett") and Todd Meister ("Meister").

8.   Simultaneously with the Closing, and also pursuant to the Reorganization Plan, Plaintiffs Sheperd, Bollinger, Laub and Smith Trust acquired common membership interests in Defendant Innovations, by conversion of Promissory Notes (in the aggregate amount of $350,000) originally issued to them as angel investors in Plaintiff CHI Vermont.

9.   The governing document for Defendant Innovations, which sets forth the rights and protections for each member of Defendant Innovations, including the rights and protections of Plaintiffs, is the Amended and Restated Operating Agreement dated March 13, 2013, ("the "Operating Agreement"). The Operating Agreement is a legal and binding contract, valid and in full force and effect. The Operating Agreement, with the only amendment known to Plaintiffs, is attached as Exhibit "A" hereto and hereby incorporated and made an integral part of this Complaint.

10.   The Operating Agreement provides that Defendant Innovations will be managed by a seven person Board of Managers appointed by Radius and CHI Vermont, with one Manager of the Board of Managers to be independent from both Radius and CHI Vermont.

11.   Upon information and belief, at the time of the Closing, Defendant Innovations had fourteen members, all but one of whom signed the Operating Agreement on or about March 13, 2013. Upon information and belief, member

Kim Lopdrup signed the Operating Agreement subsequently, upon becoming a member of Innovations some months later.

12.   Upon information and belief, from shortly after the date of Closing through the present, Defendant Innovations has been under the control and domination of Defendants Radius and Shalett.

13.   **Unlawfully using their domination and control, Defendants Radius and Shalett immediately purported to dilute Plaintiffs' common membership interests from over 50% at Closing, to 11.5% or less as of the filing of this Complaint.** Defendants have ignored, violated and flouted the statutory rights and written contractual protections of Plaintiffs as members of Defendant Innovations, for the purposes of increasing Radius' controlling stake in Defendant Innovations, diluting Plaintiffs' interests as common members, and "freezing out" Plaintiffs from any role in corporate governance.

14.   The unlawful conduct of Defendants Radius and Shalett and the active participation and assistance of MacPherson in their management, control and domination of Defendant Innovations is set forth in detail in the paragraphs below.

## Parties and Jurisdiction

15.   Plaintiff Culinary Health Investors, LLC ("Plaintiff CHI Vermont") is a Vermont limited liability company organized on April 12, 2007, whose registered address is 2168 Bonnet Street in Manchester Center, Vermont in Bennington County. CHI Vermont is active and in good standing as of the filing of this Complaint. As of the date of filing hereof, and at all times when the acts complained of occurred, CHI Vermont has been the owner of common membership interests in Defendant Culinary Health Innovations, LLC.

16.   Plaintiff Joseph Sheperd ("Sheperd") is an individual residing at Border Lane, in Woodstock, Vermont.  As of the date of filing hereof, and at all times when the acts complained of occurred, Shepherd has been the owner of common membership interests in Defendant Innovations, representing  an investment of $100, 000.

17.   Plaintiff David Bollinger ("Bollinger") is an individual residing at Border Lane, in Woodstock, Vermont. As of the date of filing hereof, and at all times when the acts complained of occurred, Bollinger has been the owner of common membership interests in Defendant Innovations, representing an investment of $75, 000.

18.   David Laub ("Laub") is an individual residing in New York, New York. As of the date of filing hereof, and at all times when the acts complained of occurred, Laub has been the owner of common membership interests in Defendant Innovations, representing an investment of $100,000.

19.   The Henry R. Smith Revocable Trust (the "Smith Trust") is a Trust organized under the laws of Vermont. The sole Trustee, Hank Smith, is a resident of Woodstock Vermont. As of the date of filing hereof, and at all times when the acts complained of occurred, the Smith Trust has been the owner of common membership interests in Defendant Innovations, representing an investment of $75, 000.

20.   Defendant Innovations is a limited liability company, organized in Delaware on March 3, 2011. Defendant Innovations was formally qualified to do business in Vermont from its formation until March 16, 2015.

21.   From March 3, 2011 through August 2013, when Defendant Innovations' original CEO, David Thompson ("Thompson"), resigned, Defendant Innovations' principal office was located in South Burlington, Vermont.

22.   Upon information and belief, Defendant Innovations continues to conduct business in Vermont through the present day, or has substantial contacts in Vermont.

23.   Upon information and belief, in 2014 and 2015 Defendant Innovations ordered the production of all of its IQ food samples from Mr. James S. Stillman of

5

Fairfax, Vermont. Upon information and belief, some of these food samples were made by Mr. Stillman in Vermont, and shipped to Defendant Innovations (or other consignees) from Vermont. Upon information and belief, Defendant recently ordered additional samples of IQ food products from Mr. Stillman, or from Northern Culinary Brands, LLC, a Vermont-based limited liability company in which Mr. Stillman and three other Vermont residents are the sole members.

24.    Upon information and belief, seven members of Defendant Innovations, including all but one of the Plaintiffs, are individual residents of or entities formed in Vermont.

25.    Defendant Innovations claims an interest in a bank account at The Bank of Bennington in Manchester, Vermont. Upon information and belief, Defendant Innovations shows the balance in such account as an asset on its Balance Sheet. Such account was opened by and continues to be maintained in trust by a licensed Vermont attorney.

26.    Defendant Innovations was sued in Bennington Superior in a suit filed November 12, 2014, Docket No. 399-11-14 Bncv, and did not object to or contest the Court's personal jurisdiction in such suit. In that suit, mediation was conducted and the matter settled on September 8, 2015 in Arlington, Vermont by Retired Judge Arthur J. O' Day. Defendant Innovations made the final payment for such settlement by wire into a Vermont bank account on or about November 1, 2015. In connection with such suit, Defendant Innovations engaged Vermont counsel (Herbert Ogden, Esq. of Danby Vermont) and had regular dealings and communications with him through (at least) January 2016. The Stipulation and Order for Dismissal in that case was filed in Bennington on November 20, 2015. Mr. Shalett signed the final Release in that case and mailed it to Vermont counsel. That Release was mailed by Shalett, and received by Defendant Innovations' Vermont local counsel on November 25, 2015. Defendant Innovations never objected and thereby consented to Vermont's jurisdiction in that very recent matter, and that consent speaks for itself.

27.    Upon information and belief, Defendant Shalett authorized and approved two wires to a Vermont bank account in furtherance of the settlement in that matter,

6

and was involved directly in execution of the Releases exchanged in that civil case.

28.     Since the Closing on March 13, 2013, Defendant Shalett has engaged in hundreds of direct communications (by telephone, text and electronically) with Vermont residents, sending and receiving a very large number of responses to and from these residents of Vermont. Upon information and belief, these residents include Plaintiff CHI Vermont, Plaintiff Shepherd, Plaintiff Bollinger, Plaintiff Smith Trust, Bob Baird, Attorney Herb Ogden, Stuart Revo, (Ret.) Judge Arthur O' Day, former CEO Thompson of South Burlington, Vermont, Scott Stillman, Northern Culinary Brands, LLC, Attorney Rebecca Rice in Rutland, Vermont, and others.

29.     Until January 2016, certain of Defendant Innovations company records were located in Vermont, in the possession of Defendant Innovations' former Corporate Secretary, (later the Assistant Secretary), a Vermont resident who served from the formation of Defendant Innovations until his resignation effective September 16, 2014.

30.     Defendant Innovations voluntarily filed a Petition for Chapter 11 Reorganization on June 14, 2012, in the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Vermont, in Rutland, being Case No. 12-10529 cab.

31.     Upon the in-person testimony of Shalett in Burlington, Vermont, Defendant Innovations' Reorganization Plan (the "Plan") was confirmed by such Bankruptcy Court on December 19, 2012, and became final 30 days later.

32.     The facts alleged in Paragraphs 20 through 31 above are sufficient to vest in this Honorable Court specific personal jurisdiction over Defendant Innovations and over Defendant Shalett.

33.     Upon information and belief, Defendant Sean MacPherson ("MacPherson") is the General Counsel and Secretary of Defendant Innovations.

34.     In these capacities, MacPherson has sent and received scores of communications to numerous residents of Vermont, including those to Plaintiff CHI Vermont, Plaintiff Smith Trust, Attorney Herb Ogden, Stuart Revo, (Ret.)

Judge Arthur O' Day, former CEO Thompson of South Burlington, Vermont, and others.

35.     MacPherson was also directly responsible for managing the defense and settlement of the Vermont civil case described in Paragraph 26 above. This included personally directing and managing Defendant Innovations' local counsel, Herbert Ogden, Esq., of Danby, Vermont. In September 2015, MacPherson traveled to Arlington, Vermont to personally attend the mediation session for the Vermont civil case described in Paragraph 26 above. Defendant MacPherson managed and directed that mediation session on behalf of Defendant Innovations, and at that session represented that he had authority to bind Defendant Innovations.

36.     Upon information and belief, subsequent to that mediation session, MacPherson communicated directly with the plaintiff in that civil case, who was a resident of Vermont, authorized and approved two wires to a Vermont bank account in furtherance of the settlement, and was involved directly in drafting, revision and execution of the Releases exchanged in settling that civil case.

37.     The facts alleged in Paragraphs 33 through 36 above are sufficient to vest in this Honorable Court specific personal jurisdiction over Defendant MacPherson.

### Vermont has Jurisdiction over Radius and Shalett, As Defendant Innovations is their Mere Alter Ego

38.     Radius, a member of Defendant Innovations and a signatory to the Operating Agreement, is a New York limited liability company. Upon information and belief, it is wholly owned by Bruce Shalett and his associate, Todd Meister ("Meister").

39.     At all times during the period when the acts complained of herein occurred, Shalett, individually, and through the investment vehicle Radius, exercised total domination and control of Defendant Innovations.

40.     Since forcing the resignation of former CEO Thompson in August 2013 through the present, Shalett (individually and in some cases through Radius) has

operated Defendant Innovations without regard for the corporate formalities contained in the Operating Agreement intended to protect the interests of Plaintiffs.

41.   Since forcing the resignation of former CEO Thompson in August 2013 through the present, Shalett (individually and in some cases through Radius) has operated Defendant Innovations without any regard for the statutory rights and written contractual protections of Plaintiffs as minority members.

42.   Defendants have acted in bad faith and engaged in self-dealing transactions, for the purpose of increasing Radius' controlling stake in Defendant Innovations, diluting the interests of the common members, including Plaintiffs, and freezing out all unrelated parties from corporate governance.

43.   Shalett's conduct and actions (individually and in some cases through Radius) in operating Defendant Innovations as an alter ego of Radius (with the active participation and assistance of MacPherson) is set forth in detail in the paragraphs which follow.

44.   In breach of the Operating Agreement, Radius and Shalett have exercised unilateral control and domination over all aspects of the business and financial affairs of Defendant Innovations, including direct control of the cash and spending of Defendant Innovations.

45.   In breach of the Operating Agreement, Radius (under the direction of Shalett) has engaged in material self-dealing transactions for the benefit of itself and Shalett, including but not limited to causing and directing Defendant Innovations to ignore the provisions of Section 4.5 of the Operating Agreement. Upon information and belief, these self-dealing transactions have substantially increased the ownership interests of Radius in Defendant Innovations from approximately 43.76% at the Closing to purportedly more than 85% at present.

46.   Upon information and belief, since asserting total control and domination of Defendant Innovations, Radius and Shalett have never nominated the Independent Manager required under the Operating Agreement, nor submitted such nomination to Plaintiff CHI Vermont for approval, as required by the Operating Agreement.

47.   As evidence that Defendant Innovations was being operated by Radius and Shalett as a mere alter ego of Radius and Shalett, Defendant Innovations has wrongfully rejected CHI Vermont's appointment of a Manager to the Board of Managers, in willful and material breach of the Operating Agreement.

48.   Plaintiff CHI Vermont formally notified Defendant Innovations of the appointment of Mr. Norman Friedland ("Friedland") to Innovations' Board of Managers by emails from Hank Smith, the Trustee of Smith Trust, and Norman Friedland , to Defendant Shalett on April 28, 2015. Copies of these two e-mails (the "Notice of Appointment of Manager") are attached to this Complaint as Exhibit "B", and are hereby incorporated as an integral part of this Complaint.

49.   This appointment has been rejected in bad faith by Defendant Innovations, at the direction of Radius and Shalett, with the active participation and assistance of MacPherson, on the grounds of false and spurious procedural objections.

50.   In alleging such bogus procedural defects for the exclusive benefit of Radius and Shalett, MacPherson has clearly aligned himself with Radius and Shalett rather than with the company, Defendant Innovations.

51.   Defendant Innovations, at the direction of Radius and Shalett, with the active participation and assistance of MacPherson, continued to reject the CHI Vermont appointment even after receiving a detailed Secretary's Certificate from CHI Vermont, addressing all of the alleged procedural defects in the appointment. A copy of this Secretary's Certificate, dated May 27, 2015, and sent to MacPherson, is attached as Exhibit "C" and hereby incorporated as an integral part of this Complaint.

52.   It became obvious to Plaintiffs from Defendant Innovations' bad faith refusal to recognize the Friedland appointment that further efforts or appointments would be futile.

53.   Defendant Innovations' bad faith has been further evidenced by Shalett's repeated oral statements to Stuart Revo, a member of CHI Vermont, that Plaintiffs could never reverse these wrongful actions without filing a lawsuit. That statement demonstrates calculated and rapacious greed. Defendants have used their control

to do what they like, openly daring Plaintiffs to sue them, and confident they will never have to return all of the benefits reaped through their self-dealing conduct.

54.    After Friedland's appointment by CHI Vermont to the Board of Managers of Defendant Innovations, Friedland properly requested and (upon two occasions) gave proper Notice of a Meeting of the Board of Managers for May 27, 2015 and June 18, 2015, respectively. None of the Managers appointed by Radius responded to such Notices or attended the Board Meetings.

55.    Ignoring the Board Meetings and refusing to respond or attend is further evidence that Shalett and Radius operated Innovations as their mere alter ego, showing disdain for corporate formalities in governance, flouting of the Operating Agreement, and bad faith towards Plaintiffs.

56.    At least since rejection of Friedland's appointment, Plaintiffs have received minimal, inaccurate and misleading information regarding the business and financial condition of Defendant Innovations. Shalett has stated to one of CHI Vermont's members that it would make no sense for him to provide information which could be used to sue him.

57.    Since at least October 2014, Plaintiffs have received no Notice of any meetings of the Innovations' Board of Managers, or of the members.

58.    Beginning around August 2013, Radius and Shalett effectively sidelined Defendant Innovations' Company Counsel, replacing him with attorney Alan Annex, of the Greenberg, Traurig LLP firm in New York City. Upon information and belief, Mr. Annex is a longtime friend of Shalett and attorney for both Radius and Shalett.

59. CHI Vermont and other Plaintiffs were under the reasonable belief that Mr. Annex was providing legal advice for the benefit of all members of Defendant Innovations.

60.    However, in after-the-fact written communication to CHI Vermont, Mr. Annex stated that the legal advice he was providing to Defendant Innovations was for the exclusive benefit of Radius and Shalett.

61.    Upon information and belief, Mr. Annex was loyal to Radius and Shalett and was unable to render good faith, disinterested advice to Defendant Innovations, or to place the best interests of Defendant Innovations and all of its members uppermost.

62.    Annex's representation of Defendant Innovations in negotiations for new financing with Xsellix, instead of utilizing existing Company Counsel (or even new, disinterested counsel), is further evidence of bad faith, and that Defendant Innovations was being operated by Radius and Shalett as a mere alter ego of Radius and Shalett.

63.    Since effectively sidelining Thompson on May 30, 2013, Radius and Shalett hired a dizzying succession of Chief Executive Officers for Defendant Innovations, including Chris Dominello, Kevin Nemetz, Emile Westergaard, David Wasson, Robert Jacobs, and apparently even Shalett himself, without adequate (or any) notice or consultation with the Board of Managers.

64.    Upon information and belief, as set forth in detail in paragraphs 232 through 239 below, Radius and Shalett personally defamed former Defendant Innovations CEO, David Thompson.  In September 2014, Thompson then sued Innovations, Radius, Shalett, Meister and Alan Annex for such defamation in Federal Court for the Southern District of New York in New York City.

65.    Defendant Innovations, Radius, Shalett, Meister (and Mr. Annex) then entered into a confidential settlement with Mr. Thompson. The terms of this settlement have never been disclosed to Plaintiffs. Upon information and belief, the legal costs incurred by Radius and Shalett were paid by Defendant Innovations and the settlement was funded with Defendant Innovation's corporate monies, notwithstanding that the substance of claims by Thompson were against Radius, Shalett and Annex personally. The commingling of company finances amongst Innovations, Radius and Shalett and the satisfaction of Radius liabilities with Innovations funds are additional evidence that Innovations has been operated as the mere alter ego of Shalett and Radius.

66.    The specific conduct alleged above and below, evidencing that Radius and Shalett operated Defendant Innovations as their mere alter ego, give this Honorable Court jurisdiction over Radius and Shalett, on an alter ego basis.

## COUNT I

## AGAINST INNOVATIONS, RADIUS, SHALETT and MACPHERSON
## FOR BREACH OF CONTRACT (THE OPERATING AGREEMENT)

67.   Plaintiffs hereby reiterate, allege again, and incorporate Paragraphs 1 through 66 as if these were again fully set forth herein.

68.   The management, governance, and rights and obligations of the members of Defendant Innovations are set forth in the Operating Agreement.

69.   At all times since the Closing, Shalett has been the Executive Co-Chairman of Defendant Innovations. His associate, and the other member of Radius, Todd Meister, has been the other, less involved Co- Chairman. Mr. Meister is not named as a defendant in this Complaint.

70.   Shalett and Radius have exercised complete domination and control over the Board of Managers and the day-to-day management of Defendant Innovations.

71.   Upon information and belief, Radius loaned funds to Defendant Innovations (the "Radius loans") from time to time, for purposes that were never disclosed to Plaintiffs.  Plaintiffs have received no specific and little or no general information regarding the dates, amounts, terms, conditions, or use of proceeds of the Radius loans.

72.   The terms and conditions of such Radius loans could not include any provision permitting conversion of such loans into additional equity (i.e., membership interests) in Defendant Innovations, since Section 4.5 of the Operating Agreement specifically prohibits such conversion.

73.   Article 4.5 of the Operating Agreement provides that advances to Defendant Innovations cannot be capital contributions, but "…shall be a debt of the Company to such member and shall be payable or collectible only out of the assets of the Company in accordance with the terms and conditions upon which such advances are made."

74.   Upon information and belief, the terms and conditions of such Radius loans were never approved by any member of Defendant Innovations' Board of Managers,   unless this purportedly occurred without notice to any person other than a member of the Board of Managers appointed by Radius.

75.   Upon information and belief, contrary to the Operating Agreement, and without the consent of any minority members or any persons on the Board of Managers unrelated to Radius, Defendant Innovations, under the domination and control of Radius and Shalett and with active participation and assistance of MacPherson, has purportedly converted the loans made by it to Defendant Innovations, resulting in purported dilution of Plaintiff's membership interests from a significant stake down to a tiny percentage of Innovations.

76.   At Closing, and prior to such purported conversion, Plaintiff CHI Vermont owned a 40.26% common membership interest in Defendant Innovations. Upon information and belief, immediately after such purported conversion, such interest was purportedly reduced to approximately 8.8% or less.

77.   At Closing, and prior to such purported conversion, Plaintiff Bollinger owned a 2.25% common membership interest in Defendant Innovations. After such purported conversion, such interest was purportedly reduced to .58% or less.

78.   At Closing, and prior to such purported conversion, Plaintiff Sheperd owned a 3% common membership interest in Defendant Innovations. After such purported conversion, such interest was purportedly reduced to .77%, or less.

79.   At Closing, and prior to such purported conversion, Plaintiff Laub owned a 3% common membership interest in Defendant Innovations. After such purported conversion, such interest was purportedly reduced to .77%, or less.

80.   At Closing, and prior to such purported conversion, Plaintiff Smith Trust owned a 2.25% common membership interest. After such purported conversion, such interest was purportedly reduced to .58%, or less.

81.   At the Closing, collectively, the Plaintiffs owned a 50.76% common membership interest prior to such purported conversion. Immediately after such purported conversion, such collective interest was purportedly reduced to 11.50%, or less.

82.   Conversion of the Radius loans into equity would have required an amendment to the Operating Agreement.

83.   Article 13.4 of the Operating Agreement provides that the Operating Agreement cannot be amended "without the prior written consent of any member that would be materially and adversely affected by such amendment."

84.   Plaintiffs have been "materially and adversely affected" by the purported conversion.

85.   Plaintiffs were never asked for such consent, nor have they given such consent.

86.   It follows that any such purported conversion of the Radius loans is a material breach of the Operating Agreement, and is therefore null, void and of no force and effect.

87.   Article 3.5 of the Operating Agreement requires that any loan, provision of services or transaction between Defendant Innovations and a member must be "approved by the Board, including in each case a majority of disinterested Managers."

88.   Upon information and belief, the purported Radius loans and the conversion of these loans into additional equity were never approved in such manner.

89.   It follows that also for this reason, the terms and conditions of the Radius loans and any such purported conversion of the Radius loans are null, void and of no force and effect.

90.   Article VIII of the Operating Agreement sets forth the provisions governing the management of Defendant Innovations.

91.   Article VIII. 1(a) gives Plaintiff CHI Vermont the unrestricted right to appoint and remove at least two of the Managers to the seven-person Board of Managers, and the right of approval/disapproval to appointment of an Independent Manager.

92.   Beginning April 28, 2015, Defendant Innovations, under the control and domination of Radius and Shalett with the participation and assistance of

15

MacPherson, has unilaterally and spuriously rejected the appointment by Plaintiff CHI Vermont of its designated Manager.

93.    On April 28, 2015, CHI Vermont notified Defendant Innovations of the appointment of Mr. Norman Friedland to Defendant Innovations' Board of Managers, as set forth in Exhibit B.

94.    Under the control and domination of Radius and Shalett with the participation and assistance of MacPherson, Defendant Innovations improperly rejected the appointment by CHI Vermont of its designated Manager to the Board of Managers.

95.    Defendant Innovations' rejection of the appointment by CHI Vermont of Norman Friedland to the Board of Managers was a material breach of the Operating Agreement, and ignored the detailed letter from Plaintiff CHI Vermont's Secretary to Defendant Innovations dated May 27, 2015.  A copy of this letter is attached and hereby incorporated into this Complaint as Exhibit "C".

96.    The rejection of this appointment by Defendant Innovations was done in bad faith by Defendant Innovations.

97.    The rejection was in bad faith, because Defendant had no bona fide reason to reject the appointment.

98.    The sole purpose of such rejection was to freeze out Plaintiffs (and other unrelated investors) and make it impossible for Plaintiffs to obtain information regarding the business, financial condition and affairs of Defendant Innovations, or to oppose the unlawful conversion of the Radius loans.

99.    Such bad faith on Defendant Innovations' part is further evidenced by a false statement in Defendant Innovations' recent Private Placement Memorandum (dated October 12, 2015), that despite having the right to appoint two Board members CHI Vermont "currently has not appointed any designees".

100.  Article 10.3 of the Operating Agreement, entitled "Books and Records", requires Defendant Innovations to "cause to be prepared all federal, state and local income and other tax returns that the Company is required to file" and to "send or deliver to each person who was a member at any time during each year such tax

information as shall be reasonably necessary for the preparation by such person of such person's federal income tax return and state income and other tax returns."

101.  Upon information and belief, Defendant Innovations has violated the Operating Agreement by not timely preparing all tax returns when due, or sending required tax information to the members, including Plaintiffs.

102.  In violation of the Operating Agreement, Defendant Innovations has not timely sent or delivered all K-1 schedules or information necessary for Plaintiffs to file 2013, 2014 or 2015 tax returns, and Plaintiffs have never received any K-1 schedules or other information relating to the 2014 and 2015 tax years.

103.  Plaintiffs have suffered direct financial harm as a result of Defendants' multiple and material breaches of the Operating Agreement.

## COUNT II

### AGAINST INNOVATIONS, RADIUS, SHALETT and MACPHERSON FOR MINORITY OPRESSION

104.  Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-103 as if these were again fully set forth herein.

105.  Plaintiffs had a reasonable expectation, based upon the Operating Agreement, that their minority interests would be fairly represented on the Board of Managers of Defendant Innovations, in compliance with the Operating Agreement.

106.  The Operating Agreement, negotiated between CHI Vermont and Shalett on behalf of himself and Radius, provided specific protections for Plaintiffs' minority interests.

107.  Inter alia, these protections included representation by appointees of CHI Vermont on the Defendant Innovations' Board of Managers, consultation and voting on decisions of the Board of Managers by an Independent Manager on the Board of Managers, prohibition against any member increasing its ownership

percentage by lending Defendant Innovations monies and then converting that loan into additional equity, and proscription of self-dealing transactions between Defendant Innovations and any member.

108.   All of the Defendants knew (or should have known) that Plaintiffs had this expectation of fair representation of their minority interests on the Board and respect for and adherence to the provisions of the Operating Agreement.

109.   This knowledge was based upon the express language contained in the Operating Agreement. The Operating Agreement gave Plaintiff CHI Vermont the right to appoint at least two, and under certain circumstances three, Managers to the Board of Managers. The Operating Agreement also provided for the appointment of an Independent Manager, nominated by Radius and subject to the approval of Plaintiff CHI Vermont, whose advice and vote would be critical in resolving disputes between CHI Vermont and Radius and preventing self-dealing transactions.

110.   Moreover, Defendant Innovations, controlled and dominated by Shalett, knew (or should have known) that Plaintiffs had this expectation, since the composition of the Board of Managers resulted from very protracted, arms-length negotiations by Radius and Shalett, through their transaction counsel, Steve Uslaner, of Littman Krooks L.P. in New York City.

111.   These protracted negotiations began in July 2012 and lasted more than 7 months all the way to Closing on March 13, 2013.

112.   As a very senior business attorney, Defendant MacPherson would certainly have read the Operating Agreement immediately after his retention by Defendant Innovations.

113.   Therefore, Defendant MacPherson also should have known that Plaintiffs had this expectation of fair representation on the Board, and respect for and adherence to the provisions of the Operating Agreement.

114.   The fair and balanced composition of the Board of Managers was central to the Plaintiffs' decision to accept the Radius investment into Defendant Innovations, and for Plaintiffs Bollinger, Sheperd, Laub and Smith Trust to convert their Promissory Notes into equity in Innovations at Closing.

115.   Plaintiffs had a reasonable expectation, based upon the express language of the Operating Agreement, that their interests could not be diluted by the conversion into equity of any loans to Defendant Innovations by Radius.

116.   Defendant Innovations and Radius and Shalett knew (or should have known) that Plaintiffs had the expectation that no loans from the majority/controlling member would be converted into equity, based upon the express language contained in the Operating Agreement.

117.   The Operating Agreement clearly states that loans from members must be repaid by Defendant Innovations and cannot be construed as capital contributions.

118.   Moreover, Defendants Innovations, Radius and Shalett knew (or should have known) that Plaintiffs had this expectation, since (inter alia) the opposition to any such conversion and dilution was communicated in writing and orally by CHI Vermont to Defendants Innovations, Radius and Shalett, upon numerous occasions.

119.   The protections against unfair dilution of their minority interests by conversion of loans from members were central to CHI Vermont's decision to issue membership interests to Radius and for Plaintiffs' decision to invest in Defendant Innovations.

120.   Since asserting total control and domination of Defendant Innovations in the spring of 2013, Defendant Innovations, at the direction of Radius and Shalett, with the participation and assistance of MacPherson, have denied Plaintiffs basic information regarding the business and financial condition of Defendant Innovations.

121.   After repeatedly and fruitlessly orally requesting information, on May 28, 2015 Plaintiff Smith Trust presented a formal demand to Defendant Innovations for information about the business of Defendant Innovations. A copy of this information demand is attached to and hereby incorporated into this Complaint as Exhibit "D".

122.   Defendants unlawfully rejected such demand for information, in bad faith and violation of both Delaware and Vermont law.

123.   In response to Defendants' bad faith rejection of the demand for information, Plaintiff CHI Vermont sent Defendant MacPherson a thoroughly researched Memo of Delaware law regarding information demands.

124.   Even after receiving the Memo of Law from Plaintiff CHI Vermont, Defendants failed to provide the information requested by Plaintiff.

125.   Plaintiffs had a reasonable expectation of access to information about the business and finances of Defendant Innovations.

126.   Defendants knew or should have known that, as investors, Plaintiffs expected a reasonable amount of information about the business and financial condition of Defendant Innovations. This expectation of reasonable access to information is so universal among prospective investors that any practice departing from it should have been disclosed and contained in the Operating Agreement.

127.   There is nothing contained in the Operating Agreement restricting members rights to information regarding the business and financial condition of Defendant Innovations.

128.   Plaintiffs' reasonable expectation that they would receive basic information about the business and financial affairs of Defendant Innovations (either directly or through the Managers appointed by CHI Vermont) was central to their decision to invest.

129.   (Even) subsequent to the Closing, when Defendants Shalett and Radius cited the need for additional capital in Innovations as a reason to force Plaintiffs to consent to the unlawful conversion or invest additional capital themselves, Defendants refused to provide the information necessary for Plaintiffs to make an informed decision.

130.   Plaintiffs have suffered direct financial harm as a result of the oppressive and unlawful acts of Defendants.

131.   Plaintiffs are entitled to dissolution of Defendant Innovations under V.S.A. Title 11 Section 3101 (5) (E) when (as in this case) "the managers or members in

control have acted, are acting or will act in a manner that is illegal, oppressive, fraudulent or unfairly prejudicial to the petitioning member."

## COUNT III

## FOR A DECLARATORY JUDGMENT

132.  Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-131 as if these were again fully set forth herein.

133.  As set forth in paragraphs 67-89 and paragraphs 115-119 above, the purported conversion of the Radius loans, and the purported dilution of Plaintiffs' membership interests in Innovations was in clear violation of the Operating Agreement.

134.  Plaintiffs hereby request this Honorable Court for a Declaratory Judgment that the purported conversion of the Radius loans was unlawful, and is therefore null, void and of no force and effect.

135. Plaintiffs hereby request this Honorable Court for a Declaratory Judgment establishing with certainty the Plaintiffs' true equity interest in Defendant Innovations.

## COUNT IV

## WRONGFUL DENIAL OF INFORMATION REQUESTS

## AGAINST INNOVATIONS, RADIUS, SHALETT and MACPHERSON

136.  Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-135 as if these were again fully set forth herein.

137.  Based upon the facts alleged in Paragraphs 121-129 above, Defendants' bad faith refusal of Plaintiffs' demand for information regarding the state of the business and financial condition of Defendant Innovations violated and continues

to violate Delaware Code Section 18-305. (Such bad faith refusal also violates V. S. A. Title 11 Chapter 21 Section 3058).

138.   As a result of this information freeze-out, Plaintiffs were inhibited in advising, assisting or participating in Defendant Innovations' efforts to attract new capital on terms which would be more beneficial to all members, including Plaintiffs.

139.   Plaintiffs have suffered direct financial harm as a result of the wrongful denial of their demand for information.

## COUNT V

## BREACH OF FIDUCIARY DUTY

## AGAINST INNOVATIONS, SHALETT and RADIUS

140.   Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-139 as if these were again fully set forth herein.

141.   Shalett, in his individual capacity as Co-Chairman of Defendant Innovations' Board of Managers and via his control of majority member Radius, has exercised unilateral control and domination of Defendant Innovations throughout the period when the acts and omissions complained of occurred.

142.   Because of this domination and control, Shalett and Radius have fiduciary duties to all members of Defendant Innovations, including Plaintiffs, specifically the duties of loyalty and care (the latter sometimes called the duty of "fair dealing").

143.   These fiduciary duties prohibit Shalett and Radius from making decisions (or causing Innovations to make decisions) or taking actions (or causing Innovations to take actions), which violate the Operating Agreement.

144.   These fiduciary duties prohibit Shalett and Radius from making decisions (or causing Innovations to make decisions) or taking actions (or causing

Innovations to take actions) resulting in a gain, profit or advantage to which they are not legally entitled.

145.   The duty of loyalty requires that actions and decisions by Shalett benefit all members of Defendant Innovations, and do not oppress minority owners, including Plaintiffs.

146.   Shalett, in his individual capacity as Co-Chairman of Defendant Innovation's Board of Managers and via his control of Radius, and Radius itself, intentionally violated the duty of loyalty on a continual basis, at least since August 2013 through the present day.

147.   Shalett, both in his individual capacity as co-Chairman of Defendant Innovation's Board of Managers and via his control of Radius, and Radius itself, intentionally violated the fiduciary duty of care (fair dealing) on a continual basis, since at least August 2013 through the present day.

148.   Shalett's and Radius' decisions, causing Defendant Innovations to violate the terms of the Bankruptcy Court approved Reorganization Plan were a breach of the fiduciary duties of loyalty and care. (See paragraphs 177 et. sequitur below).

149.   Shalett's and Radius' decisions, causing Defendant Innovations to breach the Operating Agreement by failing to appoint an Independent Manager to Defendant Innovations' Board of Managers were a breach of the fiduciary duty of loyalty.

150.   Shalett's and Radius' decisions, causing Defendant Innovations to breach the Operating Agreement by issuing additional equity to Radius by converting the Radius loan(s) was a breach of the fiduciary duty of loyalty.

151.   Shalett's and Radius' decisions, causing Defendant Innovations to ignore the most basic principles of corporate governance, was a breach of the fiduciary duty of loyalty.

152.   Shalett's and Radius' decisions, in oppressing the rights and interests of the Plaintiffs, and causing Defendant Innovations to oppress the rights and interests of Plaintiffs, was a breach of the fiduciary duty of loyalty.

153.   Shalett's failure to disclose to CHI Vermont and, in violation of his oath to the Bankruptcy Court, his censure and the settlement of disciplinary matters against him as determined by the Business Conduct Committee of the Chicago Board Options Exchange, and the financial and other penalties imposed in connection with that censure and settlement was a breach of the fiduciary duty of loyalty and fair dealing. ***Chicago Board Options Exchange, In Matter of Bruce Shalett, File No. 11-0041(a) May 31, 2012.*** The findings in this matter are attached as Exhibit "E" hereto.

154.   Shalett's and Radius' decisions rejecting the valid appointment of CHI Vermont's appointee to the Innovations Board of Managers was a breach of the fiduciary duty of loyalty.

155.   Shalett's and Radius' decisions causing Defendant Innovations to ignore the rights of Plaintiffs, in violation of the Operating Agreement and Delaware law, to receive timely and truthful information concerning Defendant Innovations, was a breach of the fiduciary duty of loyalty.

156.   Shalett's and Radius' decisions, causing Defendant Innovations to transmit information to Plaintiffs that was materially and intentionally false and misleading, was a breach of the fiduciary duty of loyalty. Inter alia, such false and misleading information included but was not limited to false information regarding a prospective lender requiring Plaintiffs to consent to conversion of the Radius loans or sell out at a deflated price, and information regarding Innovations' product sales, hiring, business relationships, and valuations.

157.   Shalett's and Radius' decisions causing Defendant Innovations to violate state and Federal securities laws in connection with the offer and sale of securities by Defendant Innovations, by, among other matters, failing to make bad actor disclosures as required by Rule 506 of the Securities Exchange Act of 1934, was a breach of the fiduciary duties of loyalty and care.

158.   Shalett's and Radius' decisions causing Defendant Innovations to fail to disclose to potential investors the claims of Plaintiffs, and to affirmatively lie to prospective investors that CHI Vermont had "not appointed any designees" to the Board of Managers, when they knew that Plaintiff CHI Vermont had appointed

Mr. Norman Friedland on April 24, 2015 was a breach of the fiduciary duties of loyalty and care.

159.   Shalett's failure to truthfully advise Defendant Innovations' accountants of the illegality of the conversion of the Radius loan into additional equity for Radius, and of other actions giving rise to Plaintiffs' material claims against Defendant Innovations, was a breach of the fiduciary duties of loyalty and care.

160.   Upon information and belief, Shalett's failure to make such disclosures caused Defendant Innovations' accountants to prepare materially inaccurate certifications regarding the true financial condition of Defendant Innovations, and to omit from Innovations' financial statements the risk that the relief sought by Plaintiffs herein (which among other matters involves the dissolution of Defendant Innovations) could be granted, was a breach of the fiduciary duties of loyalty and care.

161.   Upon information and belief, in July or August of 2013, Shalett and Radius decided to sideline the Innovations Company Counsel and instead formally retain or utilize Shalett's close friend, attorney Alan Annex (from approximately August 2013 at least through the end of that calendar year) to represent Innovations in negotiations with Xsellex for new Innovations' financing.

162.   Only much later did Plaintiffs discover (through an email from Mr. Annex) that, (contrary to Plaintiffs' understanding), Mr. Annex had not been representing Innovations during this period, but only the narrow interests of Shalett and Radius.

163.   Because Shalett and Radius utilized only Alan Annex to represent his and Radius' interest in seeking new financing during the critical period from August 2013 at least through the end of that calendar year, there was no legal counsel representing the interests of all members of Defendant Innovations, including Plaintiffs, in such new financing effort.

164.   Shalett's and Radius' decision to sideline Innovations Company Counsel and retain or utilize Shalett's close friend, attorney Alan Annex to represent Innovations in negotiations with Xsellex for new Innovations' financing, was a breach of fiduciary duty of loyalty.

165.   Shalett's decisions, causing Defendant Innovations to engage in a self-dealing transaction with Radius and breach the provisions of Article 4.5 of the Operating Agreement and issue additional equity to Radius was a breach of the fiduciary duty of loyalty.

166.   Shalett's and Radius' decisions, causing Defendant Innovations to make meritless threats of litigation against CHI Vermont and certain members of CHI Vermont, in an effort to extort them into agreeing to the unlawful and unfair conversion of the Radius loan into additional equity in Defendant Innovations was a breach of the fiduciary duty of loyalty.

167.   Shalett's decisions, causing Defendant Innovations to make meritless threats of litigation against CHI Vermont and certain members of CHI Vermont, in an effort to extort it/ them to agree to a redemption of their equity in Defendant Innovations at a price which was not established by any independent valuation and which would have benefited only Radius and Shalett was a breach of the fiduciary duty of loyalty.

168.   Shalett's and Radius' decisions, causing Defendant Innovations to make meritless threats of litigation against CHI Vermont and certain members of CHI Vermont, to extort them into approving the actions of Defendant Innovations for the sole benefit of Radius and Shalett, was a breach of the fiduciary duty of loyalty.

169.   Shalett's and Radius' decisions causing Defendant Innovations to pay legal and settlement costs for claims brought by David Thompson against Radius and Shalett and other individuals was a breach of the fiduciary duty of loyalty.

170.   Shalett's and Radius' decisions, causing Defendant Innovations to pay legal fees of Sean MacPherson and Alan Annex, whose sole focus was to represent the interests of Radius and Shalett against the Plaintiffs, and not the interests of all of the members of Defendant Innovations, was a breach of the fiduciary duty of loyalty.

171.   Shalett's and Radius' decisions causing Defendant Innovations to deny Plaintiffs information which they were legally and contractually entitled to receive, was a breach of the fiduciary duty of loyalty.

172.   Shalett's and Radius' decisions causing Defendant Innovations to offer and/or issue securities of Defendant Innovations to one or more third parties on terms which were unfairly disadvantageous to Plaintiffs was a breach of the fiduciary duty of loyalty.

173.   Shalett's and Radius' decisions, causing Defendant Innovations to be unable to hire and/or retain senior executives, (specifically, Kevin Nemetz, Chris Dominello, Emile Westergaard, David Wasson, and Robert Jacobs),  was a breach of the fiduciary duty of care.

174.   Shalett's and Radius' failure to truthfully advise Campbell of the failure of Defendant Innovations to meet the performance milestones or other conditions of the contractual arrangements between Campbell and Defendant Innovations was a breach of the fiduciary duties of loyalty and care.

175.   Upon information and belief, Shalett and Radius have failed to make any effort to modify the existing contractual arrangements with Campbell. This failure has jeopardized the entire Innovations' undertaking and threatens Innovations' ownership of its most valuable asset, the IP. Such failure is an act or omission of gross negligence, and constitutes a breach of the duty of care.

176.   As a direct result of the breaches of fiduciary duties described above, Plaintiffs have suffered significant financial harm.


## COUNT VI

## NON-PAYMENT OF COURT ORDERED INTEREST

## AGAINST INNOVATIONS, RADIUS, SHALETT and MACPHERSON


177.   Plaintiffs hereby reiterate, allege again, and incorporate Paragraphs 1-176 above as if these were again fully set forth herein.

178.   As set forth above, on June 14, 2012, Defendant Innovations voluntarily filed a Petition for Chapter 11 Reorganization in the United States Bankruptcy Court for the District of Vermont in Rutland (the "Bankruptcy Court").

179.   Defendant Innovations' Reorganization Plan (the "Plan") was confirmed by the Bankruptcy Court on December 20, 2012 and became final in January 2013. Later in 2013, Defendant Innovations formally emerged from the Bankruptcy proceeding.

180.   Under the Plan, Defendant Innovations was ordered to pay Plaintiffs Bollinger, Sheperd, Laub and Smith Trust accrued interest (as of the time the Petition was filed) on December 31, 2013, unless these Plaintiffs elected to convert such interest into additional equity/common membership interests in Defendant Innovations.

181.   None of Plaintiffs Bollinger, Sheperd, Laub or Smith Trust elected to convert the amount of interest owed to them into additional common membership interests.

182.   Defendant Innovations has never paid the Court ordered interest amounts owed to respective Plaintiffs.

183.   The Bankruptcy Court ordered Defendant Innovations to pay Plaintiff Bollinger the amount of $7212.33 in such interest.

184.   The Bankruptcy Court ordered Defendant Innovations to pay Plaintiff Sheperd the amount of $9616.43 in such interest.

185.   The Bankruptcy Court ordered Defendant Innovations to pay Plaintiff Laub the amount of $29,552.87 in such interest.

186.   The Bankruptcy Court ordered Defendant Innovations to pay Plaintiff Smith Trust the amount of $7212.33 in such interest.

187.   Defendants Innovations, Radius and Shalett have as much disdain for the lawful Orders of the United States Bankruptcy Court as they do for the provisions of the Operating Agreement.

188.   Defendants' failure to satisfy and discharge the Court ordered obligations of Defendant Innovations further evidences their bad faith towards Plaintiffs as minority and non-controlling members.

189.   Upon information and belief, Defendant MacPherson has never advised Innovations or the other Defendants that Defendant Innovations must pay the interest amounts to Plaintiffs Bollinger, Sheperd, Laub and Smith Trust.

190.   The absence of clear, unambiguous, written legal advice regarding Defendant Innovations' Court Ordered obligations evidences Defendant MacPherson's complicity in the acts complained of herein.

191.   Plaintiffs have suffered direct damages as a result of Defendants' non-payment of Court ordered interest.

## COUNT VII

## DEMAND FOR ACCOUNTING

## AGAINST INNOVATIONS, SHALETT and RADIUS

192.   Plaintiffs hereby reiterate, allege again, and incorporate Paragraphs 1-191 above as if these were again fully set forth herein.

193.   As set forth in paragraphs 141 and 142 above, Defendants Shalett and Radius have a fiduciary duty to Plaintiffs.

194.   As set forth in paragraphs 136-172 above, Plaintiffs have alleged with specificity many breaches of fiduciary duties by Defendants.

195.   As set forth in paragraphs 93-98 above and 105-129 above, Plaintiffs have been wrongfully frozen out of their rightful role as members in the governance of Innovations.

196.   Other circumstances in this matter also render an accounting just and reasonable.

197.   Inter alia, these circumstances include the nearly three year period when Plaintiffs have been denied virtually any information regarding the business of Defendant Innovations, making it impossible to know without an accounting the full extent of Defendants' unlawful conduct and to precisely calculate Plaintiffs' membership interests.

198.   These circumstances also include the likely complexity of Defendants' financial machinations during this three year period in which Plaintiffs have been intentionally been frozen out from access to information about Innovations' financial dealings, capital structure and governance.

199.   Plaintiffs therefore may not have adequate remedies available to them at law.

## COUNT VIII

### CIVIL CONSPIRACY

### AGAINST MACPHERSON, SHALETT AND RADIUS

200.   Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-199 as if these were again fully set forth herein.

201.   Upon information and belief, Defendant Innovations retained MacPherson and/or the MacPherson law firm in September 2014, and appointed him Secretary on September 16, 2014.

202.   Upon information and belief, MacPherson and Shalett agreed with one another and Radius to carry out the unlawful acts of breach of contract, oppression, denial of information, breach of fiduciary duties and non-payment of Court-Ordered interest described above.

203.   Upon information and belief, MacPherson, Shalett and Radius then performed and carried out such acts to the detriment of Plaintiffs.

204.   Upon information and belief, MacPherson participated directly and assisted each of Shalett's and Radius' breaches of the Operating Agreement described above, except for those involving Alan Annex.

205.   Upon information and belief, MacPherson participated directly and assisted each of Shalett's and Radius' acts of oppression against Plaintiffs described above, except for those involving Alan Annex.

206.   Upon information and belief, MacPherson rendered knowingly false, skewed and unethical legal advice to Shalett and Radius with respect to refusing in bad faith Plaintiffs' information demand described above.

207.   Upon information and belief, MacPherson participated directly and assisted each of Shaletts' and Radius' breaches of fiduciary duties to Plaintiffs described above, except for those involving Alan Annex.

208.   Upon information and belief, MacPherson rendered false and unethical legal advice to Shalett and Radius with respect to breaching the Operating Agreement to allow conversion of the Radius loan(s).

209.   Upon information and belief, MacPherson rendered false and unethical legal advice to Shalett and Radius to create the fiction that the Board of Managers properly approved the conversion of the loan.

210.   Upon information and belief, MacPherson rendered false and unethical legal advice to Shalett and Radius with respect to rejection of CHI Vermont's appointment of Friedland to the Board of Managers.

211.   Upon information and belief, MacPherson rendered false, skewed and unethical legal advice to Shalett and Radius with respect to denying Plaintiffs the receipt of timely and accurate information.

212.   Upon information and belief, MacPherson rendered false, skewed and unethical legal advice to Shalett and Radius with respect to preparation of false and misleading offering documents for Defendant Innovations' securities.

213.   Upon information and belief, MacPherson rendered false, skewed and unethical legal advice to Shalett and Radius with respect to Innovations' compliance with state and federal securities laws in connection with Defendant Innovations' securities offerings.

214.   Upon information and belief, MacPherson rendered false, skewed and unethical legal advice to Shalett and Radius with respect to transmittal of materially false information concerning Defendant Innovations to Plaintiffs.

215.   Upon information and belief, MacPherson rendered false, skewed and unethical legal advice to Shalett and Radius with respect to approval of Defendant Innovations' settlement with David Thompson, which was self-dealing *per se.*

216.   Upon information and belief, MacPherson rendered false, skewed legal advice with respect to non-payment of Court Ordered interest to Plaintiffs, and/or failed to render honest and forthright advice to Innovations regarding this matter.

217.   MacPherson is liable for the acts and omissions of Innovations, Shalett and Radius in connection with the conspiracy.

218.   Radius is liable for the acts and omissions of Innovations, Shalett and MacPherson in connection with the conspiracy.

219.   Shalett is liable for the acts and omissions of Innovations, MacPherson and Radius in connection with the conspiracy.

220.   Plaintiffs have been damaged financially by the acts and omissions in furtherance of the conspiracy complained of herein.

## COUNT IX

## AGAINST MACPHERSON

## AIDING AND ABETTING

221.   Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1-220 as if these were again fully set forth herein.

222.   Upon information and belief, MacPherson aided and abetted, and actively assisted and participated with the other Defendants in the unlawful acts of breach of contract, oppression, denial of information, breach of fiduciary duties, and non-payment of Court Ordered interest described in Paragraphs 1 through 191 above.

223.   Under Delaware law, MacPherson is liable to Plaintiffs for such aiding and abetting, even if no agreement between MacPherson and all or some of the Defendants is proven by Plaintiffs.

224.   MacPherson is liable for the acts and omissions of Innovations, Shalett and Radius in connection with his aiding and abetting of such acts and omissions.

225.   Plaintiffs have suffered direct financial damages as a result of MacPherson's aiding and abetting.

## COUNT X.

## PIERCING THE CORPORATE VEIL

## AGAINST RADIUS, SHALETT and MACPHERSON

226.   Plaintiffs hereby reiterate, allege again, and incorporate Paragraphs 1-225 above as if these were again fully set forth herein.

227.   Based upon the specific allegations above that Defendants have not followed the corporate formalities set forth in the Operating Agreement and otherwise, this Honorable Court should pierce the Innovations' corporate veil, and hold Defendants MacPherson, Radius and Shalett liable for all of the acts and omissions of Defendant Innovations.

228.   Based upon the specific allegations of material breach of contract, minority oppression, wrongful denial of information requests, breach of fiduciary duty, non-payment of Court ordered interest, and bad faith towards Plaintiff, the needs of justice dictate this Honorable Court pierce the Innovations' corporate veil, and hold Defendants Radius, Shalett and MacPherson liable for all of the acts and omissions of Defendant Innovations.

## COUNT XI

## DERIVATIVELY ON BEHALF OF DEFENDANT INNOVATIONS

## AGAINST RADIUS, SHALETT and MACPHERSON

## FOR CORPORATE WASTE

229. Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1- 228 as if these were again fully set forth herein.

230. This derivative action should proceed because any demand upon Defendant Innovations, which is completely dominated by Radius and Shalett, to bring this claim, would be futile, since this claim exposes Radius and Shalett to a substantial likelihood of Board of Managers and personal liability for the acts complained of.

231. As described in detail in the paragraphs above, Shalett (and Radius) have demonstrated their bad faith, and their failure to act in an independent or disinterested matter.

232. Upon information and belief, Shalett and Radius defamed former CEO David Thompson, ("Thompson") inter alia by sending (or instructing their attorneys to send) several defamatory letters and emails to members of Defendant Innovations and other persons.

233. Upon information and belief, Shalett and Radius, or other persons acting at their behest, also defamed former CEO Thompson by slandering him in various telephone conversations.

234. Upon information and belief, these defamatory statements were purportedly made on behalf of Defendant Innovations, with no advance disclosure to or consultation with any disinterested or independent officers, or to members or persons on the Board of Managers, except Shalett himself and/or those directly affiliated with or controlled by him.

235. The publication of these statements about Thompson represented the personal animus of Shalett and Radius towards Thompson.

236. The publication of these statements could not have been the product of the exercise of a valid business judgment, as they needlessly exposed Defendant Innovations to risk that Thompson would sue and recover against it, with no benefit to Innovations.

237. Upon information and belief, Thompson did file suit for defamation against Innovations, Radius, Shalett, Annex and Meister, on or about September 9, 2014 in New York Southern District Court in New York City.

34

238.   Upon information and belief, in October 2014 Defendant Innovations reached a confidential and substantial settlement with Thompson (also without consultation with or disclosure to any independent or disinterested person on the Board of Managers).

239.   Upon information and belief, such settlement and associated legal expenses were and will be paid by Defendant Innovations out of corporate funds.

240.   Any payment by Defendant Innovations pursuant to such settlement constitutes a waste of company funds, since the settlement arose in connection with conduct by Defendants which was individual and personal.

241.   No disinterested or independent person on the Board of Managers (if there were or is one) could have approved such settlement unless it were fully funded by Shalett and Radius.

242.   Innovations has suffered corporate waste and direct financial loss, as a result of such settlement with Thompson, and Shalett and Radius are liable to Innovations for such waste and financial loss.

243.   Upon information and belief, Shalett and Radius have also made other payments and entered into other contracts with related or friendly third parties, for products and services at a grossly inflated price.

244.   Upon information and belief, inter alia, such contracts include an approximately $200,000 payment to MakeAble for packaging design to a related or friendly party, notwithstanding that Innovations was selling virtually no IQ products then.

245.   Such contracts and payments to related or friendly parties, and others which Plaintiffs seek to discover, also amount to corporate waste for which Shalett and Radius are liable to Innovations.

246.   Innovations has suffered corporate waste and direct financial loss, as a result of such contracts and payments, and Shalett and Radius are liable to Innovations for such waste and financial loss.

## COUNT XII

## DERIVATIVELY ON BEHALF OF DEFENDANT INNOVATIONS

## AGAINST SHALETT

## OVERSIGHT LIABILITY

247.   Plaintiffs hereby reiterate, allege again, and incorporate paragraphs 1- 246 as if these were again fully set forth herein.

### Oversight Liability for Violation of Securities Laws

248.   Since at least September 2013, all of the Defendants, including Shalett as a Manager and the Co-Chairman of the Board of Managers, have been engaged in an effort to raise capital for Defendant Innovations, in a so-called Series "B" round.

249.   Upon information and belief, all of the Defendants have participated directly in this effort to enrich themselves by raising capital, in an unlawful scheme to conceal from prospective investors the potential liability to Plaintiffs based upon the acts complained of herein.

250.   Upon information and belief, the Innovations Private Placement Memorandum, dated October 12, 2015, (and likely other financing documents to be discovered), violated Delaware, Vermont and federal securities laws by failing to disclose the potential claims of Plaintiffs as set forth herein, which are material to any prospective investor, and by knowingly making statements which are  false.

251.   Defendants falsely stated in their Private Placement Memorandum that Plaintiff CHI Vermont had "not appointed any designees" to the Board of Managers, when they knew that Plaintiff CHI Vermont had appointed Mr. Norman Friedland on April 24, 2015.

252.   Defendant Innovations omitted to mention in the Private Placement Memorandum (and likely in other financing documents) anything about the dispute with Plaintiffs regarding conversion of the Radius loans, and the known risk of litigation with Plaintiffs arising out of such loans and purported conversion.

253.   This was a material omission.

254.   Defendant Shalett demonstrated a conscious disregard for his fiduciary duties and responsibilities by permitting or directing the distribution of financing documents omitting material information and making false statements.

255.   Defendant Shalett's conscious disregard of his fiduciary duties and responsibilities in connection with Defendant Innovations' financing documents is coupled with his demonstrated bad faith as set forth throughout this Complaint.

256.   Defendant Shalett was fully informed regarding Plaintiff CHI Vermont's appointment of Mr. Friedland to the Board, as well as the substantial risk to Defendant Innovations which violating securities laws created.

257.   Consciously breaking the securities laws, by material omission or falsehood, could under no circumstances be deemed a prudent or reasonable business judgment.

258.   The manner in which Shalett permitted or directed the financing documents of Defendant Innovations constituted not a prudent business judgment, but an act of gross negligence for which Shalett is liable to Defendant Innovations.

**Gross and Willful Mismanagement of Business Relationship with Campbell**

259.   Defendant Innovations' business relationship with Campbell has always been critical to the reputation and success of Defendant Innovations, and to the execution of its strategy.

260.   Campbell retains a first security interest in the IP, pending satisfactory performance and payment of a guaranteed minimum to Campbell by Defendant Innovations.

261.   Ownership of such IP, including all Trademarks and Patents for IQ, could revert to Campbell, absent the modification of existing contractual arrangements with Campbell.

262.   Prior to the assertion of domination and control by Shalett and Radius, the Campbell's relationship was carefully and skillfully managed by Defendant Innovations.

263.   The earlier, successful management of the Campbell's relationship was evidenced by Campbell's express written consent to and support of Defendant Innovations' Reorganization Plan, which was filed with the Bankruptcy Court.

264.   Upon information and belief, during the almost three years of domination and control by Shalett and Radius, Defendant Innovations has failed to meet the contractual performance milestones previously negotiated with Campbell.

265.   Upon information and belief, during the almost three years of domination and control by Shalett and Radius, Shalett and Radius have failed to truthfully advise Campbell of the failure of Defendant Innovations to meet the existing performance and sales milestones contractually agreed with Campbell.

266.   Upon information and belief, during the almost three years of domination and control by Shalett and Radius, Shalett and Radius have failed to truthfully advise Campbell of the likelihood that Innovations will be unable to timely make the minimum guaranteed payment due to Campbell in 2017, under the Asset Purchase Agreement.

267.   Upon information and belief, Shalett has failed to make any good faith effort to modify the existing contractual arrangements with Campbell.

268.   Upon information and belief, Shalett's failure to make such good faith effort, and possibly any effort whatsoever, has jeopardized the entire Defendant Innovations' undertaking, threatening Innovations' ownership of its most valuable asset, the IQ Intellectual Property.

269.   Without modification of existing contractual obligations to Campbell, Defendant Innovations' failure to meet existing contractual milestones for IQ

development and sales could result in Campbell's reacquisition of the IQ Intellectual Property.

270.   Intentionally failing to disclose the Company's present circumstances and plans to Campbell (a member of Defendant Innovations) could under no circumstances be deemed a prudent or reasonable business judgment.

271.   Failure to make full and honest disclosures to Campbell, and to make an effort to modify the contractual arrangements with Campbell to protect the assets of Defendant Innovations, did not and could not be deemed a prudent business judgment under any circumstances.

272.   Such failure is an act of gross negligence for which Shalett is liable to Defendant Innovations.

273.   Defendant Innovations has and will suffer damages, including the potential loss of Plaintiffs' entire investment, as a direct result of Shalett's failures to properly, diligently or faithfully carry out his responsibilities as a Manager and the Co-Chairman of the Board of Managers.

274.   Shalett is personally and financially liable to Defendant Innovations for the lack of proper oversight of the business relationship with Campbell.


WHEREFORE, in view of the egregious and illegal conduct of Defendants set forth above, Plaintiffs hereby respectfully request money damages and equitable relief as follows:

On all Counts:

(i) a full accounting of all of Defendant Innovations' books and records; and,

(ii) an Order prohibiting Defendant Innovations from indemnifying or otherwise compensating Shalett, Radius or MacPherson, and requiring them to immediately return all moneys paid to them, or to any third person on their behalf; and,

(iii) an Order subordinating any payments or distributions by Defendant Innovations to Radius or any affiliate thereof to the full payment to Plaintiffs of $1,047,000; and,

(iv) an Order awarding Plaintiffs costs and expenses in this litigation against Radius, Shalett and MacPherson, jointly and severally, including reasonable attorneys' fees and expenses, and other costs and disbursements; and

(v) all such other relief as this Honorable Court may deem just and proper.

And Separately,

On Count I:

(i) a finding that Defendant Innovations' conversion of the Radius loan(s) into additional membership interests of Defendant Innovations is a breach of the Operating Agreement, and the issuance of any membership interests as a result of such conversion is null, void and of no force and effect as of the date of any such issuance; and,

(ii) an Order that Plaintiffs' equity interest in Innovations be restored to the status quo ante prior to such illegal conversion(s) and prior to all other illegal conduct discovered during the course of these proceedings; and,

(iii) a cancellation of any membership interests issued by Innovations to Radius or any other person or party in connection with such illegal conversion(s); and,

(iv) a finding that all loans by Radius or an affiliate of Radius are in violation of the Operating Agreement, and were illegal, self-dealing transactions as a matter of law, and an Order requiring formal nullification of any legal or financial obligations of Defendant Innovations to Radius or affiliate of Radius arising out of any such loans; and,

(v) direct damages to Plaintiffs, in an amount to be proven at trial, but in no event to be less than $1,047,000, representing the total cash investment of Plaintiffs (and the individual members of CHI Vermont, as the case may be), and,

(vi) punitive damages in the amount of $5,000,000, to punish and deter the egregious and illegal conduct of Defendants for intentionally and in bad faith breaching the Operating Agreement and abusing their majority control, and,

On Count II:

(i) a finding that the acts complained of in Count II constitute illegal minority oppression of Plaintiffs as a matter of law; and,

(ii) a permanent injunction by this Honorable Court against Defendant Innovations, Radius, Shalett and MacPherson from taking any future action, or encouraging or supporting any other person taking any action, or causing Defendant Innovations to take any action, intended or likely to oppress the interests of the Plaintiffs, and,

(iii) an Order removing Shalett as a member of Defendant Innovations' Board of Managers or as an executive or employee of Defendant Innovations and divesting Shalett and Radius of all influence or authority over the affairs of Defendant Innovations, and an Order that all of the past or present Board of Managers appointed by Radius be removed immediately and permanently enjoined from serving on such Board again, or serving as officers or Managers of Innovations in future; and,

(iv) an Order reforming the Operating Agreement by appointing a three person Committee to recommend revisions in light of Plaintiff's substantially prevailing on Counts I and II, under the ongoing supervision of the Court, one person appointed by Plaintiffs, one by Radius, and a third Independent person, which Committee shall act by majority vote and submit a proposed, Amended Operating Agreement for adoption by Innovations and ratification of the Court and directing Radius, to the extent its consent is required for the adoption and approval of such Amended Operating Agreement to deliver such consent, and declaring that the validity and enforceability of any agreements made by Defendant Innovations while Shalett and Radius were controlling the affairs and decisions of Defendant Innovations are subject to the approval and ratification of the newly constituted Board of Managers after the adoption of an Amended Operating Agreement and a new Board is in place pursuant thereto; and,

(v) an Order confirming the appointment of Mr. Norman Friedland to the Board of Managers of Innovations, and any other appointment by CHI Vermont of a second person to the Board of Managers; and,

(vi) direct damages, in an amount to be proven at trial, but in no event to be less than $1,047,000, representing the total cash investment of Plaintiffs (and the individual members of Plaintiff CHI Vermont (as the case may be); and,

(vii) punitive damages in the amount of $5,000,000, to punish and deter the egregious and illegal conduct of Defendants for intentionally and in bad faith oppressing the minority interests of Plaintiffs and abusing their majority control; and,

(viii) as an alternative to reformation of the Operating Agreement and damages in favor of Plaintiffs, dissolution of Defendant Innovations and the placement of Radius at the very end of the queue in any liquidation or distribution of the assets of Innovations; and,

On Count III, a Declaratory Judgment (i) that the purported conversion of the Radius loans was unlawful, and is therefore null, void and of no force and effect and (ii) after accounting for the nullity of the Radius loans and other unlawful acts discovered during these proceedings, fixing the precise amount of Plaintiffs' respective membership interests in Defendant Innovations; and,

On Count IV, an Order directing Defendant Innovations to deliver all information set forth in the Demand for Inspection on a date no later than 10 business days from the date thereof; and,

On Count V:

(i) a finding that all or certain of the acts and omissions complained of in Count V constitute breaches of fiduciary duty by Shalett, and that Radius and Innovations are also liable for these acts as an alter ego of Shalett as a matter of law; and,

(ii) an Order removing Shalett as a member of Defendant Innovations' Board of Managers or as an executive or employee of Defendant Innovations and divesting Shalett and Radius of all influence or authority over the affairs of Defendant Innovations, and an Order that all of the past or present Board of Managers appointed by Radius be removed immediately and permanently enjoined from serving on such Board again, or serving as officers or Managers of Innovations in future; and,

(iii) an Order reforming the Operating Agreement by appointing a three person Committee to recommend revisions in light of Plaintiff's substantially prevailing on Counts I and II, under the ongoing supervision of the Court, one person appointed by Plaintiffs, one by Radius, and a third Independent person, which

Committee shall act by majority vote and submit a proposed, Amended Operating Agreement for adoption by Innovations and ratification of the Court and directing Radius, to the extent its consent is required for the adoption and approval of such Amended Operating Agreement to deliver such consent, and declaring that the validity and enforceability of any agreements made by Defendant Innovations while Shalett and Radius were controlling the affairs and decisions of Defendant Innovations are subject to the approval and ratification of the newly constituted Board of Managers after the adoption of an Amended Operating Agreement and a new Board is in place pursuant thereto; and,

(iv) direct damages, in an amount to be proven at trial, but in no event to be less than $1,047,000, representing the total cash investment of Plaintiffs (and the individual members of Plaintiff CHI Vermont (as the case may be); and,

(v) punitive damages in the amount of $5,000,000, to punish and deter the egregious and illegal conduct of Shalett in his capacity as a Manager and Executive Co-Chairman, and Radius as controlling member, for intentionally and in bad faith breaching their fiduciary duties to all other members including Plaintiffs and abusing their majority control, and,

On Count VI:

(i) an Order directing Defendant Innovations, Radius and Shalett to pay all required Court Ordered interest to Plaintiffs and other persons in the amount of $84,690.09 pursuant to the Defendant Innovations' Bankruptcy Plan of Reorganization; and,

(ii) an Order directing Defendant Innovations, Radius and Shalett to pay the judgment rate of interest on all required Court Ordered interest to Plaintiffs and other persons pursuant to Defendant Innovations' Bankruptcy Plan of Reorganization, from December 31, 2013, the date when such payments were originally due, and,

On Count VII, a full equitable accounting of all of Defendant Innovations' financial books and records, the cost of which is borne solely by Defendants Radius, Shalett and MacPherson, so that Plaintiffs are not forced to bear any

portion of an accounting made necessary exclusively by these Defendants' unlawful conduct; and,

On Count VIII:

(i) a finding that Radius, Shalett and MacPherson were co-conspirators in a scheme to deprive Plaintiffs of their rightful economic interest in Defendant Innovations and,

(ii) a finding that Defendant MacPherson is jointly and severally liable for the unlawful acts of the other defendants for conspiracy; and,

(iii) an Order removing MacPherson as a corporate officer of Defendant Innovations and as Counsel to Defendant Innovations, barring him or any other member or employee at his law firm from serving in any capacity for Defendant Innovations, and requiring him to disgorge and return all monies or other things of value paid or transferred to him or his law firm pursuant to any Invoices for services rendered or otherwise, within 30 days from the date hereof and cancelling all outstanding amounts owed to him, if any; and,

On Count IX:

(i) a finding that MacPherson aided and abetted Innovations', Radius' and Shalett's breaches of contract, minority oppression, denial of information, breaches of fiduciary duty to Plaintiffs, and non-payment of interest as alleged herein; and,

(ii) a finding that Defendant MacPherson is jointly and severally liable for the unlawful acts of the other defendants for aiding and abetting; and,

(ii) an Order removing MacPherson as a corporate officer of Defendant Innovations and as Counsel to Defendant Innovations, barring him or any other member or employee at his law firm from serving in any capacity for Defendant Innovations, and requiring him to disgorge and return all monies or other things of value paid or transferred to him or his law firm pursuant to any Invoices for services rendered or otherwise, within 30 days from the date hereof and cancelling all outstanding amounts owed to him, if any, and,

On Count X:

44

(i) a finding that Radius, Shalett and MacPherson have not followed corporate formalities in the government and management of Innovations; and,

(ii) a finding that the needs of justice dictate piercing the Innovations' corporate veil; and,

(iii) an Order that after piercing the corporate veil, Radius, Shalett and MacPherson are jointly and severally liable for the acts and omissions of Defendant Innovations; and,

On Count XI:

(i) a finding that Shalett and Radius are liable to Defendant Innovations for corporate waste; and,

(ii) an Order that all amounts paid by Innovations pursuant to any settlement with Thompson or for other contracts with related parties be reimbursed to Innovations by Shalett and Radius, and,

On Count XII:

(i) a finding that Shalett and Radius are liable to the Defendant Innovations for oversight liability; and,

(ii) direct damages to Innovations in an amount to be proven at trial, and,


Executed this 21st day of April, 2016 in Manchester, Vermont.

_____

Stuart W. Revo
Attorney for Plaintiffs
P.O. Box 801
Manchester, Vermont 05254
802 375-5637
revolaw@gmail.com
License no. 4202

Culinary Health Innovations, LLC

AMENDED AND RESTATED
LIMITED LIABILITY COMPANY
OPERATING AGREEMENT

As of March 13, 2013

### CULINARY HEALTH INNOVATIONS, LLC

### AMENDED AND RESTATED OPERATING AGREEMENT

**AMENDED AND RESTATED OPERATING AGREEMENT,** dated as of March 13, 2013, among Culinary Health Innovations, LLC, a Delaware limited liability company (the "Company"), and each of the persons set forth on Schedule I hereto as the members of the Company and such other persons that may hereafter be admitted to the Company in accordance with this Agreement. Each such person is referred to individually herein as a "Member" and collectively as the "Members."

### RECITALS

**WHEREAS,** the Company was formed as a limited liability company by the filing of a Certificate of Formation with the Secretary of State of Delaware in accordance with the Delaware Limited Liability Company Act; and

**WHEREAS,** the Company and certain Members entered into an operating agreement dated as of March 4, 2011 (the "Prior Operating Agreement"); and

**WHEREAS,** the Company and Radius Brand Strategies, LLC ("RBS") have entered into a Reorganization Plan Equity Interest Agreement dated as of November 19, 2012 (as in effect on the date hereof, the "Purchase Agreement") providing for the purchase and sale of certain Class A Preferred Units of the Company, the features of which are more fully described below; and

**WHEREAS,** the Purchase Agreement granted RBS and Other Class A Preferred Holders (as defined below) that may enter into such Purchase Agreement certain Financing Warrants (as defined below) pursuant to which RBS and Other Class A Preferred Holders may acquire additional Class A Preferred Units; and

**WHEREAS,** in connection with the Company's Reorganization Plan (as such term is defined in the Purchase Agreement), Campbell Soup Company ("Campbell") executed and delivered to the Bankruptcy Court (as such term is defined in the Purchase Agreement), a Consent to the Company's Motion to Assume Asset Purchase Agreement, which contemplated, *inter alia*, the issuance of certain Class A-1 Preferred Units of the Company, the features of which are more fully described below; and

**WHEREAS,** the Company and the Members wish to amend and restate the Prior Operating Agreement to authorize the Class A Preferred Units, to admit RBS and Other Class A Preferred Holders, and to admit Campbell Investment Company ("Campbell Investment Co"), a related entity of Campbell, as Members of the Company and to otherwise set forth the respective rights, powers and interests of the Members with respect to the Company and to provide for the management of the business and operations of the Company.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I

DEFINED TERMS

1.1     <u>Definitions</u>.  The following defined terms as used in this Agreement shall, unless otherwise defined herein, each have the meaning set forth in this Article I.

"<u>Activities</u>" shall have the meaning set forth in <u>Section 8.7(b)</u> hereof.

"<u>Additional Common Units</u>" shall have the meaning set forth in <u>Section 6.1(d)(i)</u> hereof.

"<u>Affiliate</u>" means, when used with reference to a specific Person (or when not referring to a specific Person shall mean an Affiliate of a Member), any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specific Person.

"<u>Agreement</u>" means this Amended and Restated Operating Agreement, including the Schedules hereto, as originally executed and as subsequently amended from time to time in accordance with the provisions hereof.

"<u>Allocation Percentage</u>" means the percentage of issued and outstanding Units owned by a Member represented by a fraction, the numerator of which is the number of Units owned by a Member (determined as if all such Units were converted into Common Units) and the denominator of which is the number of Units owned by all Members (determined as if all such Units were converted into Common Units).

"<u>Automatic Conversion Event</u>" shall have the meaning set forth in Section <u>6.1(b)</u> hereof.

"<u>Board</u>" or "<u>Board of Managers</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a federal holiday.

"<u>Campbell</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Campbell Investment Co</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Campbell Notes</u>" means of (i) a 10% Secured Convertible Note, Number 6A dated October 29, 2009 issued by Green Mountain Food and Nutrition LLC (subsequently renamed Culinary Health Investors LLC, a Vermont limited liability company) ("<u>CHI Vermont</u>") in favor of Campbell Investment Co in the principal amount of $200,000 (ii) a 10% Unsecured

Convertible Note, Number 6 dated October 29, 2009 issued by CHI Vermont in favor of Campbell Investment Co in the principal amount of $50,000.

"Capital Account" means the Capital Account maintained for each Member pursuant to Section 4.2 hereof.

"Capital Contribution" means the total amount of cash, property and/or services (valued at their Fair Market Value) contributed to the Company by all the Members or any one Member, as the case may be.

"Certificate of Formation" means the Certificate of Formation of the Company described in Section 2.1 hereof.

"Change in Control" means any transaction or series of transactions relating to, directly or indirectly, (a) any consolidation or merger of the Company with or into any corporation or other entity, other than any consolidation or merger resulting in the Members of the Company immediately prior to such transaction holding, after such transaction, fifty one percent (51%) or more of the capital stock or other equity interests of the surviving or resulting corporation or other entity entitled to vote for the election of directors (or comparable governing body), or (b) any sale or other disposition by the Company of all of substantially all of its assets or Units, or any exclusive licensing transaction having substantially the same effect, other than any such sale or other disposition to a buyer in which the Members of the Company immediately prior to such sale or other disposition hold, after such transaction, fifty one percent (51%) or more or more of the capital stock or other equity interests entitled to vote for the election of directors (or comparable governing body).

"Class A Liquidation Preference Amount" shall mean, with respect to any Series A Preferred Unit, an amount equal to two times (2x) the Original Issue Price for such Unit plus all accrued but unpaid Preferential Distributions thereon.

"Class A Preference Amount" shall mean, with respect to any Series A Preferred Unit, an amount equal to the Original Issue Price for such Unit plus all accrued but unpaid Preferential Distributions thereon.

"Class A Preferred Managers" means the Managers appointed by the Class A Preferred Members in accordance with Section 8.1(a) hereof.

"Class A Preferred Member" shall mean each person listed on Schedule I as holding Class A Preferred Units, together with each Person to whom one or more Class A Preferred Units of a Class A Preferred Member are transferred and who is admitted to the Company as a Class A Preferred Member pursuant to the terms of this Agreement.

"Class A Preferred Subsequent Closing" shall mean closings under the Purchase Agreement that occur subsequent to the Initial Closing.

"Class A Preferred Units" shall have the meaning set forth in Section 3.1 hereof.

"Class A-1 Liquidation Preference Amount" shall mean, with respect to any Series A-1 Preferred Unit, an amount equal to the Original Issue Price for such Unit.

"Class A Preferred Managers" shall have the meaning set forth in Section 8.1(a)(i) hereof.

"Class A-1 Preferred Member" shall mean each person listed on Schedule I as holding Class A-1 Preferred Units, together with each Person to whom one or more Class A-1 Preferred Units of a Class A-1 Preferred Member are transferred and who is admitted to the Company as a Class A-1 Preferred Member pursuant to the terms of this Agreement.

"Class A-1 Preferred Units" shall have the meaning set forth in Section 3.1 hereof.

"Co-Sale Member" shall have the meaning set forth in Section 7.5(b) hereof.

"Co-Sale Right" shall have the meaning set forth in Section 7.5(b) hereof.

"Co-Sale Securities" shall have the meaning set forth in Section 7.5(b) hereof.

"Code" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended.

"Commission" means the federal Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"Common Member" shall mean each person listed on Schedule A as holding Common Units, together with each Person to whom one or more Common Units of a Common Member are transferred and who is admitted to the Company as a Common Member pursuant to the terms of this Agreement; and reference to a "Common Member" shall mean any one of the Common Members.

"Common Units" shall have the meaning set forth in Section 3.1 hereof.

"Company" means Culinary Health Innovations, LLC, the limited liability company formed by the filing of the Certificate of Formation, as constituted from time to time.

"Company Business" means the manufacturing, distribution, marketing and sale, in all channels, of meals, meal plans, and other food items including, but not limited to, the "Intelligent Quisine" meal plans.

"Company Indemnified Parties" shall have the meaning set forth in Section 9.1(e)(ii) hereof.

"Company Property" means all property owned by the Company, including without limitation cash, all tangible and intangible personal property (including without limitation goodwill or going concern value) and all real property.

"Consent" shall when capitalized and used in the proper context mean that certain Campbell Soup Company's Consent to Culinary Health Innovations, LLC's Motion to Assume Asset Purchase Agreement filed on or about December 17, 2012 with the United States Bankruptcy Court in Rutland, Vermont.

"Conversion Notice" shall have the meaning set forth in Section 6.1(c)(iv) hereof.

"Conversion Price" in respect of any Class A Preferred Unit or Class A-1 Preferred Unit shall initially be the respective Original Issue Price of such security, subject to adjustment from time to time as provided in Section 6.1(d) hereof.

"Conversion Rate" shall have the meaning set forth in Section 6.1(a) hereof.

"Corrective Tax Allocation" means an allocation for tax purposes of gross income and gain, or gross loss and deduction, that differs from the Company's allocation of the corresponding book item.

"Damages" shall have the meaning set forth in Section 9.1(e)(i) hereof.

"Distributable Funds" means the excess, from time to time, of the Company's cash on hand over the current needs of its business, including for operating expenditures and capital reserves.

"Drag-Along Notice" shall have the meaning set forth in Section 7.6(b hereof.

"Drag-Along Sale" shall have the meaning set forth in Section 7.6(a) hereof.

"Drag-Along Transferor" shall have the meaning set forth in Section 7.6(a) hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

"Exercise Price" means the aggregate exercise price for the Financing Warrants, which shall be equal to approximately Three Hundred Seventy Five Thousand dollars ($375,000).

"Fair Market Value" means (i) as to any publicly-traded security, (x) if such security is then traded on a national securities exchange or quoted on the NASDAQ Stock Market (or a similar national quotation system), the average of the closing prices of such security on such exchange or system over the ten trading-day period ending five trading days prior to the date of determination, and (y) if such security is actively traded over-the-counter, the average of the closing bid prices of such security over the ten trading-day period ending five trading days prior to the date of determination (for purposes of this clause (i), "trading day" means any day on which the exchange, system or over-the-counter market on which such security is traded is open for trading, and "closing prices" and "closing bid prices" mean (A) for a security traded primarily on the New York Stock Exchange, the American Stock Exchange or NASDAQ Stock

5

Market, the last reported trade price or sale price, as the case may be, at 4:00 p.m. Eastern Time on the applicable trading day and (B) for any other security, the market price as of the end of the regular hours trading period that is generally accepted as such for the applicable exchange, system or market on the applicable trading day (provided that if, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a security as of a given trading day shall change from those set forth above, such other generally accepted benchmark times shall thereafter be used for purposes of this definition)); (ii) as to any property (including any non-publicly-traded security) or service, the price at which a willing seller would sell and a willing buyer would buy such property or service having full knowledge of the facts, and assuming each party acts on an arm's-length basis with the expectation of concluding the purchase or sale within a reasonable time; and (iii) as to any Unit, the applicable Ownership Percentage represented by such Unit multiplied by the value of the Company as a going concern, without regard for liquidity, minority or other discounts. For purposes of Section 4.2(c), in the case of a Capital Contribution, the value of "all of the Company's property" shall equal the value ascribed to the Company as a whole in determining the price per Unit to be paid for the Units issued in exchange for such Capital Contribution. For purposes herein, the Fair Market Value of any property, service or Unit shall be determined in good faith by the Board of Managers; provided, however, that if any Member disputes the Fair Market Value of any property, service or Unit as so determined by the Board of Managers, such dispute shall be submitted to a Qualified Investment Bank selected jointly by the Company and the disputing Member(s) (the cost of which shall be borne by the Company), and the determination of such firm of the Fair Market Value of the property, service or Unit in question shall be binding on the Company and all Members.

"Family Member" shall have the meaning set forth in Section 7.5(e) hereof.

"Financing Warrants" means the warrants granted to RBS and Other Class A Preferred Holders pursuant to the Purchase Agreement, pursuant to which such parties may acquire additional Class A Preferred Units.

"Founding Members" means David Thompson, Gene D'Ovidio, Richard Gray, and David McCarron.

"Fully-Diluted Basis" shall include, when used to refer to the number of Common Units then outstanding, (i) all Common Units that are issued and outstanding at such time plus (ii) all Common Units that are issuable upon the conversion, exercise or exchange of all other Units and Unit Equivalents that are issued and outstanding at such time and that are, directly or indirectly, convertible into or exercisable or exchangeable for Common Units, regardless of whether such Units or Unit Equivalents are then convertible, exercisable or exchangeable plus (iii) all Common Units that are reserved for issuance under Option Plans.

"Initial Closing" shall have the meaning ascribed to the term "Closing" in the Purchase Agreement.

"Initiating Holders" shall have the meaning set forth in Section 9.1(b)(ii) hereof.

"IPO" shall mean an initial public offering of Common Stock by the Company or

successor thereof.

"IPO Alternative" shall mean an event pursuant to which the Company, or a successor thereof, becomes subject to the reporting requirements of the Exchange Act and a public trading market has been established for the Common Stock or the common stock of such successor, if the Common Stock has been exchanged for common stock or securities convertible into, or exchangeable for, common stock of such successor.

"Liquidator" shall have the meaning set forth in Section 12.2 hereof.

"LLC Act" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to such LLC Act.

"Maintenance Securities" shall have the meaning set forth in Section 9.2(a) hereof.

"Majority-In-Interest" means (i) with respect to all Members (or a subset of all Members), one or more of such Members whose aggregate number of Common Units (calculated on a Fully-Diluted Basis) exceeds fifty percent (50%) of the aggregate number of Common Units then held by all of such Members (calculated on a Fully-Diluted Basis); and (ii) with respect to Class A Preferred Members, one or more Class A Preferred Members whose aggregate number of Class A Preferred Units exceeds fifty percent (50%) of the aggregate number of Class A Preferred Units held by all Class A Preferred Members.

"Manager" means each individual serving on the Board of Managers as provided in Section 8.1 hereof.

"Members" shall have the meaning set forth in the opening paragraph of this Agreement.

"Membership Interest" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, (a) a right of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement, (b) any management rights, voting rights or rights to consent, and (c) all other rights, preferences, privileges and obligations conferred upon the Units held by such Member pursuant to this Agreement. Each Member's Membership Interest shall equal the sum total of Units owned by such Member at such time.

"Net Income" or "Net Loss" means for any fiscal year (or portion thereof) the net income or net loss of the Company determined in accordance with the same principles as employed in determining the Company's taxable income or loss for U.S. federal income tax purposes taking into account the full amount of any recognized gains or losses. For purposes of this computation, taxable income or loss shall include every item requiring separate computation under Section 702(a) of the Code, shall include tax-exempt income as income and noncapital nondeductible expenditures as deductions, and shall be determined consistently with Treasury Regulations § 1.704-1(b). In the event of any distribution of property by the Company to the Members, gain or loss shall be taken into account for these purposes as if the property had been sold by the Company for its then Fair Market Value.

"New Units" means any Units or Unit Equivalents other than securities of the Company issued (i) upon the exercise or conversion of any Unit Equivalent in accordance with its original terms; (ii) upon the granting of options and/or issuance of Common Units to employees, consultants or officers of the Company pursuant to an Option Plan; (iii) in connection with a Qualified Public Offering; (iv) in connection with commercial, joint venture and strategic transactions approved by the Board; provided that such issuances are for purposes other than primarily for capital raising purposes and provided that at any time such issuances do not exceed more than such number that is reasonably acceptable to the Board; (v) to financial institutions or other lenders in connection with credit lines or loans approved by the Board; (vi) pursuant to the Company's bona fide acquisition of another Person by merger, purchase of stock or assets or other reorganization, in each case as approved by the Board (and, if required, the Class A Preferred Members); and (vii) in connection with any split, distribution, combination, recapitalization or similar event affecting the aggregate number of issued and outstanding Units.

"Option Plan" shall mean an option or similar equity incentive plan adopted by the Company for the benefit of employees, consultants or officers of the Company, (i) which plans in the aggregate provide for the issuance of options to purchase Common Units constituting in the aggregate no more than 1,306,148 Common Units of the Company (which number is based on 15% of the outstanding Common Units of the Company calculated on a Fully-Diluted Basis assuming the full $2.5 million is invested under the Purchase Agreement) and (ii) each of which plans is approved by the Board (including at least two of the three Class A Preferred Managers) and the Members of the Company.  It is understood and agreed that any issuances of securities pursuant to the Option Plan shall not dilute the Ownership Percentage(s) of the Class A Preferred Members and appropriate actions shall be taken by the Company with respect to the foregoing, including, without limitation, the issuance of additional Class A Preferred Units to the Class A Preferred Members in furtherance of the foregoing.

"Original Issue Price" shall mean (i) with respect to Class A Preferred Units issued at a Class A Preferred Closing, $.82 per Class A Preferred Unit, (ii) with respect to Class A Preferred Units issued exercise of Financing Warrants, if any, the exercise price per Class A Preferred Unit at which such Class A Preferred Units are bought and sold and (iii) with respect to Class A-1 Preferred Units issued to Campbell, $.4737 per Class A-1 Preferred Unit.

"Other Class A Preferred Holders" means purchasers of Class A Preferred Units pursuant to the Purchase Agreement, excluding RBS.

"Ownership Percentage" means the percentage of issued and outstanding Units owned by a Member represented by a fraction, the numerator of which is the number of Units owned by a Member (determined as if all such Units were converted into Common Units) and the denominator of which is the number of Units owned by all Members (determined as if all such Units were converted into Common Units).  The Ownership Percentages of each Member as of the date hereof are included in Schedule I hereto, which schedule shall be amended from time to time by the Company in writing to reflect changes therein.

"Permitted Transfer" shall have the meaning set forth in Section 7.5(e) hereof.

"Person" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity, and the heirs, executors, administrations, legal representatives, successors and assigns of such person as the context may require.

"Preemptive Rights Exercise Notice" shall have the meaning set forth in Section 9.2(b) hereof.

"Preemptive Rights Notice" shall have the meaning set forth in Section 9.2(a) hereof.

"Preferential Distribution" means, with respect to any Class A Preferred Unit, an amount per annum equal to 7% of the Original Issue Price for such Unit. The Preferential Distribution shall commence to accrue on the date hereof and shall be paid in cash or in additional Class A Preferred Units at the election of the Board of Managers (valued at the Original Issue Price of the Class A Preferred Units) on a semi-annual basis, commencing December 31, 2013 and each June 30 and December 31 thereafter.

"Prior Operating Agreement" shall have the meaning set forth in the Recitals hereto.

"Proportionate Share" means such percentage as shall be determined by dividing the number of Units held by a Member (determined as if all such Units were converted into Common Units) by the total Units held by all Members (other than a Member proposing to Transfer Units under Section 7.5(a) hereof) (determined as if all Units were converted into Common Units).

"Proposed Regulations" means Section 1.704-1 of the proposed regulations as promulgated by the United States Department of Treasury as of the date hereof.

"RBS" shall have the meaning set forth in the Recitals hereto.

"Qualified Investment Bank" means an independent investment banking firm that is engaged as a regular part of its business in the valuation of business entities, where "independent" means that such firm is not a Member or an Affiliate of the Company, any Member or any director, Manager or officer of the Company or any Member and does not regularly provide services to any Member or any Affiliate of the Company, any Member or any director, Manager or officer of the Company or any Member.

"Qualified Public Offering" shall have the meaning set forth in Section 6.1(a)(ii) hereof.

"Registrable Securities" shall mean all Common Units (or common equity interests of any successor entity as to which the registration rights set forth in Section 9.1 apply) issued or issuable on or after the date hereof to Class A Preferred Members or Class A-1 Preferred Members upon conversion of their respective Units at the time of a Qualified IPO or otherwise; provided, however, that Registrable Securities shall not include any Units which have

9

previously been registered or which have been sold to the public either pursuant to a registration statement or Rule 144.

"Rule 144" shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

"Rule 145" shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

"Securities Act" means the Securities Act of 1933, as amended, including the rules and regulations promulgated thereunder.

"Purchase Agreement" shall have the meaning set forth in the Recitals hereto.

"Subject Units" shall have the meaning set forth in Section 7.5(a)(i) hereof.

"Substitute Member" shall have the meaning set forth in Section 7.3 hereof.

"Successor Corporation" shall have the meaning set forth in Section 8.3 hereof.

"Tax Matters Member" shall have the meaning set forth in Section 10.7 hereof.

"Transfer" shall have the meaning set forth in Section 7.1 hereof.

"Transfer Notice" shall have the meaning set forth in Section 7.5(a)(i) hereof.

"Transferring Member" shall have the meaning set forth in Section 7.5 hereof.

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"Unit" means the basic unit of ownership interest in the Company including any Common Units and any Class A Preferred Units or Class A-1 Preferred Units.

"Unit Equivalent" means (a) any security convertible, with or without consideration, into any Unit (including any option, warrant or other right to subscribe for or purchase such a security), (b) any security carrying any option, warrant or other right to subscribe for or purchase any Unit or (c) any such option, warrant or other right.

"Violation" shall have the meaning set forth in Section 9.1(e)(i) hereof.

1.2     Interpretation. Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate. References to any statute or Treasury Regulations mean such statute or regulations as amended at the time and include any successor legislation or regulations. The headings to the Articles and Sections are for convenience of reference and shall not affect the meaning or

interpretation of this Agreement. The Schedules and Exhibits are hereby incorporated by reference into and shall be deemed a part of this Agreement.

## ARTICLE II

## ORGANIZATION

2.1    Formation.    The Company has been organized as a Delaware limited liability company under and pursuant to the LLC Act by the filing of Certificate of Formation with the Office of the Secretary of State of the State of Delaware.    In the event of a conflict between the terms of this Agreement and the Certificate of Formation, the terms of the Certificate of Formation shall prevail.

2.2    Name.    The name of the Company is Culinary Health Innovations, LLC.

2.3    Purposes.    The purposes for which the Company is organized and operated are to engage in any lawful act or activity for which limited liability companies may be organized under the LLC Act including, without limitation, operating the Company Business. The Company shall enter into all contracts or agreements and do all things necessary or appropriate to the accomplishment of the foregoing purposes.

2.4    Duration.    The Company shall continue in existence until the Company shall be sooner dissolved and its affairs wound up in accordance with the LLC Act or this Agreement.

2.5    Office.    The principal office of the Company shall be 27 Mockingbird Lane, S. Burlington, Vermont 05403 or at such other place as the Board may designate from time to time.

## ARTICLE III

## CAPITAL STRUCTURE; MEMBERS

3.1    Capital Structure.    The capital structure of the Company shall consist of two classes of Units: (i) common equity Units (the "Common Units") and (ii) preferred equity Units designated as "Class A Preferred Units" and "Class A-1 Preferred Units", as follows:

(a)    Class A Preferred Units.    The Company shall initially be authorized to issue 3,604,281 Class A Preferred Units, of which (i) 2,537,200 shall, effective as of the date hereof, be issued to the Class A Preferred Members in the amounts set forth on Schedule I in exchange for the payment to the Company by the Class A Preferred Members of their respective Capital Contributions as set forth on Schedule I (ii) 609,756 of which shall be reserved for issuance to the Class A Preferred Members that purchase such Class A Preferred Units at subsequent closings under the Purchase Agreement and (iii) 457,325 of which (subject to adjustment under the terms of the Financing Warrants) shall be reserved for issuance upon the exercise of the Financing Warrants. The holders of Class A Preferred Units shall be entitled to all applicable rights, privileges and benefits, and subject to the obligations,

11

set forth in this Agreement.  Except as provided in Section 6.3, the holders of Class A Preferred Units shall vote together as one class with the Common Units on all matters submitted to the Members for their vote, with each Class A Preferred Unit entitled to such number of votes on each such matter as is equal to the number of Common Units into which such Class A Preferred Unit would be convertible as of the record date of such vote.

(b)  Class A-1 Preferred Units.  The Company shall initially be authorized to issue 670,027 Class A-1 Preferred Units, all of which shall, effective as of the date hereof, be issued or reserved to the Class A-1 Preferred Member(s) in the amounts set forth on Schedule I. 134,023 Class A-1 Preferred Units shall be issued to Campbell Investment Co, representing two percent (2%) of the issued and outstanding equity of the Company on a fully diluted basis as of the Initial Closing, in exchange for the conversion of all principal and interest under Number 6 of the Campbell Notes, simultaneously with such Initial Closing hereunder. Such conversion shall be deemed to constitute full repayment and satisfaction of such Campbell Note, which shall be cancelled and surrendered by Campbell and Campbell Investment Co to the Company. The conversion of Number 6 of the Campbell Notes shall constitute the respective Capital Contribution of Campbell Investment Co respecting the issuance of these 134,023 Units as set forth on Schedule I.  In addition, 536,004 Class A-1 Preferred Units shall be reserved for Campbell Investment Co, representing eight percent (8%) of the issued and outstanding equity of the Company on a fully diluted basis as of the Initial Closing. As set forth in the Consent, all of the principal and interest on Secured Number 6A of the Campbell Notes shall also be converted in accordance with the terms and conditions of such Consent. Such conversion, if and when it occurs, shall be deemed to constitute full repayment and satisfaction of Number 6A of the Campbell Notes, which shall be cancelled and surrendered by Campbell Investment Co to the Company. The conversion of Number 6A of the Campbell Notes, at the time of conversion, shall constitute the respective Capital Contribution of Campbell Investment Co respecting the issuance of these 536,004 Class A-1 Preferred Units as set forth on Schedule I. Alternatively, pursuant to such Consent, in the event the conditions of that certain May 16, 2012 letter from Campbell to the Company are not satisfied, Campbell may demand return of the monies escrowed in that certain Attorney Trust Account f/b/o Campbell Investment Company in Manchester, Vermont, along with such additional amounts necessary to constitute full repayment of the principal and accrued interest on Secured Note 6A. In such event Campbell shall have no further claim to or interest in the 536,004 Class A-1 Preferred Units reserved for it hereunder.  The holders of Class A-1 Preferred Units shall be entitled to all applicable rights, privileges and benefits, and subject to the obligations, set forth in this Agreement.  Except as provided in Section 6.2, the holders of Class A-1 Preferred Units shall vote together as one class with the Common Units on all matters submitted to the Members for their vote, with each Class A-1 Preferred Unit entitled to such number of votes on each such matter as is equal to the number of Common Units into which such Class A-1 Preferred Unit would be convertible as of the record date of such vote.

(c)  Common Units.  The Company shall initially be authorized to issue 8,707,651 Common Units, (i) 3,127,195 of which are issued and outstanding as of the date of this Agreement and held by the Members in the amounts set forth on Schedule I, (ii) 1,306,148 shall be reserved for issuance under the Company's Option Plan, and (iii) 4,274,308 of which shall be reserved for issuance upon the conversion of any Class A

Preferred Units (including those Class A Preferred Units reserved for issuance pursuant to the Financing Warrants) and Class A-1 Preferred Units. The holders of Common Units shall vote together as one class with the Class A Preferred Units on all matters submitted to the Members for their vote, with each Common Unit entitled to one on each such matter.

          (d)    Additional Securities. Subject to the applicable provisions of Sections 6.2, 6.3, 8.2 and/or 9.2, the Board of Managers shall have the authority to authorize and issue additional Common Units, Class A Preferred Units and Class A-1 Preferred Units, to create and issue new classes of Units, and to amend this Agreement as may be necessary to reflect any such changes.

        3.2    Members; Member Authority. The name, address, number and type of Units and Ownership Percentage of each Member of the Company as of the date hereof are listed on Schedule I to this Agreement. Schedule I shall be amended from time to time by the Board of Managers to reflect any changes therein. In accordance with Section 8.5 hereof, no Member shall have the authority to act on behalf of or to bind the Company solely in such Member's capacity as a Member of the Company.

        3.3    Admission of Additional Members. No additional Members shall be admitted to the Company, except: (a) additional Members approved by the Board of Managers or (b) as transferees of Membership Interests in the Company in accordance with the provisions of Article VII hereof. A Person shall be deemed admitted as a Member at the time that such Person executes an amendment to, or counterpart of, this Agreement and such other instruments as the Board deems reasonably necessary or desirable in connection therewith.

        3.4    Limitation on Liability. The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, except as required by law.

        3.5    Business Transactions Involving a Member or Affiliate of a Member. A Member or its Affiliate may lend money to, provide services to, and transact other business with the Company, provided that any such transactions are (i) on commercially reasonable, arms'-length terms, and any such Member or Affiliate shall have the same rights and obligations with respect to such matters as a Person who is not a Member or an Affiliate of a Member, and (ii) approved by the Board, including in each case a majority of the disinterested Managers. The Members acknowledge that the agreements among the Company, the Members and/or their Affiliates that are listed on Schedule 3.5 hereto are, or on the date of the Initial Closing will be, in effect.

        3.6    Confidentiality. Each Member agrees that, during and after the period that each Member is a Member of the Company, except as otherwise required by law, court order or regulatory authority, each Member will not disclose to any person or entity any confidential or proprietary information or ideas of the Company directly or indirectly, individually, or through any Person or utilize any such confidential or proprietary information or ideas for such Member's own benefit, or for the benefit of any third party.

ARTICLE IV

CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

4.1     Initial Capital Contributions.   The Company at the Initial Closing is issuing, and at the Class A Preferred Subsequent Closing (if such occurs) will issue, Units in exchange for Capital Contributions to the Company.  The aggregate Capital Contribution of each Member as of the date hereof is set forth opposite such Member's name on Schedule I hereto.

4.2     Capital Accounts.

(a)     Subject to subsections (b) and (c) of this Section 4.2, a Capital Account shall be established and maintained for each Member.  Each Member's Capital Account shall be (i) increased by the Capital Contributions of such Member and any Net Income and other items of income or gain allocated to such Member and (ii) decreased by the amount of cash and Fair Market Value (on the date of distribution) of any other Company property distributed to such Member and any Net Losses and other items of loss or deduction allocated to such Member.

(b)     It is intended that the Capital Accounts will be maintained at all times in accordance with Section 704 of the Code and applicable Treasury Regulations thereunder, and that the provisions hereof relating to the Capital Accounts be interpreted in a manner consistent therewith.  If the manner in which the Capital Accounts are to be maintained pursuant to this Section 4.2 is required to be modified to comply with the requirements of Section 704(b) of the Code and the applicable Treasury Regulations thereunder, then, notwithstanding anything to the contrary contained in this Section 4.2, the Board may alter the manner in which Capital Accounts are maintained, and the Board may amend this Agreement to reflect any such modification; provided, however, that any such modification shall not materially alter the economic agreement among the Members.

(c)     Notwithstanding the foregoing provisions of this Section 4.2, immediately prior to (i) any Capital Contribution to the Company by a new or existing Member as consideration for a Unit (other than in the case of all of the existing Members (and no new Members) making Capital Contributions pro rata in proportion to their respective Ownership Percentages), or (ii) any distribution of money or other property by the Company to any Member as consideration for a Unit (other than in the case of (x) a distribution to all of the Members pro rata in proportion to their respective Ownership Percentages or (y) a Preferential Distribution to the Class A Preferred Members), the Capital Account of each Member shall be increased or decreased, as the case may be, to reflect its pro rata share of the Fair Market Value of all the Company property.  Such adjustment shall reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property that has not previously been reflected in the Capital Accounts would be allocated among the Members if there were a taxable disposition of such property for its Fair Market Value on the date of the contribution or distribution and shall otherwise be made in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) (for the avoidance of doubt, it is intended that such allocation would be made in accordance with Sections 5.1 and 5.2).  For the avoidance of doubt, this Section 4.2(c) shall apply with respect to the issuance of Class A Preferred Units at

14

the Initial Closing, Class A Preferred Subsequent Closing(s), if any and, if it occurs, the Class A Preferred Warrant Closing.

4.3     Return of Capital Contributions.  Except as otherwise provided herein or in the LLC Act, no Member shall have the right to withdraw, or receive any return of, all or any portion of such Member's Capital Contribution.

4.4     Interest.  No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

4.5     Loans From Members.  Loans by a Member to the Company shall not be considered Capital Contributions.  If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made.  Loans by a Member may bear interest. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Section 12.3.  There are no loans outstanding by any Member to the Company.

4.6     Additional Capital Contributions.  No Member shall be required to make any additional Capital Contributions to the Company.

ARTICLE V

ALLOCATIONS AND DISTRIBUTIONS

5.1     Allocations of Net Income.  Subject to the provisions of Sections 5.3, 5.4 and 5.6 hereof, the Net Income for each Fiscal Year shall be allocated among the Members as follows:

(a)     First, to the Members, in proportion to and to the extent of, the cumulative Net Losses allocated to the Members under Section 5.2 hereof and not previously taken in to account under this Section 5.1; and then

(b)     Second, to the Class A Preferred Members until they have been allocated an amount that together with prior allocations under Sections 5.1(a) and (b) hereof equals the cumulative amount distributed or distributable to such Member under Sections 5.6(a) and 5.6(b); and then.

(c)     Third, to the Members in accordance with their respective Allocation Percentages.

5.2     Allocations of Net Losses.  Subject to the provisions of Sections 5.3, 5.4 and 5.6 hereof, the Net Losses for each Fiscal Year shall be allocated among the Members as follows:

      (a)    First, to the Common Members in respect of their Common Units, in proportion to the positive balances in their respective Capital Accounts, until such balances have been reduced to zero;

      (b)    Second, to the Class A Preferred Members and Class A-1 Preferred Members in proportion to their respective Capital Accounts, until such balances have been reduced to zero; and then

      (c)    Third, to the Members in accordance with their respective Allocation Percentages.

5.3    <u>Regulatory Allocations</u>.  Section 704 of the Code and the Treasury Regulations issued thereunder, including the provisions of such Treasury Regulations addressing qualified income offset provisions, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt, are hereby incorporated by reference.  If, as a result of the provisions of Section 704 of the Code and such Treasury Regulations, items of income, gain, deduction or loss are allocated to the Members in a manner that is inconsistent with the manner in which they intend to divide such items as reflected in <u>Section 5.1</u>, to the extent permitted under such Treasury Regulations, items of income, gain, loss and deduction shall subsequently be allocated among the Members so as to prevent such allocations from distorting the manner in which the net amounts of income, gain, deduction and loss will be divided among the Members pursuant to this Agreement.

5.4    <u>Allocations for Tax Purposes</u>.  Except as otherwise provided herein, all items of Company income, gain, deduction and loss for income tax purposes shall be allocated among the Members in the same proportion as they share in the Net Income and Net Losses and other items of income, gain, deduction or loss allocated pursuant to <u>Sections 5.1 and 5.2</u>.  Any credits against income tax shall be allocated in accordance with Treasury Regulations § 1.704-1(b)(4)(ii).

5.5    <u>Other Allocation Rules</u>.  Income, gain, loss and deductions of the Company shall, solely for income tax purposes, be allocated among the Members in accordance with Code Section 704(c) so as to take account of any difference between the adjusted basis of the assets of the Company for federal income tax purposes and their respective adjusted book values, and otherwise shall be allocated in the same manner as the related book items were otherwise determined by the Members.  Any allocations required by Code Section 704(c) shall be effectuated using the traditional method with curative allocations described in Regulation §1.704-3(c).

5.6    <u>Distributions of Distributable Funds</u>.

      (a)    <u>Preferential Distribution to the Class A Preferred Members</u>. The Board of Managers shall cause Distributable Funds, to the extent legally available therefor, to be distributed (subject to <u>Section 5.6(d)</u> below) in cash to the Class A Preferred Members, prior to and in preference of any other distributions to holders of Common Units, Class A-1 Preferred Members or other equity interests of the Company, in an amount per Unit equal to the Preferential Distribution.  The Preferential Distributions shall be cumulative and

shall accrue from and after the date of issue whether or not declared and whether or not there are any funds of the Company legally available for the payment of distributions. Any Preferential Distributions paid to the Class A Preferred Members shall be made to them pro rata in accordance with their respective Allocation Percentages.

(b)      Return of the Original Issue Price to the Class A Preferred Members. If all required Preferential Distributions have been made to the Class A Preferred Members in accordance with Section 5.6(a), the Board of Managers shall cause Distributable Funds, to the extent legally available therefor, to be distributed (subject to Section 5.6(d) below) in cash to the Class A Preferred Members, prior to and in preference of any other distributions to holders of Common Units, Class A-1 Preferred Members or other equity interests of the Company, in amounts and proportion necessary to return the Original Issue Price to each of the Class A Preferred Members.

(c)      Balance of Distributable Funds. If all required Distributions have been made to the Class A Preferred Members in accordance with Sections 5.6(a) and 5.6(b), the Board of Managers shall cause any remaining Distributable Funds, to the extent legally available therefor, to be distributed in cash to the Members (including the Class A Preferred Members and Class A-1 Preferred Members) in proportion to their respective Allocation Percentages.

(d)      Minimum Tax Distributions. Notwithstanding Sections 5.6(a), 5.6(b) and 5.6(c) above, it is the intention of the Members that, to the extent feasible in light of the business needs of the Company, in preference to any distributions described in Sections 5.6(a), 5.6(b) and 5.6(c) above, a minimum distribution will be made to each Member at the end of each calendar year (or quarterly, if necessary) in an amount sufficient to permit each Member to pay tax, calculated at the same rate for all Members equal to the highest combined federal, state and local tax rate applicable to any Member, on each Member's allocable share of the excess of (i) the amount of the Company's taxable income for such year and all prior years, less (ii) the sum of (x) all prior years' taxable income on distributions that have been made under this Section 5.6(d) and (y) the amount, if any, of the Company's total net taxable losses for all prior periods. Any amounts distributed pursuant to this Section 5.6(d) shall be considered an advance against any Preferential Distributions payable pursuant to Sections 5.6(a) above or other distributions payable pursuant to Sections 5.6(b) and 5.6(c) above.

(e)      Restriction on Distributions. The Company shall not make any distributions to the Members if: (x) after giving effect to the distribution, all liabilities of the Company (other than liabilities to Members with respect to their Membership Interests and liabilities for which the recourse of creditors is limited to specified property of the Company) would exceed the Fair Market Value of all Company property (net of any liabilities to which such Company property may be subject); (y) the Company would be required to borrow funds for such distributions; or (z) after giving effect to the distribution, the Company would be unable to pay its debts as they become due.

(f)      Allocation of Distributions to Class A Preferred Members. Any distributions made on a Class A Preferred Unit shall be allocated, first, to payment of

Preferential Distributions on such Unit (whether or not yet accrued), and, second, to the return of the Original Issue Price for such Unit.

## ARTICLE VI

### CERTAIN RIGHTS AND PRIVILEGES OF CLASS A PREFERRED UNITS

6.1     Conversion.  The Class A Preferred Units and Class A-1 Preferred Units (strictly for purposes of this Section 6.1, the term "Class A Preferred Units" shall refer collectively to the Class A Preferred Units and the Class A-1 Preferred Units unless specifically referenced to the contrary) shall be convertible into Common Units as follows:

(a)     Right to Convert.  Each Class A Preferred Unit shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of issuance of such Unit, by delivery of a Conversion Notice, and without the payment of additional consideration by the holder thereof, into that number of fully-paid, non-assessable Common Units determined by dividing (i) the Original Issue Price plus accrued but unpaid Preferential Distributions in respect of such Class A Preferred Unit, by (ii) the then-current Conversion Price (the number of Common Units into which each Class A Preferred Unit may be converted is hereinafter referred to as the "Conversion Rate").  Upon any decrease or increase in the Conversion Price, as described in this Section 6.1, the Conversion Rate shall be proportionately increased or decreased.

(b)     Automatic Conversion.  Each Class A Preferred Unit shall be converted automatically into fully-paid, nonassessable Common Units at the then effective Conversion Rate for such Class A Preferred Unit upon the occurrence of any of the following (each of the events referred to in the following clauses (i), (ii), (iii) and (iv), an "Automatic Conversion Event"):

(i)     upon the receipt by the Company of a written request for such conversion from the holders of at least fifty-one percent (51%) of the Class A Preferred Units then outstanding, or, if later, the effective date for conversion specified in such requests;

(ii)     immediately prior to the closing of the sale of Common Units (or common equity interests of any successor entity organized for such purpose) to the public at a price per Unit of at least $4.10 in a bona fide, firm commitment underwritten public offering pursuant to an effective registration statement filed under the Securities Act resulting in at least Twenty Five Million Dollars ($25,000,000) of gross cash proceeds (before underwriting discounts, commissions and fees) (a "Qualified Public Offering"); provided, however, that such Class A Preferred Units (for such purposes the foregoing and the balance of this sub paragraph (ii) means solely the Class A Preferred Units) shall only be automatically converted in connection with a Qualified Public Offering if, on or prior to the date of the closing of such Qualified Public Offering, the holders of the Class A Preferred Units shall have received distributions from the Company aggregating at least the amount of the Class A Preference Amount; or

(iii)    upon the exercise by any Triggering Holder of its Drag-Along rights as provided for in Section 7.6 hereof.

(c)    Mechanics of Conversion.

(i)    No fractional Common Units shall be issued upon conversion of Class A Preferred Units. For such purpose, all Class A Preferred Units to be converted by each holder of Class A Preferred Units shall be aggregated for the purposes of determining whether the conversion would result in the issuance of any fractional Unit. In lieu of any fractional Unit to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the then Fair Market Value of a Common Unit.

(ii)    In order for any Class A Preferred Units to be converted into Common Units pursuant to this Section 6.1, and the holder thereof to receive certificates therefor, such holder shall either (i) surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or of any transfer agent for the Class A Preferred Units and the Common Units or (ii) notify the Company or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such certificates, and shall give written notice to the Company at such office that such holder elects to convert the same; provided, however, that upon the consummation of an Automatic Conversion Event, the outstanding Class A Preferred Units shall be converted automatically without any further action by the holders of such Units and whether or not the certificates representing such Units are surrendered to the Company or its transfer agent, provided that the Company shall not be obligated to issue certificates evidencing the Common Units issuable upon such Automatic Conversion Event unless and until either the certificates evidencing such Class A Preferred Units are delivered to the Company or its transfer agent as provided above, or the holder notifies the Company or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such certificates as provided above. Upon the consummation of any Automatic Conversion Event, each holder of record of Class A Preferred Units shall be deemed to be the holder of record of the Common Units issuable upon such conversion, notwithstanding that the certificates representing such Class A Preferred Units shall not have been surrendered at the office of the Company, that notice from the Company shall not have been received by any holder of record of Class A Preferred Units, or that the certificates evidencing such Common Units shall not then be actually delivered to such holder. The Company shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Class A Preferred Units, a certificate or certificates for the number of Common Units to which such holder shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amount payable as the result of any applicable fractional Common Unit.

(iii)    Any voluntary conversion pursuant to Section 6.1(a) shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the Class A Preferred Units to be converted (or such later date specified in the Conversion Notice), and the person or persons entitled to receive the Common Units issuable upon such conversion shall be treated for all purposes as the record holder or holders of Common

Units on such date; provided, however, that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Company or other similar event, the conversion may, at the option of any holder tendering Class A Preferred Units for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Units issuable upon such conversion of the Class A Preferred Units shall not be deemed to have converted such Class A Preferred Units until immediately prior to the closing of such transaction or the occurrence of such event. Any automatic conversion pursuant to Section 6.1(b) shall be deemed to have been made as of the occurrence of such Automatic Conversion Event, and the person or persons entitled to receive the Common Units issuable upon such conversion shall be treated for all purposes as the record holder or holders of Common Units on such date.

(iv)    All notices from any holder of Class A Preferred Units requesting conversion of any such Units (a "Conversion Notice") shall: (i) state the number of whole Class A Preferred Units to be so converted and (ii) be delivered to the Company at its principal executive offices or such other address as the Company may from time to time specify in writing to the holders of Class A Preferred Units.

(d)    Adjustments to Conversion Price for Dilutive Issuances.

(i)    Additional Common Units. For purposes of this Section 6.1(d), "Additional Common Units" means all Common Units issued (or deemed to be issued pursuant to Section 6.1(d)(ii)) by the Company at any time when there are Class A Preferred Units outstanding (including Common Units subsequently reacquired or retired by the Company), other than:

(A)    Common Units issued upon conversion of, or as a distribution on, the Class A Preferred Units;

(B)    Common Units or Unit Equivalents issued under an Option Plan;

(C)    Common Units or Unit Equivalents issued to financial institutions or lessors in connection with bona fide commercial credit arrangements, equipment financings, commercial property lease transactions, or similar transactions, and approved by the Board (including at least two of the three Class A Preferred Managers);

(D)    Common Units or Unit Equivalents issued in connection with bona fide acquisitions, mergers or similar transactions approved by the Board (and, to the extent required by Section 6.3, the Class A Preferred Members);

(E)    Common Units or Unit Equivalents issued in connection with a Qualified Public Offering;

(F)    Common Units or Unit Equivalents aggregating five percent or less of the Common Units then outstanding (calculated on a Fully-Diluted

Basis) issued (i) in connection with bona fide strategic partnership transactions or (ii) to suppliers of goods or services pursuant to bona fide transactions, in each case primarily for purposes other than raising capital and which have been approved by the Board (including at least two of the three Class A Preferred Managers);

(G)   Common Units or Unit Equivalents issued in any other transaction in which exemption from the provisions of Section 6.1(d)(iii) hereof is approved by the holders of a Majority-In-Interest of the Class A Preferred Members; and

(H)   Common Units issued upon the exercise, conversion or exchange of any Unit Equivalent described in this Section 6.1(d)(i) in accordance with its terms.

(ii)   Deemed Issue of Additional Common Units. In the event the Company, at any time or from time to time when there are Class A Preferred Units outstanding, shall issue any Unit Equivalents, then the maximum number of Common Units (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) ultimately issuable upon the exercise, conversion or exchange of such Unit Equivalents shall be deemed to be Additional Common Units (unless excepted from the definition of Additional Common Units or for which no adjustment is required pursuant to Section 6.1(d)(iii)) issued as of the time of such issuance; provided, however, that in any such case in which Additional Common Units are deemed to be issued:

(A)   no further adjustment in the Conversion Price of the Class A Preferred Units shall be made upon the subsequent issuance of Common Units or Unit Equivalents in connection with the exercise, conversion or exchange of such Unit Equivalents;

(B)   if such Unit Equivalents by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Company or in the number of Common Units issuable upon the exercise, conversion or exchange thereof (other than a change pursuant to the anti-dilution or recapitalization provisions of such Unit Equivalents), the Conversion Price of the Class A Preferred Units and any subsequent adjustments based thereon shall be recomputed to reflect such change as if such change had been in effect as of the original issue thereof;

(C)   no readjustment pursuant to clause (B) above shall have the effect of increasing the Conversion Price of the Class A Preferred Units to an amount which exceeds the lower of (i) the Conversion Price in effect immediately prior to the original adjustment made as a result of such Unit Equivalents and (ii) the Conversion Price that would have resulted from any other issuances of Additional Common Units and any other adjustments provided for herein between the original adjustment date and such readjustment date; and

(D)   upon the expiration of any such Unit Equivalents which shall not have been exercised, the Conversion Price of the Class A Preferred Units computed upon the original issue thereof and any subsequent adjustments based thereon

shall, upon such expiration, be recomputed as if the only Additional Common Units issued were the Common Units, if any, actually issued upon the exercise, conversion or exchange of such Unit Equivalents and the consideration received therefor was the consideration actually received by the Company for the issuance of such exercised, converted or exchanged Unit Equivalents plus the consideration actually received by the Company upon such exercise, conversion or exchange of all such Unit Equivalents.

(iii)    Adjustment of Conversion Price Upon Issuance of Additional Common Units.  In the event the Company at any time or from time to time when there are Class A Preferred Units outstanding, shall issue Additional Common Units (including Additional Common Units deemed to be issued pursuant to Section 6.1(d)(ii)) without consideration or for a consideration per Additional Common Unit less than the applicable Conversion Price of any outstanding Class A Preferred Units in effect on the date of and immediately prior to such issuance, then, the Conversion Price of such Class A Preferred Units shall be reduced, concurrently with such issuance, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, (i) the numerator of which shall be the number of Common Units outstanding immediately prior to such issuance plus the number of Common Units which the aggregate consideration received by the Company for the total number of Additional Common Units so issued would purchase at such Conversion Price immediately prior to such issuance, and (ii) the denominator of which shall be the number of Common Units outstanding immediately prior to such issuance plus the number of such Additional Common Units actually so issued.  For the purpose of the foregoing calculation, the number of Common Units outstanding immediately prior to such issuance shall be calculated on a Fully-Diluted Basis.  Notwithstanding the foregoing, the Conversion Price shall not he reduced at such time if the amount of such reduction would be less than One Cent ($0.01), but any such amount shall be carried forward, and a reduction will be made with respect to such amount at the time of, and together with, any subsequent reduction which, together with such amount and any other amounts so carried forward, equal One Cent ($0.01) or more in the aggregate. For the purposes of this Section 6.1(d)(iii), all Common Units issuable upon conversion of all outstanding Class A Preferred Units and the exercise, exchange and/or conversion of any other outstanding Unit Equivalents shall be deemed to be outstanding.  For purposes of clarification, in no event shall an adjustment in the Conversion Price of any Class A Preferred Unit be made in respect of the issuance of Additional Common Units unless the consideration per Unit (as determined pursuant to Section 6.1(d)(iv)) for an Additional Common Unit issued or deemed to be issued by the Company is less than the Conversion Price in effect with respect to such Class A Preferred Unit on the date of, and immediately prior to, such issuance.

(iv)    Determination of Consideration.  For purposes of this Section 6.1(d), the aggregate consideration received by the Company for the issuance (or deemed issuance) of any Additional Common Interests shall be computed as follows:

(A)    Cash consideration shall be computed as the aggregate amount of cash received by the Company before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with such issuance.

(B)   Any consideration other than cash shall be computed at its Fair Market Value; provided, however, that if a definitive agreement to which the Company is a party includes a value for such non-cash consideration that is approved in good faith by the Board in accordance with the terms of this Agreement, and which value is intended to be a measure of the Fair Market Value of such non-cash consideration and not discounted for any reason, such value shall be the value of such assets for the purposes of this Section 6.1(d).

(C)   In the event Additional Common Units are issued together with other assets of the Company (including securities that do not constitute Additional Common Units) for consideration which covers both, the consideration received for the Additional Common Units shall be the proportion of such consideration so received, computed as provided in clauses (A) and (B) above, as reasonably determined in good faith by the Board.

(D)   With respect to Additional Common Units deemed to have been issued pursuant to Section 6.1(d)(ii), the consideration per Unit received by the Company for such Additional Common Units shall be determined by dividing (x) the total amount, if any, received or receivable by the Company as consideration for the issuance of such Unit Equivalents plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the full exercise, conversion or exchange of such Unit Equivalents into Common Units, by (y) the maximum number of Common Units (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the full exercise, conversion or exchange of such Unit Equivalents into Common Units.

(e)   Adjustments for Subdivisions or Combinations of Common Units.   In the event the outstanding Common Units shall be subdivided (by split, recapitalization or otherwise) into a greater number of Common Units, the Conversion Price of the Class A Preferred Units in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased and the Conversion Rate proportionately increased.   In the event the outstanding Common Units shall be combined (by reclassification or otherwise) into a lesser number of Common Units, the Conversion Price in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased, and the Conversion Rate proportionately decreased.

(f)   Adjustments for Reclassification, Exchange and Substitution.   If the Common Units issuable upon conversion of the Class A Preferred Units shall be changed into the same or a different number of a different class or series of Units or any other class or series of equity securities of the Company, whether by capital reorganization, reclassification, consolidation, merger or otherwise (other than a subdivision or combination of Common Units as provided under Section 6.1(e) above), then, in any such event, in lieu of the number of Common Units which the holders of Class A Preferred Units would otherwise have been entitled to receive upon the conversion thereof, each holder of Class A Preferred Units shall

23

have the right thereafter to convert such Class A Preferred Units into the number and class or series of Units or other class or series of equity securities of the Company which a holder of the number of Common Units deliverable upon conversion of the Class A Preferred Units immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such new class or series of Units or other equity securities. In any such ease, appropriate adjustment shall be made in the application of the provisions of this <u>Section 6.1</u> with respect to the rights of the holders of Class A Preferred Units after the capital reorganization to the end that the provisions of this <u>Section 6.1</u> (including adjustment of the Conversion Price then in effect and the number of Units or other equity securities issuable upon conversion of the Class A Preferred Units) shall be applicable after that event and be as nearly equivalent as practicable.

(g)    <u>Certificate as to Adjustments</u>. Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this <u>Section 6.1</u>, the Company, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Class A Preferred Units a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon the written request at any time of any holder of Class A Preferred Units, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of Common Units or other equity securities and the amount, if any, of other property which at the time would be received upon the conversion of Class A Preferred Units.

(h)    <u>Reservation of Common Units Issuable Upon Conversion</u>. The Company shall at all times reserve and keep available out of its authorized but unissued Common Units, solely for the purpose of effecting the conversion of the Class A Preferred Units, such number of its Common Units as shall from time to time be sufficient to effect the conversion of all then outstanding Class A Preferred Units; and, if, at any time, the number of authorized but unissued Common Units shall not be sufficient to effect the conversion of all then outstanding Class A Preferred Units, the Company will take such action as may, in the opinion of the Board, be necessary to increase its authorized but unissued Common Units to such number of Common Units as shall be sufficient for such purpose.

(i)    <u>Payment of Taxes</u>. The Company will pay all taxes (other than taxes based upon income) and other governmental charges that may be imposed with respect to the issuance or delivery of Common Units upon conversion of Class A Preferred Units, excluding any tax or other charge imposed in connection with any transfer involved in the issue and delivery of Common Units in a name other than that in which the Class A Preferred Units so converted were registered.

6.2    <u>Protective Provisions – Class A-1 Preferred Members</u>. The affirmative vote of a Majority-In-Interest of the Class A-1 Preferred Members, voting separately as a class, is necessary for any action which (whether by merger or otherwise):

(a)    alters or changes the rights, preferences, or privileges of the Class A-1 Preferred Units;

(b)     amends or otherwise modifies the Company's Certificate of Formation or this Agreement in a manner which adversely effects the rights of the Class A-1 Preferred Members; or

(c)     increase or decrease the authorized number of Class A-1 Preferred Units.

6.3     <u>Protective Provisions – Class A Preferred Members</u>.  The affirmative vote of a Majority-In-Interest of the Class A Preferred Members, voting separately as a class, is necessary for any action which (whether by merger or otherwise):

(a)     alters or changes the rights, preferences, or privileges of the Class A Preferred Units;

(b)     creates or issues any class or series of Units or other securities senior to or pari passu with the Class A Preferred Units with respect to distributions (including liquidating distributions), voting (other than special class voting rights comparable to those described in this <u>Section 6.3</u>), conversion (including anti-dilution provisions), [redemption], registration rights or other preferences.

(c)     increase or decrease the authorized number of Class A Preferred Units.

(d)     effects a Change in Control, other than pursuant the exercise by any Triggering Holder of its Drag-Along rights as provided for in <u>Section 7.6</u> hereof;

(e)     effects a reclassification or recapitalization of the outstanding Units or other equity securities of the Company;

(f)     (i) declares or pays any Distribution (other than as provided in <u>Section 5.5</u>) or (ii) redeems any Units or makes any other distribution of cash, Units, or other assets (other than those in respect of the Class A Preferred Units in accordance with this Agreement);

(g)     amends or otherwise modifies the Company's Certificate of Formation or this Agreement in a manner which adversely effects the rights, preferences or privileges of the Class A Preferred Units, including, without limitation, increasing or decreasing the authorized capital of the Company or increasing or decreasing the size of the Board of Managers;

(h)     effects any dissolution, liquidation or other winding up of the Company or any significant subsidiary on the cessation of all or a substantial part of the Company Business or the business of any significant subsidiary;

6.4     <u>Information and Visitation Rights</u>.  Each Class A Preferred Member and Class A-1 Preferred Member shall have:

(a)     the right to receive:

(i)     as soon as available, and in any event within 10 days after the end of each month, monthly reports consisting of an income statement, cash flow and balance sheet of the prior month period and statements including year to date figures compared to monthly budgets, with variations delineated or in such form as otherwise agreed by the Board;

(ii)     Within forty-five (45) days after the end of each fiscal quarter of the Company (other than any quarter that also is the end of a fiscal year), the Board shall cause the Company to deliver to each Member a quarterly report containing the following information: (i) unaudited consolidated statements of income and cash flows of the Company for such fiscal quarter, and an unaudited consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal quarter, all prepared in accordance with generally accepted accounting principles consistently applied except as otherwise noted therein, and subject to the absence of footnotes; and (ii) a statement of changes in the Member's equity and the Member's Capital Account balance for such fiscal quarter.

(iii)     soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, (i) a balance sheet as of the end of such year, (ii) statements of income and of cash flows for such year, all such financial statements prepared by the Company in accordance with GAAP; provided, however, that following the first full fiscal year that the Company has annual revenue equal to or exceeding $10 million, the Board of Managers shall appoint independent public accountants to review and possibly audit the Company's financial statements for subsequent year end periods;

In the event the Company fails to provide monthly reports and/or financial statements in accordance with (i), (ii) or (iii) above, RBS shall have the right, at the Company's expense, to require an audit by an accounting firm of its choice, such that statements are produced to the satisfaction of RBS.

(iv)     within 10 days after the Company learns of the commencement or written threat of commencement of any material litigation or proceeding against the Company, or any other material adverse effect affecting the Company, written notice of the nature and extent of any litigation or proceeding;

(v)     as soon as available, and in any event not later than 30 days prior to the end of each fiscal year, the financial plan of the Company for the next succeeding fiscal year, including cash flow projection and operating budget, calculated monthly and any updates or revisions as soon as possible;

(vi)     promptly after receipt, copies of all accountants' management letters and all certificates as to compliance, defaults, material adverse changes, material litigation or similar matters;

(vii)     upon request, within 60 days after the end of each fiscal year, a Member list, showing the holders of all outstanding Units (both before and after giving effect to dilution and on a Fully-Diluted Basis) and detailing all Unit Equivalents granted, exercised or lapsed and all Units issued or sold during such year; and

(viii)   promptly, such other financial data relating to the business, affairs or financial condition of the Company as is available to the Company which any Class A Preferred Member or Class A-1 Preferred Member may reasonably request.

(b)      (i) access, at reasonable times and upon reasonable notice, to all books, records and properties of the Company, (ii) the right to review and copy books and records at such Member's discretion, and (iii) the right to inspect the properties of the Company and consult with management of the Company. In the event that financial information is not provided in accordance with Section 6.4(a), the fees of the advisers referenced in this Section 6.4(b) shall be paid by the Company. Should there be any material reporting discrepancies or irregularities, the Class A Preferred Members may mandate a third party to investigate at the expense of the Company.

ARTICLE VII

ASSIGNMENT OF INTERESTS

7.1     Transfer; Assignment.  Except as otherwise expressly provided in this Article VII, no Member may sell, assign, transfer, exchange, pledge or otherwise convey, dispose of or encumber (any sale, assignment, transfer, exchange, pledge, conveyance, disposition or encumbrance being hereinafter referred to as a "Transfer") all or a portion of such Member's Units.  Any attempted Transfer by a Member of such Member's Units or any part thereof not in compliance with this Article VII shall be null and void ab initio and of no force whatsoever.

7.2     RBS Consent Right.  For the period beginning on the date of the Initial Closing and ending on the third anniversary thereof, no Founding Member may Transfer any Units held by it, other than Permitted Transfers (as defined below) or Transfers to other Founding Members (subject to compliance with the other provisions of this Article VII), without the prior written consent of RBS; provided, however, that this restriction shall lapse prior to such third anniversary if RBS ceases to hold at least 50% of the Class A Preferred Units purchased by RBS and provided, further, that, subject to its right of first refusal in Section 7.5, below, RBS will not unreasonably withhold permission for third-party transfers of Units.

7.3     Rights of Transferees.  A transferee of Units has no right to participate in the management of the business and affairs of the Company or to become a Member, and shall acquire only the economic interest of the transferring Member and be entitled only to receive the distributions and allocations of profits and losses to which the transferring Member would be entitled, unless and until such transferee is admitted as a substitute Member pursuant to Section 7.4 (each a "Substitute Member").

7.4     Admission of Transferee as Substitute Member.  A transferee of Units may be admitted as a Substitute Member having the rights of the transferring Member in and to such Member's Membership Interest only with the prior written consent of the Board, which approval may be granted or withheld by the Board in its sole and absolute discretion; provided, however, that the approval of the Board shall not be required for the admission as a Substitute Member of any transferee of Units effected in accordance with the procedures set forth in

Section 7.5.  Any Substitute Member properly admitted to the Company as such shall have all the rights and powers and shall be subject to all the restrictions and liabilities of the Member originally transferring the Membership Interest.  The admission of a Substitute Member shall not in and of itself release the Member originally transferring the Membership Interest from any liability to Company that may have existed prior to the Transfer.

7.5    Right of First Refusal; Co-Sale Rights.  Except as provided in Section 7.5(e) below with respect to Permitted Transfers, each time a Founding Member (a "Transferring Member") proposes to Transfer any Units, such Transferring Member shall first offer such Units in accordance with the following provisions of this Section 7.5:

(a)    Right of First Refusal.

(i)    Such Transferring Member shall first deliver a written notice (the "Transfer Notice") to the Class A Preferred Members and the Class A-1 Preferred Members (for purposes of this Section 7.5, the term "Class A Preferred Members" shall refer collectively to the Class A Preferred Members and the Class A-1 Preferred Members unless specifically referenced to the contrary) and the Company stating (A) the Units to be Transferred (the "Subject Units"), (B) such Transferring Member's intention to Transfer the Subject Units in a bona fide arms'-length transaction, (C) the name and address of the proposed transferee, and (D) the purchase price and terms of payment for which the Transferring Member proposes to Transfer the Subject Units.

(ii)    Within fifteen (15) days after receipt of the Transfer Notice, the applicable Class A Preferred Members shall notify the Transferring Member and the Company in writing of their desire to purchase their Proportionate Share of the Subject Units (which notice may also specify the number of additional Units in excess of a Class A Preferred Member's respective Proportionate Share (determined on a basis only including those Class A Preferred Members eligible under this Section 7.5(a) in the denominator) that each would be willing to purchase if not all eligible Class A Preferred Members elect to purchase their Proportionate Share of the Subject Units (determined on a basis only including those Class A Preferred Class A Preferred Members eligible under this Section 7.5(a) in the denominator).  The failure of a Class A Preferred Member to submit a notice within the applicable period shall constitute an election not to purchase any of the Subject Units. If the other Class A Preferred Members shall not have offered to purchase all of the Subject Units, then the remainder of the Subject Units shall be allocated among the Class A Preferred Members who have offered to purchase additional Units in excess of their respective Proportionate Share, which additional Units shall be allocated among such Class A Preferred Members based upon their respective Proportionate Shares up to the amount that each such Member has agreed to purchase.

(iii)    If the (x) the Class A Preferred Members do not elect to purchase all of the Subject Units offered pursuant to the Transfer Notice upon the expiration of such fifteen (15) Business Day period (after giving effect to the allocation of any remaining Subject Units pursuant to the last sentence of Section 7.5(a)(ii) above) and (y) the proposed Transfer is not prohibited by the Class A Preferred Members under Section 7.1, above, the Transferring Member and the Company shall deliver to the Members holding Common Units a

Transfer Notice indicating the number of Subject Units remaining unsold and enclosing a copy of the initial Transfer Notice sent to the Class A Preferred Members.

(iv)     Within fifteen (15) days after receipt of this Transfer Notice, the remaining Members (other than the Transferring Member if it shall be a Member holding Common Units) shall notify the Transferring Member and the Company in writing of their desire to purchase their Proportionate Share (determined on a basis only including Common Units in the denominator) of the remaining Subject Units (which notice may also specify the number of additional Units in excess of a Member's respective Proportionate Share (determined on a basis only including Common Units in the denominator) that such Member would be willing to purchase if not all Members elect to purchase their Proportionate Share of the Subject Units).  The failure of a Member to submit a notice within the applicable period shall constitute an election not to purchase any of the Subject Units. If the other Members shall not have offered to purchase all of the remaining Subject Units, then the remainder of the Subject Units shall be allocated among the Members who have offered to purchase additional Units in excess of their respective Proportionate Share (determined on a basis only including Common Units in the denominator), which additional Units shall be allocated among such Members based upon their respective Proportionate Shares (determined on a basis only including Common Units in the denominator) up to the amount that each such Member has agreed to purchase.

(v)     If the other Members do not elect to purchase all of the Subject Units offered pursuant to the Transfer Notice upon the expiration of such thirty (30) day period (after giving effect to the allocation of any remaining Subject Units pursuant to the last sentence of Section 7.5(a)(iv) above), the Company, with the approval of the Board of Managers, may purchase any remaining portion of such Subject Units.  The Company will have fifteen (15) days after the end of the above mentioned thirty (30) day period to notify the Transferring Member in writing of its intention to accept or reject such offer.  The failure of the Company to submit a notice within the applicable period shall constitute an election not to purchase any of the Subject Units.

(vi)     The purchase by the other Members and/or the Company, as the case may be, of any Subject Units designated in the Transfer Notice shall close at a mutually agreed upon place within thirty (30) days after the expiration of the Company's right to purchase such Subject Units (as described in Section 7.5(a)(v) hereof), at the price and on the terms of payment designated in the Transfer Notice.  If the Transfer Notice provides for the payment of non-cash consideration, the other Members and/or the Company, as the case may be, may elect to pay the consideration in cash equal to the present Fair Market Value of the non-cash consideration.  At the closing, the Transferring Member shall deliver to the Company and/or the other Members, as the case may be, an applicable instrument of transfer conveying the Subject Units being transferred, which shall include a certification that the Company and/or the other Members purchasing such Units are receiving good and marketable title to such Units, free and clear of all liens, claims and encumbrances (other than those established by this Agreement), and the Company and/or such purchasing Members, as applicable, shall pay to the Transferring Member the purchase price for such Units in cash.

(b)     Co-Sale Rights.  If the Members and the Company do not elect in the aggregate to purchase all of the Subject Units (such Units not sold in accordance with

Section 7.5(a), the "Co-Sale Securities"), then each Member shall have the right to sell to the proposed transferee described in the Transfer Notice the number of Units equal to the product of (X) such Member's Proportionate Share and (Y) the number of Co-Sale Securities (which notice may also specify the number of additional Co-Sale Securities in excess of such Member's Proportionate Share that such Member would be willing to Transfer if not all Members exercise their Co-Sale Right) on the same terms and conditions as specified in the Transfer Notice (the "Co-Sale Right"). To the extent any Members exercise such Co-Sale Right, the number of Co-Sale Securities which the Transferring Member may sell to the proposed transferee shall be correspondingly reduced. Any Member desiring to exercise its Co-Sale Right shall notify the Transferring Member in writing of its intention to exercise its Co-Sale Right within fifteen (15) days after receipt of the Transfer Notice (each such Member, a "Co-Sale Member"). The failure of a Member to submit a notice within the applicable period shall constitute an election not to exercise its Co-Sale Right. To the extent the other Members have elected not to exercise their Co-Sale Right then the remainder of the Co-Sale Securities shall be allocated among the Co-Sale Members who have offered to participate in the sale of Co-Sale Securities in excess of their respective Proportionate Share, which additional Co-Sale Securities shall be allocated among such Co-Sale Members based upon their respective Ownership Percentages up to the number of Units that each such Co-Sale Member has indicated that it is willing to Transfer. Each Member who exercises its Co-Sale Right shall be required, as a condition thereto, to represent and warrant to the proposed transferee at the closing of the Transfer that such Member has good and marketable title to the Units being Transferred, free and clear of all liens and encumbrances created by such Member, and no Member shall be required to make any additional representations and warranties, indemnities or like terms or conditions to the proposed transferee that are as nearly identical as possible to those made by the Transferring Member.

(c)     Right to Transfer Following Compliance.     Following compliance with the provisions set forth in Sections 7.5(a) and, if applicable, 7.5(b), the Transferring Member may Transfer the unpurchased Subject Units (less the number of Units being Transferred by Co-Sale Members pursuant to Section 7.5(b)) to the proposed transferee, provided such Transfer (i) is completed within thirty (30) days after the expiration of the other Members' right to Transfer Units described in Section 7.5(b) above, (ii) includes the Units of any Co-Sale Member as required by Section 7.5(b) above, (iii) is made on terms no less favorable to the Transferring Member than as designated in the Transfer Notice, and (iv) the requirements of Section 7.5(d) below are met. If such Subject Units are not so Transferred, the Transferring Member must first comply with the provisions of this Section 7.5 again prior to any other or subsequent Transfer of such Subject Units.

(d)     Further Transfer Restrictions.     Notwithstanding any other provision of this Section 7.5, no Transfer of Units may be made: (i) if such Transfer, alone or when combined with other transactions, would result in a termination of the Company within the meaning of Section 708 of the Code; (ii) without an opinion of counsel satisfactory to the Board of Managers that such Transfer is subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws (which opinion may be waived by the Board of Managers in their discretion); (iii) unless and until the Company receives from the transferee the information and agreements that the Board of Managers may reasonably require, including, but not limited to, an agreement of the

transferee to be bound by all of the terms and conditions of this Agreement; and (iv) unless and until the Company receives from the Transferring Member an agreement to pay all expenses of the Company (including reasonable attorneys' fees) incurred in connection with such Transfer.

(e)     Permitted Transfers.   Notwithstanding any other provision of this Article VII, this Section 7.5 shall not apply to any Transfer by a Member of all or any portion of its Units (i) to one or more of its Affiliates, or (ii) in the case of a Member who is a natural person, to such Member's spouse, lineal descendant (including any adopted child or adopted grandchild), or to a custodian or trustee of any trust, partnership or limited liability company for the exclusive benefit of, or the ownership interests of which are exclusively owned by, such Member or those members of such Member's family specified in this Section 7.5(e) (each, a "Family Member") for bona fide estate or tax planning purposes (any Transfer described in clause (i) or (ii), a "Permitted Transfer").  Any such Permitted Transfer may be effected at any time without the approval of the Board or any other Members.  Upon any Permitted Transfer of Units by a Member, the transferee shall be admitted as a Substitute Member of the Company without the approval of the Board, provided that such transferee executes and delivers to the Company an agreement to be bound by all of the terms and conditions of this Agreement.

7.6     Drag-Along Rights.

(a)     Subject to the rights of first refusal in Section 7.5(a) above, if any one or more holders of Units comprising at least fifty one percent (51%) of the outstanding Units of the Company (calculated on a Fully-Diluted Basis) ("Drag-Along Transferor(s)") propose(s) to Transfer all of their or its Units to any bona fide third party Person other than pursuant to a Permitted Transfer for a consideration at least equal to the Fair Market Value of such Units (a "Drag-Along Sale"), then the Drag-Along Transferor(s) may require each of the other Members to Transfer all of their Units to the proposed purchaser in accordance with this Section 7.6.  Without limiting the foregoing, if the Drag-Along Sale is structured as a merger or consolidation or a sale of all or substantially all of the assets of the Company, the other Members shall take such actions as the Company may reasonably request (including, without limitation waiving any dissenters' rights, appraisal rights or similar rights (if any)) in order to effectuate the transaction.

(b)     The Drag-Along Transferor(s) shall exercise their rights under this Section 7.6 by delivering to the other Members a written notice (a "Drag-Along Notice") of any proposed Drag-Along Sale, which notice shall set forth the identity of the proposed purchaser, the consideration to be paid, the number of Units to be sold, the terms and conditions of payment offered and the proposed date of the sale.

(c)     The Members shall cooperate in good faith with the Drag-Along Transferor(s) in consummating any sale under this Section 7.6.  At the closing of any such Transfer, each Member shall deliver to the proposed purchaser his or its Units, free and clear of any liens, together with such certificates of transfer as the purchaser may reasonably request.  In addition, if requested by the purchaser, each Member shall be required to make representations, warranties and indemnities regarding his or its Units, including, without

31

limitation, the ownership of and authority to transfer such Units, the absence of any liens on such Units and the compliance of such Transfer with applicable laws.

(d)     The obligations of each of the Members with respect to a Drag-Along Sale are subject to the satisfaction of the conditions that (1) upon the consummation of the Drag-Along Sale, all of the Members holding Units will receive the same form and amount of consideration per Unit, (2) any indemnification obligations any Member is required to undertake pursuant to this Section 7.6 shall be on a pro rata basis (except as may relate to representations and warranties that are specific to such Member), and shall be several and not joint and (3) the terms of the Drag-Along Sale shall not include any provisions subjecting a Member to any indemnification or other liability beyond the value of the consideration received in the Drag-Along Sale by such Member.

7.7     Death, Incompetency or Dissolution of a Member; No Withdrawal. Upon the death, incompetency, bankruptcy, insolvency, dissolution or other cessation to exist as an individual or legal entity, the authorized representative or successor, as applicable, of the Member shall have all the rights of a Member for the purpose of effecting the orderly winding up and disposition of the business of such Member and such power the Member possessed to make an assignment of its interest in accordance with the terms hereof.  No Member shall have the right to withdraw from the Company.

ARTICLE VIII

MANAGEMENT OF THE COMPANY

8.1     Board of Managers.   Except for situations in which the approval of Members is expressly required by this Agreement or by a provision of the LLC Act, the business of the Company shall be managed solely and exclusively by a Board of Managers comprised of representatives appointed by the Members as provided herein (the "Board"), which may make (or delegate to officers of the Company in accordance with this Agreement the authority to make) all decisions affecting the business and affairs of the Company.  The Board shall initially consist of seven (7) Managers, subject to increase as provided herein.

(a)     Appointment.   The Managers serving on the Board shall be appointed as follows:

(i)     Initially, CHI Vermont shall have the right to appoint three (3) Managers to the Board, one of whom shall be the Chief Executive Officer of the Company and a Majority-in-Interest of the Class A Preferred Members shall have the right to appoint three (3) Managers to the Board, at least one of whom shall be an Executive Chairman of the Company (such persons the "Class A Preferred Managers").   The last Manager shall be an independent Manager ("Independent Manager") designated by RBS and subject to the approval of CHI Vermont, which shall not be unreasonably withheld.  Upon the Initial Closing, the Board shall consist initially of the following persons: *CHI Designees*: David Thompson (CEO), Dr. Robert Rubin, Dr. David McCarron *RBS Designees*: Bruce Shalett (Co-Executive Chairman), Todd Meister (Co-Executive Chairman), Robert Meister.   *Independent*: Teresa Teague. Notwithstanding the foregoing, the appointment of Ms. Teague as the Independent Manager shall

32

be subject to the approval of Ms. Teague's employer. In the event such approval is not obtained, RBS shall designate an alternate qualified independent person to serve in such capacity and so long as such person is not a family member or an Affiliate of either Messrs. Shalett or Meister, such person shall be approved by CHI Vermont to serve as Independent Manager.

(ii)     If the Company fails to meet the budgeted total revenue and/or pre-tax income targets in the annual budget or business plan approved by the Board for three consecutive fiscal quarters commencing with the third fiscal quarter of 2013; provided that such shortfall is equal to or in excess of 15% of either of such budgeted revenue and/or pre-tax income targets on a cumulative basis (i.e., for the three applicable consecutive fiscal quarters) per budgeted item, then (and only then), promptly following written notice from RBS, CHI Vermont shall designate one (1) Manager to resign from the Board and the Class A Preferred Members shall have the right to appoint one (1) additional Manager to the Board and thereafter the Class A Preferred Members shall have the right to appoint four (4) Managers to the Board and CHI Vermont shall have the right to appoint two (2) Managers to the Board.

This Section 8.1 (a) (ii) shall become null, void and of no force and effect at such time as RBS and its Affiliates shall no longer be the owners of at least 15% of the outstanding membership interests of the Company measured on as converted to Common Units basis.

(iii) If, at any time, there shall remain outstanding less than 20% of the number of Class A Preferred Units originally issued by the Company pursuant to the Purchase Agreement (at both the Initial Closing and any Class A Preferred Subsequent Closings), the entire Board of Managers shall be elected on an annual basis by a Majority-In-Interest of the Members (voting together as a single class).

(b)     Resignation and Removal.  Any Manager may resign from the Board at any time.  A resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company.  The resigning Manager shall be replaced by a vote of those Members entitled to appoint such Manager.  Except as provided in the next succeeding sentence, any Manager may be removed, with or without cause, at any time at the election vote of the Members entitled to appoint such Manager, and only by those Members.  The Independent Manager may be removed at the election of both RBS and CHI Vermont and the replacement Independent Manager shall be designated by RBS, subject to the approval of CHI Vermont, which shall not be unreasonably withheld.

(c)     Board Action.  Unless otherwise specified in this Agreement, the Board shall act by majority vote, with each Board member having one vote.

(d)     Meetings; Quorum.  The Board may hold special meetings at such places and times as are designated in the call of the meeting, upon at least three business days' notice given by the Board member calling the meeting.  At any meeting of the Board, the presence of a majority of the Board members shall constitute a quorum; provided that the failure of any member of the Board to be present at a meeting of the Board shall not prevent a quorum from being established if such member of the Board has failed to be present for the

previous two meetings called during a period of not less than one (1) month in accordance with the procedures set forth herein. Any meeting may be adjourned from time to time by a majority of votes, whether or not a quorum is present, and the meeting may be held as adjourned upon reasonable notice. Majority vote at a meeting at which a quorum is present shall be the act of the Board (unless another voting requirement is specifically provided for in another provision of this Agreement).

(e)     Action by Consent.  Any action of the Board may be taken without a meeting if (i) Board members holding not less than the minimum number of votes that would be required to approve and adopt such action at a meeting consent to the action in writing, (ii) written notice (delivered in person or by facsimile) of the actions to be approved by such Board members is given to all Board members, and (iii) the written consents are filed with the records of the meetings of the Board.  Such actions by consent shall be treated for all purposes as actions taken at a meeting.

(f)     Telephonic Meetings.  Board members may participate in a meeting of the Board by means of a conference telephone or similar communications equipment, provided all Board members participating in the meeting can hear each other at the same time.  Participation in a meeting by conference telephone or similar means shall constitute presence in person at such meeting.

(g)     Committees of the Board.  To the extent that the Managers appoint one or more committees of the Board, at least one Manager appointed by the Class A Preferred Members shall be a member of each committee of the Board, including the compensation, corporate governance and audit committees.

8.2     Actions Requiring Approval of the Board.  Notwithstanding anything to the contrary contained in this Agreement, the following actions shall require approval by the Board:

(a)     the amount and timing of all distributions to Members;

(b)     the authorization and/or issuance of any additional Units or Unit Equivalents in the Company;

(c)     any sale, reorganization, merger or consolidation of the Company with or into any other Person or any other business combination;

(d)     any sale of all or substantially all of the assets of the Company;

(e)     any amendment to or modification of the Certificate of Formation or this Agreement (subject to the provisions of Section 13.4 hereof);

(f)     the registration of any securities of the Company under the Securities Act;

(g)  the admission of any Member to the Company other than a Member admitted as a Substitute Member of a transferor of Units effected in accordance with the procedures set forth in Section 7.5;

(h)  the voluntary dissolution and winding up of the affairs of the Company; and

(i)  any other action specifically provided elsewhere in this Agreement as subject to the approval of the Board.

8.3  Actions Requiring Approval of the Class A Preferred Managers. Notwithstanding anything to the contrary contained in this Agreement, the following actions shall require approval of the majority of the Class A Preferred Managers (for clarification purposes, to the extent any action set forth below is also covered in Section 8.2 above, such action shall in all cases require the approval of the majority of the Class A Preferred Managers):

(a)  The approval of the Company's annual budget;

(b)  The effectuation of any related party transactions between the Company and any of its Affiliates;

(c)  The creation of any mortgage, pledge or other security interest in all or substantially all of the property of the Company or a subsidiary;

(d)  The transfer of a significant portion of the Company's assets to any third party (including a subsidiary or an Affiliate);

(e)  The transfers or grant of rights in any of the Company's intellectual property, other than limited licenses that are incidental to sales of the Company's products and services in the ordinary course of business;

(f)  The adoption of any Option Plan not in effect on the Closing Date or increasing the current pool of options available under any existing Option Plan,

(g)  The granting of any options to employees, managers, consultants or any other parties under any Option Plan or otherwise;

(h)  The incurrence of debt or guarantees in excess of $50,000 in the aggregate;

(i)  The incurrence of capital expenditures in excess of $50,000 in the aggregate;

(j)  The intentional deviation from the expense levels included in a Board approved annual budget by more than $50,000;

(k)     The entering into of any contract or assumption of any obligation that imposes upon the Company a responsibility to pay an amount greater than $50.000;

(l)     Any initial public offering of the equity securities of the Company;

(m)     Any change to the Company Business, or materially modifying the Company's business plan;

(n)     The acquisition of any interest in any business or enters into any joint venture involving consideration above $50,000;

(o)     The appointment of new senior level executives either with C-level titles or annual compensation in excess of $100,000;

(p)     The hiring of any employee or consultant with an annual salary/compensation in excess of $50,000.

(q)     The modification or termination of any employment agreement or compensation arrangement with any executive officers and key employees;

(r)     The amendment of the legal entity status of the Company (e.g., from a limited liability company to a C-corporation);

(s)     Any change to the Company's accounting practices; or

(t)     The selection or changes to the Company's independent public accountants.

8.4     Conversion to Corporate Form.  In addition to those actions set forth in Section 8.2, the Board may, upon obtaining the appropriate approvals as set forth above, at any time, effect a conversion of the Company into a corporation organized under the laws of the State of Delaware (a "Successor Corporation") by whatever means the Board deems desirable, provided that (a) such conversion is effected in connection with the registration of the Company's securities under the Securities Act and the consummation of a Qualified Public Offering and (b) the Members are afforded substantially the same rights, preferences and privileges in the Successor Corporation as provided herein or in any other agreement or document relating to the Member's Units or their interest in the Company.  In such case, no Member shall have any voting rights or veto power over the Board's decision to so reorganize, and each Member shall provide all necessary cooperation, including without limitation, the execution of any documents or filings as may be reasonably required to effect such conversion.

8.5     Officers.  The Board shall have the authority to appoint such officers of the Company as it may deem necessary or desirable, who need not be Members of the Company. The officers of the Company shall be agents of the Company, authorized to execute and deliver documents and take other actions on behalf of the Company, subject to the direction and supervision of the Board and subject to the limitations set forth in Section 8.2 hereof.  The

officers of the Company shall have such duties as may be approved by the Board. The Board shall have the right to remove any officer of the Company, either for or without cause, at any time.

8.6   Scope of Members' Authority.   No Member, acting purely in such Member's capacity as a Member, shall have any authority to act for, or to assume any obligation or responsibility on behalf of, the Company or any other Member.  Any act of a Member in violation of this Section 8.5 shall be null and void and without force and effect. Each Member shall indemnify and hold the Company and the other Members harmless for any costs and damages incurred by the Company or any other Member as a result of, or which are wholly or partly attributable to, that Member's unauthorized action on behalf of the Company or any other Member; and, in addition to any other remedies available to the Company or the other Members, the Company may apply any distribution to which such Member that acted without authority would otherwise be entitled towards the satisfaction of that Member's liability to the Company or the other Members (with any such amount offset on behalf of a Member being distributed to such Member in satisfaction of the respective liability) under this Section 8.5.  Only the officers of the Company shall have the authority (subject to the limitations set forth in Section 8.2 hereof) to bind the Company and to sign documents on its behalf.

8.7   Devotion of Time; Standard of Care; Liability.   Unless otherwise specified in a written employment or consulting agreement with the Company, the officers and members of the Board shall devote such time and attention to the business and affairs of the Company as shall be necessary to operate the business of the Company.  Each officer and Board member shall discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or it reasonably believes to be in the best interests of the Company.  The doing of any act or the omission to do any act by any officer or any member of the Board, the effect of which may cause or result in loss or damage to the Company, if done in good faith and otherwise in accordance with the terms of the preceding sentence and the terms of this Agreement, shall not subject such Person to any personal liability to the Company or the Members, provided that such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct, fraud, active and deliberate dishonesty or knowing violation of the law or this Agreement.  No officer or any member of the Board shall be liable for any monetary damages to the Company for any breach of such duties except (i) for acts committed in bad faith or attributable to such Person's gross negligence, willful misconduct, fraud, active and deliberate dishonesty or knowing violation of the law or this Agreement or (ii) if such Person personally gained in fact a financial profit or other advantage to which such Person was not legally entitled.

8.8   Other Businesses.

(a)   Subject to the provisions of Sections 8.6 and 8.7(b) hereof, the Members may engage in other business activities or possess interests in other businesses of every kind and description, independently or with others whether conducted or held directly or through Affiliates; provided such activities or businesses do not compete directly with the Company Business (for the avoidance of doubt, such proviso shall not apply to the Class A Preferred Members or their respective Affiliates).

(b)    Notwithstanding anything to the contrary contained in <u>Section 8.7(a)</u> above, the Company and each Member acknowledge and agree that (i) RBS, its Affiliates and any subsequent holder of Class A Preferred Units and their respective Affiliates (collectively, "Other Class A Preferred Holders") engage in a wide variety of activities and have investments in many companies; (ii) it is critical that RBS, its Affiliates and Other Class A Preferred Holders be permitted to continue to develop their current and future business and investment activities without any restriction arising from an investment by such parties in the Company or any other relationship, contractual or otherwise, between RBS, its Affiliates and Other Class A Preferred Holders, on the one hand, and the Company or any of its Affiliates, on the other hand; and (iii) from time to time, in connection with the foregoing activities (the "<u>Activities</u>"), RBS, its Affiliates and Other Class A Preferred Holders may have information that may be considered useful to the Company or certain other persons in their position as equity holders of the Company.  Accordingly, notwithstanding anything to the contrary in the Certificate of Formation or this Agreement, to the fullest extent permitted by law, at any time when any of RBS, its Affiliates and Other Class A Preferred Holders is a Member, the Company acknowledges and agrees that (a) the Company does not intend or desire that the relationship between RBS, its Affiliates and Other Class A Preferred Holders and the Company or any of its Affiliates (x) interfere with or impose conditions or restrictions on any of the Activities of RBS, its Affiliates and Other Class A Preferred Holders or (y) confer upon the Company any right to participate in any of the Activities of RBS, its Affiliates and Other Class A Preferred Holders and (b) the Company intends and desires that (I) RBS, its Affiliates and Other Class A Preferred Holders shall be free to engage in the Activities in any capacity, whether passive or active, without any obligation or liability to the Company or to its equity holders or Members, including, without limitation, any obligation to offer the Company a right to acquire, participate in or have any interests of any nature whatsoever in any of such Activities; (II) and   RBS, its Affiliates and Other Class A Preferred Holdersand their respective Affiliates shall have no duty to disclose any information known by such person to the Company; <u>provided</u> that this <u>Section 8.7</u> shall not relieve RBS, its Affiliates and Other Class A Preferred Holders and their respective Affiliates of any contractual obligation between RBS, its  Affiliates and Other Class A Preferred Holders and the Company to maintain the confidentiality of any information pertaining to the Company.

ARTICLE IX

<u>REGISTRATION RIGHTS; PREEMPTIVE RIGHTS</u>

9.1    <u>Registration Rights</u>.

(a)    <u>Piggyback Rights</u>.  If the Company decides to register any Units for its own account or for the account of any other party (including pursuant to the exercise of any demand rights set forth in <u>Section 9.1(b)</u>), other than (A) a registration or any form of registration statement that does not permit secondary sales and (B) a registration relating solely to (1) employee benefit plans, (2) corporate reorganization, (3) a Rule 145 transaction, or (4) debt securities, the Company will:

(i)    promptly and in no event later than fifteen (15) days prior to the filing of the registration statement, give all Class A Preferred Members and Class A-1

Preferred Members written notice thereof, which notice shall state whether the public offering involves an underwriting; and

(ii)    use its best efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth below, and in any underwriting involved therein, all the Registrable Securities specified in written request(s) made by any such Member within fifteen (15) days after the written notice from the Company described in clause (i) above is delivered, which request may specify all or part of such Member's Registrable Securities.

(b)    <u>Demand Rights</u>.

(i)    Subject to the conditions of this <u>Section 9.1</u>, if at any time after the six month anniversary of a Qualified IPO, the Company receives a written request from the holders of a Majority-in-Interest of the issued and outstanding Registrable Securities that the Company file a registration statement under the Securities Act covering the resale of the Common Units  and (C) such registration shall reasonably be expected to yield net proceeds, after underwriting discounts and commissions, of five million dollars ($5,000,000) or more, the Company shall (x) promptly give notice of such registration to the other Members in accordance with <u>Section 9.1(a)</u>, and (y) shall cause such registration statement to be prepared and filed and use its best efforts to have including therein all Registrable Securities that such holders request to be registered and all Registrable Securities that any other Members requests to be registered pursuant to their piggyback registration rights exercised in accordance with <u>Section 9.1(a)</u> and (z) use its best efforts to have such registration statement declared effective.

(ii)    Subject to the conditions of this <u>Section 9.1</u>, if, at any time after the six month anniversary of an IPO or IPO Alternative, the Company receives a written request from either (x) the holders of a Majority-in-Interest of the Class A Preferred Units and Class A-1 Preferred Units then outstanding  or (y) the holders of a Majority-in-Interest of the issued and outstanding Common Units that were issued to Class A Preferred Members and Class A-1 Preferred Units upon conversion of their Class A Preferred Units and Class A-1 Preferred Units at the time of the IPO or IPO Alternative (either (x) or (y), the "<u>Initiating Holders</u>") that the Company file a registration statement under the Securities Act covering the resale of Common Units then outstanding or which are issuable upon conversion of the Class A Preferred Units and Class A-1 Preferred Units held by such holders (or such lesser percentage of such Common Units as shall reasonably be expected to yield net proceeds, after underwriting discounts and commissions, of more than five million dollars ($5,000,000)), the Company shall (x) promptly give notice of such registration to the other Members in accordance with <u>Section 9.1(a)</u>, and (y) use its best efforts to effect, as soon as practicable and subject to the terms set forth in this <u>Section 9.1</u>, to cause the registration under the Securities Act of all Registrable Securities that such Initiating Holders request to be registered and all Registrable Securities that any other Members request to be registered pursuant to their piggyback registration rights exercised in accordance with <u>Section 9.1(a)</u>.  Notwithstanding the foregoing, the Company shall not be obligated to effect any registration pursuant to this <u>Section 9.1(b)(ii)</u>: (A) after the Company has effected an aggregate of two registrations pursuant to <u>Section 9.1(b)(i)</u> and/or this <u>Section 9.1(b)(ii)</u>, (B) if the Company has, within the six month period preceding the date of a request pursuant to this <u>Section 9.1(b)(ii)</u>, already effected a registration pursuant to this <u>Section</u>

9.1(b)(ii) or any other registration in which the holders of Class A Preferred Units and Class A-1 Preferred Units and Class A-1 Preferred Units were entitled to participate pursuant to Section 9.1(a), or (C) if, within 30 days following receipt of a request pursuant to this Section 9.1(b)(ii), the Company gives notice to the Members of the Company's intention to file a registration statement pertaining to a registration for its own account within 90 days thereafter in which the holders of Class A Preferred Units and Class A-1 Preferred Units are entitled to participate pursuant to Section 9.1(a).

(iii)     In addition to the demand rights granted to the Class A Preferred Members and Class A-1 Preferred Units pursuant to Sections 9.1(b)(i) and 9.1(b)(ii), subject to the conditions of this Section 9.1, if the Company receives a written request from any Member(s) that the Company file a registration statement on Form S-3 (or any successor to Form S-3 or any other similar short-form registration statement) covering the resale of all or any part of the Registrable Securities held by such Member(s), the Company shall (x) promptly give notice of such registration to the other Members in accordance with Section 9.1(a), and (y) use its best efforts to effect, as soon as practicable and subject to the terms set forth in this Section 9.1, the registration under the Securities Act on Form S-3 (or such other short-form registration statement) of all Registrable Securities that such requesting Member(s) request to be registered and all Registrable Securities that any other Members request to be registered pursuant to their piggyback registration rights exercised in accordance with Section 9.1(a). Notwithstanding the foregoing, the Company shall not be obligated to effect any registration pursuant to this Section 9.1(b)(iii): (A) if the Company does not qualify for the use of Form S-3 (or such other short-form registration statement), (B) if the Members (including any Members joining such registration pursuant to the exercise of their piggyback registration rights in accordance with Section 9.1(a)) propose to sell Registrable Securities at an aggregate price to the public of less than one million dollars ($1,000,000), or (C) if the Company has, within the six month period preceding the date of a request pursuant to this Section 9.1(b)(iii), already effected a registration on Form S-3 (or such other short-form registration statement) for one or more Members pursuant to this Section 9.1(b)(iii) or any other registration in which the Members were entitled to participate pursuant to Section 9.1(a).

(iv)     Notwithstanding the foregoing provisions of this Section 9.1(b), if, within thirty (30) days following receipt of any request for registration pursuant to this Section 9.1(b), the Company shall furnish to the Member(s) requesting the same, a certificate signed by the Chairman of the Board (or another appropriate officer) of the Company stating that, in the good faith judgment of the Board, it would be materially detrimental to the Company and its Members for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (A) materially interfere with a significant acquisition, corporate reorganization or other similar transaction involving the Company, (B) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential and such premature disclosure would be materially adverse to the Company, or (C) render the Company unable to comply with requirements under the Securities Act or the Exchange Act, then the Company shall have the right to defer the filing of such registration statement for a period of not more than ninety (90) consecutive days after receipt of the request of the Member(s); provided, however, that (x) such right to delay a request shall be exercised by the Company not more than once in any twelve (12) month period, (y) the Company shall, as

promptly as possible after the consummation, abandonment or public disclosure of the circumstances that caused the Company to defer the filing of the registration statement, file such registration statement, and (z) the Company shall not register any securities for its own account or that of any other Member during such period (other than a registration relating solely to employee benefit plans).

(c)      <u>Underwritten Offerings</u>.

(i)      If the Members initiating any registration statement under Section 9.1(b) intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 9.1(b), and the Company shall include such information in the written notice to the other Members pursuant to Section 9.1(a). Likewise, if the Company intends to distribute securities by means of an underwriting in any registration that it proposes to initiate on its own behalf and as to which the Members are entitled to piggyback registration rights pursuant to Section 9.1(a), the Company shall include such information in its written notice to the Members pursuant to Section 9.1(a).

(ii)      In the event of any underwritten offering as described in clause (i) above, the right of any Member to include its Registrable Securities in such registration shall be conditioned upon such Member's participation in such underwriting and the inclusion of such Member's Registrable Securities in the underwriting to the extent provided herein. All Members proposing to distribute their Registrable Securities through such underwriting (together with the Company, if applicable) shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting and complete and execute all questionnaires, powers of attorney, indemnities and other documents reasonably required under the terms of such underwriting arrangements. In the case of a Company registration, the underwriter or underwriters for such offering shall be selected by the Company in its sole discretion. In the case of a demand registration initiated pursuant to Section 9.1(b), the underwriter or underwriters for such offering shall be selected by a Majority-In-Interest of the Members eligible and electing to participate in such registration (which underwriter or underwriters shall be reasonably acceptable to the Company, provided that any underwriter of recognized national standing shall be deemed acceptable to the Company). Any Member failing to enter into such underwriting agreement will be excluded from such underwriting.

(iii)      Notwithstanding any other provision of this Section 9.1, if the underwriter determines in good faith, and advises the Company and the Members in writing, that marketing factors require a limitation of the number of securities to be underwritten (including Registrable Securities), then the Company shall so advise all Members holding Registrable Securities which would otherwise be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated (x) first to the participating Class A Members and Class A-1 Preferred Units (pro rata in accordance with their respective holdings on an as-converted basis) and (y) then to all of the remaining Members participating therein on a pro rata basis based on the number of Registrable Securities requested to be included by each such Member; provided, however, that, in the case of a Company-initiated registration, no Registrable Securities shall be included therein unless all securities proposed to

be distributed by the Company are first included.  Any Registrable Securities excluded or withdrawn from such underwriting shall be withdrawn from the registration.

(d)    Registration Procedures.

(i)    Whenever required to effect the registration of any Registrable Securities under this Agreement, the Company shall use its best efforts to, as expeditiously as possible:

(A)    prepare and file with the Commission a registration statement with respect to such Registrable Securities and cause such registration statement to become effective, and keep such registration statement effective until the distribution is completed;

(B)    prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act;

(C)    furnish to each Member such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act and such other documents as they may reasonably request in order to facilitate their distribution of Registrable Securities;

(D)    use commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as are reasonably requested by a Majority-in-Interest of the Members participating in such registration of Registrable Securities, provided that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(E)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering;

(F)    notify each Member holding Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(G)    cause all such Registrable Securities registered pursuant to this Section 9.1 to be listed on a national exchange or trading system and on each securities exchange and trading system on which similar securities issued by the Company are then listed; and

(H)     provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration.

(ii)     With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the Registrable Securities to the public without registration, after such time as a public market exists for the Common Units, the Company agrees to use its best efforts to:

(A)     make and keep public information available, as those terms are understood and defined in Rule 144, at all times after the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(B)     file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(C)     so long as a Member owns any Registrable Securities, to furnish to such Member upon request a written statement by the Company of its compliance with the reporting requirements of Rule 144 (at any time after 90 days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to the reporting requirements of the Exchange Act), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company as such Member may reasonably request.

(iii)     All expenses incurred in effecting any registration pursuant to this Section 9.1 (including the reasonable fees and expenses of one counsel for the Members, chosen by a Majority-In-Interest of the Members participating in such registration) shall be borne by the Company, except all underwriting discounts, selling commissions, and transfer taxes applicable to the sale of Registrable Securities, which shall be borne by the Members in proportion to the number of Registrable Securities so registered on such Member's behalf as compared to all Registrable Securities registered in such offering.

(e)     Indemnification.  In the event any Registrable Securities are included in a registration statement under Section 9.1:

(i)     To the extent permitted by law, the Company will indemnify and hold harmless the Members, the partners, officers and directors of the Members, any underwriter (as defined in the Securities Act) for the Members and each person, if any, who controls the Members or underwriter within the meaning of the Securities Act or the Exchange Act against any losses, claims, damages, or liabilities or action (joint or several) (collectively, the "Damages") to which they may become subject under the Securities Act, the Exchange Act or

other federal or state law, insofar as such Damages (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (collectively a "Violation"):

(A)      any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto;

(B)      the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or

(C)      any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any federal or state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal or state securities law in connection with the offering covered by such registration statement;

and the Company will reimburse each person entitled to indemnification pursuant to this Section 9.1(e)(i) for any legal or other expenses reasonably incurred by them, as incurred, in connection with investigating or defending any such Damages; provided that this Section 9.1(e)(i) shall not apply to amounts paid in settlement of any such Damages if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable for any Damages to the extent they arise out of or are based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by such indemnified person.

(ii)      If any Registrable Securities are included in a registration statement, to the extent permitted by law, the Members will indemnify and hold harmless the Company, each of its directors and Managers, each of its officers who have signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter (as defined in the Securities Act) and any other selling Member under such registration statement or any of such other selling Member's partners, directors or officers or any person who controls such underwriter or other selling Member's within the meaning of the Securities Act or the Exchange Act (collectively, "Company Indemnified Parties"), against any Damages (joint or several) to which any Company Indemnified Party may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by the Member expressly for use in connection with such registration; and the Member will reimburse each Person entitled to indemnification pursuant to this Section 9.1(e)(ii) in connection with investigating or defending against any such Damages; provided that the indemnity agreement contained in this Section 9.1(e)(ii) shall not apply to amounts paid in settlement of any such Damages if such settlement is effected without the written consent of all of the Members (which consent shall not be unreasonably withheld); and provided further, that the total amounts payable in indemnity by a Member under this Section 9.1(d)(ii) in respect of all Violations shall not

44

exceed in the aggregate the net proceeds received by the Member in the registered offering out of which such Violations arise.

(iii)   If for any reason the indemnification provided for in this Section 9.1(e) is unavailable to an indemnified party in respect of any Damages, the indemnifying party shall contribute to the amount paid or payable by the indemnified party in such proportion as is appropriate to reflect the relative benefits received by, and the relative fault of, the indemnified party and the indemnifying party, as well as any other appropriate equitable considerations; provided that in no event shall the liability of a Member (when combined with all amounts contributed or otherwise paid to third parties pursuant to Section 9.1(e)) exceed the proceeds received by such Member upon the sale of Registrable Securities giving rise to the contribution obligation.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of fraudulent misrepresentation.

(f)   Termination of Registration Rights.   Except as otherwise provided herein, the registration rights of any Member pursuant to Section 9.1 shall terminate upon such date as all Registrable Securities that such Member holds or has the right to acquire may immediately be sold under Rule 144 during any ninety (90)-day period without restriction.

9.2   Preemptive Rights.

(a)   The Company shall not issue or sell to any Person any New Units unless the Company provides to each Class A Preferred Member and Class A-1 Preferred Member (for purposes of this Section 9.2, the term "Class A Preferred Members" shall refer collectively to the Class A Preferred Members and the Class A-1 Preferred Members unless specifically referenced to the contrary) written notice (the "Preemptive Rights Notice") at least twenty (20) days prior to the proposed issuance date specifying the prices at which the New Units are proposed to be issued and sold, and all other material terms of the issuance.  The Class A Preferred Members shall have the right to purchase, during the period set forth in Section 9.2(b), at the prices and on the terms specified in the Preemptive Rights Notice, up to the number of New Units (together, the "Maintenance Securities") as are necessary for such Member to maintain its Ownership Percentage as it existed immediately prior to such issuance.  For purposes of clarification, any Class A Preferred Units to be issued at any Class A Preferred Subsequent Closing shall not constitute New Units for purposes of this Section 9.2.

(b)   Each Class A Preferred Member may exercise its right to purchase Maintenance Securities by delivering written notice of acceptance of any offer made in a Preemptive Rights Notice within fifteen (15) days after receipt of the Preemptive Rights Notice, which shall specify the number of Maintenance Securities that the Member desires to purchase (which notice may also specify the number of additional Maintenance Securities in excess of a Member's respective Ownership Percentage that such Member would be willing to purchase if not all Members elect to purchase their Ownership Percentage of the Maintenance Securities being offered) (each, a "Preemptive Rights Exercise Notice").  Delivery of a Preemptive Rights Exercise Notice shall constitute a binding agreement of such Member to

purchase such Maintenance Securities described in such Preemptive Rights Exercise Notice, at the prices and on substantially the same terms and conditions set forth in the Preemptive Rights Notice. If the other Members have elected not to purchase all of the Maintenance Securities to which they are entitled then the remainder of the Maintenance Securities shall be allocated among the Members who have delivered Preemptive Rights Exercise Notices that include offers to purchase Maintenance Securities in excess of their respective Ownership Percentage, which additional Maintenance Securities shall be allocated among such Members based upon their respective Ownership Percentages up to the number of Maintenance Securities that each such Member has indicated that it is willing to purchase. The Company shall have ninety (90) days from the date it sends the Preemptive Rights Notice to consummate the proposed issuance of Maintenance Securities. On the date of such consummation, the Company shall (i) issue certificates representing the Maintenance Securities to be purchased by such Member, registered in the name of and in the denominations specified by such Member in the applicable Preemptive Rights Exercise Notice or (ii) if the Maintenance Securities are not certificated, otherwise evidence that said Units have been issued, in either case against payment by Member of the purchase price for such Maintenance Securities in cash payable by wire transfer of immediately available funds to a bank account specified by the Company or by a certified or bank cashiers' check in lawful money of the United States.

(c)     The provisions of this <u>Section 9.2</u> shall terminate upon the occurrence of a Qualified Public Offering or a Change in Control.

## ARTICLE X

## FISCAL MATTERS; BOOKS AND RECORDS

10.1   <u>Bank Accounts; Investments</u>.   The Company shall deposit Capital Contributions, revenues and any other Company funds in a bank account established in the name of the Company. The Company may, at the direction of the Board of Managers, invest Company funds in furtherance of the purposes of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments.

10.2   <u>Records Required by LLC Act; Right of Inspection</u>.   During the term of the Company's existence and for a period of four (4) years thereafter, the Company shall maintain in its principal office all records required to be kept pursuant to the LLC Act. On written request to the Board stating the purpose, a Member may examine and copy in person, at any reasonable time, for any proper purpose reasonably related to such Member's interest as a Member of the Company, and at the Member's expense, records required to be maintained under the LLC Act; <u>provided, however</u>, that the Board shall have the right to keep confidential any information, to the extent the disclosure of which the Board believes in good faith would not be in the best interest of the Company.

10.3   <u>Books and Records of Account</u>.   The Company shall maintain adequate books and records of account on a basis consistent with appropriate provisions of the Code.

10.4   <u>Tax Returns and Information</u>.  The Members intend for the Company to be treated as a partnership for tax purposes.  The Company shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within seventy-five (75) days after the end of each calendar year, the Company shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of such Person's federal income tax return and state income and other tax returns.

10.5   <u>Intentiionally Omitted.</u>

10.6   <u>Fiscal Year</u>.  The Company's fiscal year shall end on December 31 of each calendar year.

10.7   <u>Tax Matters Member</u>.  The tax matters partner of the Company pursuant to Section 6231(a)(7) of the Code shall be David Thompson (the "<u>Tax Matters Member</u>").  The Tax Matters Member shall be authorized to make any election under the Code, to determine tax accounting methods to be used by the Company and to take any action permitted to be taken by a "tax matters partner" under the Code. The Tax Matters Member shall represent the Company to the IRS solely to the extent required under the Code, in all cases at the expense of the Company. Each Member hereby approves of such designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence such approval.

ARTICLE XI

INDEMNIFICATION

11.1   <u>Indemnification and Advancement of Expenses</u>.  The Company shall, to the fullest extent permitted by law, indemnify any Person (or the testator or intestate of such Person) made or threatened to be made a party to, or called as a witness or asked to submit information in, any action or proceeding, whether civil, criminal, judicial, legislative, administrative or investigative, including an action by or in the right of the Company to procure a judgment in its favor, and including an action by or in the right of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise of any type or kind, domestic or foreign, which such Person is or was serving in any capacity at the request of the Company, by reason of the fact that such Person, is or was a Member, member of the Board, manager, officer, employee, representative or agent of the Company, or is or was serving such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees, incurred in connection with such action or proceeding, or in connection with an appeal therein; provided, however, that no such indemnification shall be made to such Person if a judgment or other final adjudication adverse to such Person establishes that (i) the acts of such Person were committed in bad faith or were the result of such Person's gross negligence, willful misconduct, fraud, active and deliberate dishonesty or knowing violation of the law or this Agreement, or (ii) such Person personally gained in fact a financial profit or other advantage to which such Person was not legally entitled; and provided further that no such indemnification shall be required with respect to any settlement or other non-adjudicated

47

disposition of any threatened or pending action or proceeding unless the Company has given its prior written consent to such settlement or other disposition.

(a)    The Company may indemnify any other Person to whom the Company is permitted to provide indemnification or the advancement of expenses by applicable law.

(b)    The Company shall, upon request, advance to any Person entitled to indemnification under this Section 11.1, or promptly reimburse any such Person for, all expenses, including attorneys' fees, reasonably incurred in defending any action or proceeding in advance of the final disposition of such action or proceeding upon receipt of a written undertaking by or on behalf of such Person to repay such amount as, and to the extent that, the Person receiving such advance is ultimately found not to be entitled to indemnification or, where indemnification is granted, to the extent the expenses so advanced or reimbursed by the Company exceed the indemnification to which such Person is entitled; provided, however, that such Person shall cooperate in good faith with any request by the Company that common counsel be utilized by the parties to an action or proceeding who are similarly situated unless to do so would be inappropriate due to actual or potential differing interests between or among such parties.

(c)    The indemnification of any Person provided by this Section 11.1 shall continue after such Person has ceased to be a Member, member of the Board, officer, employee, representative or agent of the Company and shall inure to the benefit of such Person's heirs, executors, administrators, legal representatives, successors and assigns.

(d)    For purposes of this Section 11.1, the term "Company" shall include any legal successor to the Company, including any company which acquires all or substantially all of the assets of the Company in one or more transactions.

(e)    The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 11.1 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any statute, rule, regulation or agreement.

11.2    <u>Limit on Liability of Members</u>.    The indemnification set forth in this Article XI shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any liability of any Member to any third party.

11.3    <u>D&O Insurance</u>.    The Company shall promptly (and in any event within ten (10) Business Days of February 14, 2013) obtain and shall thereafter maintain a directors' and officers' insurance policy with standard terms, coverage and provisions, in an amount of not less than $1 million per occurrence, which insurance policy shall be reasonably acceptable to RBS. The policy shall not be cancelable by the Company without prior approval by the Board of Managers, including all of the Class A Preferred Members' designees.

ARTICLE XII

DISSOLUTION AND WINDING UP

     12.1    Events Causing Dissolution.  The Company shall be dissolved upon the first of the following events to occur:

          (a)    the vote of the Board and a Majority-In-Interest of the Class A Preferred Members to dissolve and wind up the affairs of the Company;

          (b)    the sale or disposition of all or substantially all of the assets of the Company in a single transaction or a series of transactions, except as otherwise approved by the Board; or

          (c)    entry of a decree of judicial dissolution under the LLC Act.

     12.2    Winding Up.  If the Company is dissolved pursuant to Section 12.1, the winding up of the Company's affairs shall be supervised by a liquidator chosen by the Board and who may be a Member (the "Liquidator").  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, in the name of and for and on behalf of the Company to:

          (a)    prosecute and defend civil, criminal or administrative suits;

          (b)    collect Company assets, including obligations owed to the Company;

          (c)    settle and close the Company's business, and dispose of and convey all Company property, and pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company property;

          (d)    discharge the Company's known liabilities and, if necessary to set up dissolution, establish such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

          (e)    distribute any remaining proceeds from the sale of Company property to the Members in accordance with Section 12.3 hereof;

          (f)    prepare, execute, acknowledge and file a Certificate of Dissolution under the LLC Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

          (g)    exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Members under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The

Liquidator shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation and in Article XI.

12.3   Distribution of Company Property and Proceeds of Sale Thereof.

(a)   Upon completion of all desired sales of Company property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company property that is to be distributed in kind, to the following groups in the following order of priority (without duplication):

(i)   First, to satisfy Company liabilities to creditors, including Members who are creditors, to the extent otherwise permitted by law (other than for past due Company distributions), whether by payment or establishment of reserves;

(ii)   Second, to the Class A Preferred Members, pro rata in accordance with the ratio of their respective Ownership Percentage of the Class A Units until each Class A Preferred Member has received its Class A Liquidation Preference Amount and, if the proceeds thus distributed among the Class A Preferred Members shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire proceeds legally available for distribution shall be distributed ratably among the Class A Preferred Members in proportion to their full preferential amount that each such Member is otherwise entitled to receive under this subsection (ii);

(iii)   Third, to the Class A-1 Preferred Members, pro rata in accordance with the ratio of their respective Ownership Percentage of the Class A-1 Units until each Class A-1 Preferred Member has received its Class A-1 Liquidation Preference Amount and, if the proceeds thus distributed among the Class A-1 Preferred Members shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire proceeds legally available for distribution shall be distributed ratably among the Class A-1 Preferred Members in proportion to their full preferential amount that each such Member is otherwise entitled to receive under this subsection (iii);

(iv)   Fourth, to the Members, in accordance with their respective Ownership Percentages.

(b)   The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Ownership Percentages of each Member in such priority group.

12.4   Deficit Capital Accounts.   Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Allocation Percentage, upon dissolution of the Company, such deficit shall not

be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

      12.5   Filing Certificate of Dissolution.  Upon the dissolution and complete winding up of the Company, a Certificate of Dissolution shall be delivered to the Delaware Secretary of State.  Upon the filing of the Certificate of Dissolution, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the LLC Act.

      12.6   Return of Contributions Non-Recourse to Other Members.  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of Capital Contributions.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contributed by one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

      13.1   Notice.  All notices, requests, or communications provided for or permitted to be given under this Agreement shall be given in writing and addressed (i) if to the Company, to its principal office as set forth in Section 2.5, and (ii) if to any Member, to the last known address for such Member on the Company records, and shall be delivered: (a) by first class United States mail, postage paid, in which case such notice shall be deemed to have been delivered on the seventh day after its proper deposit in the United States mail; (b) by registered or certified United States mail with return receipt requested, postage prepaid, in which case such notice shall be deemed to have been delivered on receipt; (c) by Federal Express or similar overnight national courier, charges prepaid for first business-day delivery, in which case such notice shall be deemed to have been delivered on the first Business Day after deposit with such a courier; or (d) by confirmed facsimile transmission, in which case such notice shall be deemed to have been delivered on transmission; or (e) by personal delivery, in which case such notice shall be deemed to have been delivered on receipt.

      13.2   Entire Agreement.  This Agreement and the Schedules and Exhibits hereto constitute the entire agreement among the parties hereto and contain all of the agreements among such parties with respect to the subject matter hereof.  This Agreement (including the Schedules hereto) supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof, including, without limitation, any term sheet among any of the parties hereto.

      13.3   Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of

such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

13.4    Amendment.  This Agreement and the Certificate of Formation may be amended or modified upon the approval of the Board; provided that neither this Agreement nor the Certificate of Formation shall be amended without the prior written consent of any Member that would be materially and adversely affected by such amendment; and provided, further, that no amendment or modification may be made to the following Sections or Articles or the definitions used therein without the prior written consent of a Majority-in-Interest of the Class A Preferred Members: 1.1, 3.1, Article V, Article VI, 7.1, 7.2, 7.5, 7.6, 8.1, 8.2, 8.3, 8.8, Articles IX and XI, 12.3 and this 13.4.  Subject to compliance with the immediately preceding sentence, this Agreement (and Schedule I hereto) may be amended by the Board as necessary to reflect the admission of any additional Members and/or the Transfer of any Units permitted by the terms hereof.

13.5    Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

13.6    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any conflict or choice of law provisions that would make applicable the domestic substantive law of any other jurisdiction.

13.7    Further Assurances.    In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CULINARY HEALTH INNOVATIONS, LLC

By: _____
Name: David Thompson
Title: President

CULINARY HEALTH INVESTORS, LLC

By: _____
Name: David Thompson
Title: President

RADIUS BRAND STRATEGIES LLC

By: _____
Name: Bruce Shalett
Title: Manager

CAMPBELL INVESTMENT COMPANY

By: _____
Name:
Title:

*Signature Page to Amended and Restated Operating Agreement*
*of CulinaryHealth Innovations, LLC*

_(signature)_

Michael McCloud

_____

John Kelley

_____

Nigel Pearce

_____

Katherine Otte

_____

David Laub

_____

Robert Baird

_____

H. Bain Gill

_____

Hank Smith Revocable Trust

_____

Joseph S. Sheperd

_____

David S. Bollinger

*Signature Page to Amended and Restated Operating Agreement*
*of CulinaryHealth Innovations, LLC*

02/05/2013  10:33   2392677477                    MAILING CENTER                              PAGE   02/05

_____
Michael McCloud


_____
John Kelley


_____
Nigel Pearce


_____
Katherine Otte


_____
David Laub


_____
Robert Baird


_____
H. Bain Gill


_____
Hank Smith Revocable Trust


_____
Joseph S. Sheperd


_____
David S. Bollinger


*Signature Page to Amended and Restated Operating Agreement
of Culinary Health Innovations, LLC*

Michael McCloud _____

John Kelley _____

Nigel Pearce _____

Katherine Otte _____

David Laub _____

Robert Baird _____

H. Bain Gill _____

Hank Smith Revocable Trust _____

Joseph S. Sheperd _____

David S. Bollinger _____

*Signature Page to Amended and Restated Operating Agreement*
*of Culinary Health Innovations, LLC*

_____
Michael McCloud


_____
John Kelley


_____
Nigel Pearce

*Katherine Otte*
_____
Katherine Otte


_____
David Laub


_____
Robert Baird


_____
H. Bain Gill


_____
Hank Smith Revocable Trust


_____
Joseph S. Sheperd


_____
David S. Bollinger


*Signature Page to Amended and Restated Operating Agreement*
*of Culinary Health Innovations, LLC*

_____
Michael McCloud


_____
John Kelley


_____
Nigel Pearce


_____
Katherine Otte


_____
David Laub


_____
Robert Baird


_____
H. Bain Gill


_____
Hank Smith Revocable Trust


_____
Joseph S. Sheperd


_____
David S. Bollinger


*Signature Page to Amended and Restated Operating Agreement*
*of CulinaryHealth Innovations, LLC*

_____
Michael McCloud

_____
John Kelley

_____
Nigel Pearce

_____
Katherine Otte

_____
David Laub

_____
Robert Baird

_____
H. Bain Gill

_____
Hank Smith Revocable Trust

_____
Joseph S. Sheperd

_____
David S. Bollinger

*Signature Page to Amended and Restated Operating Agreement*
*of CulinaryHealth Innovations, LLC*

Michael McCloud
_____

John Kelley
_____

Nigel Pearce
_____

Katherine Otte
_____

David Laub
_____

Robert Baird
_____

H. Bain Gill
_____

Hank Smith Revocable Trust
_____

Joseph S. Sheperd
_____

David S. Bollinger
_____

*Signature Page to Amended and Restated Operating Agreement
of CulinaryHealth Innovations, LLC*

_____
Michael McCloud

_____
John Kelley

_____
Nigel Pearce

_____
Katherine Otte

_____
David Laub

_____
Robert Baird

_____
H. Bain Gill

_____
Hank Smith Revocable Trust

_____
Joseph S. Sheperd

_____
David S. Bollinger

*Signature Page to Amended and Restated Operating Agreement*
*of Culinary Health Innovations, LLC*

## SCHEDULE I

## Members, Capital Contributions and Units

| Member | Initial Capital Contribution | Class A Preferred Units | Class A-1 Preferred Units | Common Units | Ownership Percentage |
|---|---|---|---|---|---|
| Culinary Health Investors LLC | (1) | | | 2,334,512 | 40.26% |
| Radius Brand Strategies LLC | $2,022,383 | 2,537,200 (2) | | | 43.76% |
| Campbell Investment Company | $63,484 | | 134,023 (3)(4) | | 2.31% |
| Michael McCloud | $20,000 | | | 34,843 | 0.60% |
| John Kelley | $20,000 | | | 34,843 | 0.60% |
| Nigel Pierce | $10,000 | | | 17,422 | 0.30% |
| Katherine Otte | $20,000 | | | 34,843 | 0.60% |
| David Laub | $100,000 | | | 174,216 | 3.00% |
| Robert Baird | $10,000 | | | 17,422 | 0.30% |
| H. Bain Gill | $25,000 | | | 43,554 | 0.75% |
| Hank Smith Revocable Trust | $75,000 | | | 130,662 | 2.25% |
| Joseph S. Shepard | $100,000 | | | 174,216 | 3.00% |
| David S. Bollinger | $75,000 | | | 130,662 | 2.25% |
| **Total:** | | 2,537,200 (2) | 134,023(3)(4) | 3,127,195 | 100% |

(1) Initial capital contribution is the value of dilution occurring to Culinary Health Investors LLC's prior 100% ownership percentage in the Company at the time of the closing of the Purchase Agreement plus the excess value of assets transferred to the Company over liabilities assumed by the Company pursuant to that certain Asset Transfer Agreement between the Company and Culinary Health Investors LLC consummated as of the date hereof
(2) Excludes 365,860 Class A Preferred Units reserved for issuance upon exercise of Financing Warrants issued to Radius at the Initial Closing.
(3) Issued at Initial Closing.
(4) Excludes 536,004 Class A-1 Preferred Units reserved for issuance to CIC pursuant to terms of the Consent.

"(B)    Common Units or Unit Equivalents issued under an Option Plan; provided, however, that it is understood and agreed that any issuance or issuances of up to 1,306,148 Common Units (or options to purchase 1,306,148 Common Units) under the Option Plan shall be deemed to constitute Additional Common Units for purposes of adjustments to the Conversion Price of the Class A Preferred Units."

4.    <u>Management</u>.    The following amendments are hereby made to Article VIII of the Agreement:

(a)    Section 8.1(a)(ii) of the Agreement are hereby amended and restated in their entirety as follows:

"(ii)    If the Company fails to meet the budgeted total revenue and/or pre-tax income targets in the annual budget or business plan approved by the Board for three consecutive fiscal quarters commencing with the third fiscal quarter of 2013; provided that such shortfall is equal to or in excess of 15% of either of such budgeted revenue and/or pre-tax income targets on a cumulative basis per budgeted item, then (and only then), promptly following written notice from RBS, CHI Vermont shall designate one (1) Manager to resign from the Board and a Majority-In-Interest of the Class A Preferred Members shall have the right to appoint one (1) additional Manager to the Board and thereafter the Class A Preferred Members shall have the right to appoint four (4) Managers to the Board and CHI Vermont shall have the right to appoint two (2) Managers to the Board.

This Section 8.1(a) (ii) shall become null, void and of no force and effect at such time as RBS and its Affiliates shall no longer be the owners of at least 15% of the outstanding membership interests of the Company measured on as converted to Common Units basis."

(b)    Section 8.1(b) of the Agreement is hereby amended and restated in its entirety as follows:

"(b)    <u>Resignation and Removal</u>.    Any Manager may resign from the Board at any time. A resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company. The resigning Manager shall be replaced by a vote of those Members entitled to appoint such Manager. Except as provided in the next succeeding sentence, any Manager may be removed, with or without cause, at any time at the election of the Majority-In-Interest of the Members entitled to appoint such Manager, and only by those Members. The Independent Manager may be removed at the election of both RBS and CHI Vermont; provided, however, if there is a deadlock with respect to such removal, the Executive Chairman of the Company (if at such time there exists more than one Executive Chairman, then both Executive Chairmen) shall be entitled to cast an additional tie breaking vote for removal. Such decision shall be based on his good faith business judgment for the Company as a whole. In the event of any removal of the Independent Manager, the replacement Independent Manager shall be designated by RBS, subject to the approval of CHI Vermont, which shall not be unreasonably withheld."

(c)    Section 8.2 of the Agreement is hereby amended by adding a new subsection (i) thereto and renumbering subsection (i) to (j) as follows:

"(i)    increases to the size of the Board; and

(j)    any other action specifically provided elsewhere in this Agreement as subject to the approval of the Board."

     5.      <u>Counterparts</u>.  This Amendment may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

     6.      <u>Governing Law</u>.  This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware.

(Signature page to follow)

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the _____ day of March, 2013.

**BOARD OF MANAGERS:**

_____
David Thompson

_____
Bruce Shalett

_____
Peter Klein

_____
David McCarron

_____
Todd Meister

_____
Keith Meister

_____

**CLASS A PREFERRED MEMBER:**

RADIUS BRAND STRATEGIES, LLC

By:_____
    Bruce Shalett, Co-Manager

 **Gmail**

Stuart Revo <revolaw@gmail.com>

---

## Election of New manager of CHI VT
12 messages

---

**Hank** <westwind@vermontel.net>            Tue, Apr 28, 2015 at 11:20 AM
To: Bruce Shalett <bshalett@intelligentquisine.com>
Cc: normctfn@gmail.com, revolaw@gmail.com

To Culinary Health Innovations, LLC

attn: Bruce Shallet

   I was the Chair at a Members Meeting of Culinary Health Investors, LLC ("CHIVT") held on Friday, April 24, 2015.  At that meeting, the members approved the election of Norman Friedland as the new Manager of CHIVT, replacing David Thompson, , effective on that date.


   Henry Smith

---

**Norm Friedland** <normctfn@gmail.com>        Tue, Apr 28, 2015 at 11:43 AM
To: Henry Smith <westwind@vermontel.net>, Stuart Revo <revolaw@gmail.com>, Sheryl WuDunn <wudunn@gmail.com>, Peter Klein <peter@pkassoc.com>, Joseph Sheperd <jsheperd@gmail.com>, Gene D'Ovidio <genedovidio@earthlink.net>

fyi...nmf
————— Forwarded message —————
From: **Norm Friedland** <normctfn@gmail.com>
Date: Tue, Apr 28, 2015 at 11:42 AM
Subject: Re: Election of New manager of CHI VT
To: Bruce Shalett <bshalett@intelligentquisine.com>
Cc: sean macpherson <smaclaw@optonline.net>


Bruce...a per my authority under the CHIVT Operating Agreement, effective immediately have appointed myself as one of the CHIVT designees to the Board of Culinary Health Innovations, LLC, with the recognitions that CHIVT has the right to appoint additional persons to the CHIDE Board as per the CHIDE Operating Agreement. .  Please arrange for me to receive copies of all Board and Member actions from November 1, 2014 through the date hereof.   Additionally, please provide information about current D&O for all CHIDE Board Members.   Thank you  Norm  Friedland .
[Quoted text hidden]

STUART WARREN REVO
P.O. BOX 801
MANCHESTER, VERMONT 05254

Sean Macpherson
Macpherson Counsel LLP
168 Sunset Hill Road
Redding, CT 06896

May 27, 2015

Re: Wrongful Refusal to Seat Norman Friedland on Board

Dear Mr. Macpherson,

I am writing in my capacity as a member of Culinary Health Investors, LLC, and as Secretary of that company, usually referred to as "CHI Vermont" or "CHI VT". As you know, at the session of the Special Meeting of Members of CHI Vermont on April 24, 2015, David Thompson's resignation as the Manager of CHI Vermont was accepted, along with his withdrawal as a Member of the Company. At the same Meeting, Norman Friedland was duly elected by the Members to replace Mr. Thompson as Manager, and was appointed as one of CHI VT's representatives to the Board of Culinary Health Innovations, LLC ("CHI Delaware"). All of these actions were ratified by the Members at the April 24th Meeting.

As General Counsel of CHI Delaware, (and lacking standing to object to any action taken to govern the internal business and affairs of CHI VT or any basis in the laws of Vermont), you have challenged the authority of the members of CHI VT to take these actions, and (presumably based upon your erroneous and conflicted advice) CHI Delaware has wrongfully refused to seat Mr. Friedland on the Board of CHI Delaware.

The April 24th Meeting was duly noticed and convened. Membership Interests far in excess of a quorum were present, including the following:

Hank Smith Revocable Trust by Trustee in person, Peter Klein in person, Sheryl WuDunn in person, Richard Gray in person, Carl Johnson in person, Gene D'Ovidio in person, Norm Friedland in person, Stuart Revo in person, David Thompson (by written proxy to Stuart Revo) and David Bollinger (by written proxy to Norm Friedland). For the purposes of constituting a quorum, 1,680,070 Membership Interests were present and confirmed by me at the time of the Meeting with contemporaneous hand-written notes. This represents 86.34% of the outstanding Membership Interests at the moment the Meeting was convened, and prior to the surrender by Mr. Thompson of his 297,415 membership interests which occurred later in the Meeting. There is no doubt whatsoever that a proper quorum was mustered. Nor has any Member challenged the Notice of Meeting or the Quorum or the actions taken at the Meeting. You have also improperly and inaccurately challenged Mr. Thompson's right to vote at the Meeting, in view of his resignation and withdrawal. However, prior to the moment of that resignation and withdrawal as a member, Mr. Thompson was entitled to vote to accept that resignation and withdrawal.

He did so, by his proxy to me, which expressly authorized and instructed me to vote affirmatively on accepting the resignation and withdrawal. Even if you were correct in insisting that Mr. Thompson's proxy vote cast by me was invalid (and you are not correct on this point, or any other in your recent communications to Mr. Friedland), the unanimous Member vote in favor of acceptance of Mr. Thompson's resignation and withdrawal would have constituted 100% of the Membership Interests present and voting at the Meeting, and 83.87 % of the outstanding Membership Interests even after surrender of Mr. Thompson's shares to the Treasury (and eliminating his previous interests from the calculation). Your legal position, asserted on behalf of CHI Delaware, is not even vaguely colorable. It is pure and conspiratorial hokum, and you must know it. Your threats to complain about Mr. Friedland's efforts to represent CHI VT on the CHI Delaware Board and communicate directly with other CHI Delaware Board members have no merit, and may violate the Rules governing your own professional conduct. Moreover, as CHI Delaware counsel, you have a duty to give impartial advice to all of the members of CHI Delaware, instead of clearly tilted legal positions in support of its controlling member.

CHI Delaware's refusal to recognize and seat Mr. Friedland continues the long running course of conduct towards CHI VT marked by lack of transparency, lack of disclosure, and oppression of the minority member by the controlling member. This course of conduct has prevented CHI VT from exercising all of its rights under the Operating Agreement of CHI Delaware and under Delaware law. Mr. Friedland's prior removal as a Board member of CHI Delaware by Mr. Thompson in no way prevents CHI Vermont from subsequently restoring Mr. Friedland to the Board of CHI Delaware. That is exactly what has occurred. As stated in Mr. Friedland's prior communications with you, his earlier removal from the Board of CHI Delaware was a condition of Mr. Thompson's personal settlement with CHI Delaware. I have firsthand knowledge that there was no support whatsoever among the members of CHI VT for Mr. Friedland's removal by Mr. Thompson. The present refusal to recognize or seat Mr. Friedland as a full member of CHI Delaware's Board is unjustified and unlawful.

As I stated in my opening sentence, the above represents purely my personal view as a member of CHI VT, and my factual report (as Secretary) on the April 24th Special Meeting quorum, proxies and voting. I do not represent CHI VT as a lawyer, nor should this communication be deemed or construed as any such legal representation.

Very truly yours,

*Stuart Revo*

Member and Secretary of Culinary Health Investors, LLC

cc: Alexander Kanen, Esq.

and Members of Culinary Health Investors, LLC

 **Gmail** Stuart Revo <revolaw@gmail.com>

---

## Demand for Inspection of Books and Records
10 messages

---

**Henry Smith** <hanksmith1143@gmail.com>  Thu, May 28, 2015 at 5:26 PM
To: "Bruce Shalett <bshalett@intelligentquisine.com>, Todd Meister <tmeister@meisterglobal.com>, corey singman <coreydsingman@gmail.com>, sean macpherson" <smaclaw@optonline.net>, shallet@bsfreemen.com
Cc: Mike McCloud <mike@uptownbakers.com>, jkelley@ompmail.com, Nigel Pearce <revnigelpearce@gmail.com>, "David C Laub Jr." <dclaubjr@gmail.com>, robert.baird@dorel.com, "Bain (RBC Dain)" <Bain.Gill@rbcdain.com>, "&#39;Hank Smith&#39;," <westwind@vermontel.net>, Joseph Sheperd <jsheperd@gmail.com>, Dave Bollinger <vtbolly@gmail.com>, Sheryl WuDunn <wudunn@gmail.com>, Stuart Revo <revolaw@gmail.com>, kim lopdrup <klopdrup@redlobster.com>, msadopt@aol.com, Norm Friedland <normctfn@gmail.com>

Bruce, Todd

I've attached the "Demand for inspection of records and Books"

I will look forward to getting your response

Henry Smith, Trustee

Henry Smith (Hank Smith) Revocable Trust

---

📄 **CHIDEmemberDEMANDinspection5.28A.docx**
22K

5.28A

# DEMAND FOR INSPECTION OF BOOKS AND RECORDS

To:  Board Members  of Culinary Health Innovations, LLC—Bruce Shalett, Todd Meister, Corey Singman and Robert  Jacobs; Seam MacPherson, Secretary and counsel to Culinary Health Innovations, LLC and Robert Jacobs, Chief Executive Officer of Culinary Health Innovations, LLC

 CC:
mike@uptownbakers.com,jkelley@ompmail.com,revnigelpearce@gmail.com,dclaubjr@gmail.com,rober t.baird@dorel.com,Bain.Gill@rbcdain.com,westwind@vermontel.net,jsheperd@gmail.com,vtbolly@gma il.com,wudunn@gmail.com,Stuart Revo <revolaw@gmail.com>,kim lopdrup <klopdrup@redlobster.com>,msadopt@aol.com

May 28, 2015

    In accordance with Section 18-305 of the Delaware Limited Liability Company Act (the "LLC Act"), the undersigned who is a record and beneficial member of  Culinary Health Innovations, LLC ("CHIDE") respectfully demands, for  purposes reasonably related to my  interest as a member of the CHIDE  (which purposes include to evaluate (i) the value of my ownership interest (assuming the invalidity of the conversion of the Radius loan into additional CHIDE equity) (ii) the performance of CHIDE's  management (including the justification of compensation arrangements) and (iii) the legitimacy of the issuance of new CHIDE securities, including compliance with relevant securities laws and the legitimacy of the dilution of the membership  interests of Culinary Health Investors, LLC ("CHIVT") in CHIDE)    true and full information regarding the status of the business and financial condition of CHIDE.

Although the relevant Delaware case (see footnote 1 below)) mentions 'an investigation of wrongdoing" as a legitimate reason for this inspection, I am not making, nor should there be any inference that I am making, any accusation of wrongdoing.

The information I am seeking from this inspection is  specifically;

(i)  evidence of due issuance of indebtedness to Radius Brand Strategies ("Radius") and related documentation; legal advice provided to Board regarding its decision to authorize and approve the conversion of the Radius loan into CHIDE equity in the face of Section 4.5 of the Operating Agreement prohibiting  such conversion;

 (ii) Financial statements of CHIDE for 2013 and 2014, and for the first quarter of 2015,including auditor reports;  documentation evidencing furnishing of required  tax information  to Members; documentation of report of interest income to Radius re: Radius loan;

(iii) The specific terms  of CHIDE's  successful 'capital raising efforts' as mentioned in the communication from Bruce Shalett on May 15, 2015 (item A below) ;

(iv)  In connection with item (ii) above : (a)  legal opinions furnished by CHIDE's counsel in connection with any issued securities; (b) fees or commissions paid to brokers or finders, (c) evidence of filings with

ITEM A

Dear Members of Culinary Health Innovations, LLC,

We wanted to give you a brief update on the affairs of IQ (the Company) since our last communication. We are pleased to report that our capital raising efforts have been successful and have allowed the Company to make tremendous progress since the fourth quarter of 2014. This capital has been strategically deployed along several avenues which have resulted in very real progress and traction in getting the Company's products to market - - we currently have developed a substantial sales pipeline for the next 12 months, with initial shipments scheduled for September 1 of this year. Our customers include several large insurance companies, healthcare institutions, physician practice groups, post-acute care service providers among many others. Of particular interest, we have re-engaged with the American Heart Association, and are actively discussing a partnership on several "game-changing" initiatives. We have also identified key industry partners who are truly excited about selling our products in multiple channels, and we are confident based upon these relationships, and the early success of the product launch, that we will see quick and dramatic ramping of sales.

The Company has engaged several world-class experts in the areas of research and development, marketing, production and commercialization, and we are currently actively engaged in the production of marketing/sales materials, and collateral, website and fulfillment technology infrastructure. Additionally, we have been working with patent counsel and Dr. Khoo of Campbells to craft an aggressive strategy to extend and protect our IP.

We have also identified additional equity investors who firmly believe in the potential of the Company and we are in active discussions to raise additional equity capital sufficient to scale production of the Company's products to a new level and fund the operations through 2016.

Although certain minority shareholders seem intent on continuing to be a distraction rather than support the Company, we have been working tirelessly to protect and enhance the value of your investment. Given the reception we've received from both customers and investors, we are confident in a continued appreciation of the Company's valuation through the end of the year and beyond. Intelligent Quisine is finally on the verge of becoming a commercial reality, and establishing itself as the gold-standard of science-based meal programs. We hope that you are as excited about these developments as your management team is and we will endeavor to keep you informed of our progress as further events unfold.

Sincerely,

Bruce Shalett, Co-Chairman

May 15, 2015

********************************************************************************

*****************************************************************************

**BEFORE THE BUSINESS CONDUCT COMMITTEE**
**OF THE**
**CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| Bruce Shalett | ) |
| 5 Lincoln Woods Road | )   File No 11-0041(a) |
| Purchase, NY 10057 | ) |
| | ) |
| | ) |
| Respondent | ) |
| | ) |

**AMENDED**
**DECISION ACCEPTING OFFER OF SETTLEMENT**

This proceeding was instituted by the Business Conduct Committee (the "Committee") of the Chicago Board Options Exchange, Incorporated (the "Exchange") as a result of an investigation by the staff of the Exchange, which indicated that there was probable cause for finding a violation within the disciplinary jurisdiction of the Exchange. In accordance with that determination, the Committee directed the issuance of a Statement of Charges ("Statement of Charges"). Pursuant to Exchange Rule 17.8, the respondent ("Respondent"), Bruce Shalett ("Shalett"), submitted an offer of settlement ("Offer of Settlement").

In submitting the Offer of Settlement, the Respondent neither admitted nor denied the violations alleged in the Statement of Charges.

The Respondent has agreed that the determination of the Committee to accept the Offer of Settlement shall constitute a final Decision, and, as provided in Exchange Rule 17.8, the Respondent may not seek review thereof.

The Respondent understands and acknowledges that the Committee's decision in this matter will become part of his disciplinary record and may be considered in any future Exchange proceeding.

With due regard to the particulars of this matter, the Committee believes it is appropriate to accept the Respondent's Offer of Settlement based on the following stipulated facts and findings and thereby to impose the sanction specified below.

**FACTS**

1.      During all relevant periods, Arjent Capital Markets LLC ("Arjent"), was a member organization of the Exchange registered to transact business on the Exchange in accordance with Exchange Rules as an organization that conducts a Market-Maker and proprietary trading business in stocks, options and financial futures.

File No. 11-0041(a)

2.  During all relevant periods herein, Shalett was an Associated Person of Arjent, in that he was a Managing Member of Alzeon Holdings, LLC ("Alzeon"), a Class A member of Arjent.

3.  During all relevant periods herein, Exchange Rule 4.1 – Just and Equitable Principles of Trade, was in full force and effect.

4.  In or about November 2008 through in or about October 2009, Alzeon engaged in conduct whereby it received an aggregate sum of $60,754 from Arjent by accepting monthly compensation when Alzeon's capital account was a negative balance.

5.  In or about November 2009, Shalett escrowed with Arjent's regulatory counsel the sum of $4.5 million in contemplation of contributing said funds to Arjent for the purpose of purchasing and/or redeeming the equity interests of the Arjent's Class B members in the event that Arjent was unable to resume trading.

6.  On March 9, 2010, approximately $3.275 million of Shalett's escrowed funds were transferred for the purpose of purchasing, and were in fact used to purchase, 100% of the equity interests of the commodity pool operators (and their participants) associated with Arjent.

7.  On March 26, 2010 Arjent completed a second round of redemptions of Class B Member equity interests that was funded principally by Shalett.

8.  Shalett's total contributions toward the repurchase or redemption of Arjent's Class B Member equity interests exceeded $7.0 million.

9.  Every Class B Member of Arjent received full value for his/its equity interest in Arjent.

## FINDINGS

The acts, practices and conduct described in Paragraph 4 above constitute violations of Exchange Rule 4.1 by Shalett, in that Alzeon engaged in conduct whereby it improperly withdrew funds from Arjent by accepting monthly commission in the aggregate sum of $60,754 when its capital account was a negative balance.

## SANCTION

The sanction to be imposed shall consist of a censure and an undertaking whereby Shalett shall be required to re-qualify and pass the General Securities Principal Series 24 supervisory examination within 90 days after the issuance of the Decision in this matter.

## ORDER

**ACCORDINGLY IT IS ORDERED THAT**, the Respondent, Bruce Shalett shall be and hereby is censured.  Furthermore, the BCC hereby orders a modification to the BCC Decision Order

File No. 11-0041(a)

previously issued on May 31, 2012, whereby Mr. Shallot was required to re-qualify and pass the General Securities Principal Series 24 supervisory examination within 90 days after the issuance of the Decision in this matter. The BCC hereby modifies the Decision Order in the following respects, in view of Mr. Shalett's lack of affiliation in the securities industry; Mr. Shalett shall have an affirmative obligation to immediately notify the Exchange's Office of Enforcement in writing upon any re-affiliation in the securities industry. In the event Mr. Shalett re-affiliates in the securities industry, he shall be required to re-qualify and pass the General Securities Principal Series 24 supervisory examination within 90 days from any re-affilation in the securities industry or as applicable prior to acting in a capacity requiring such registration. In accepting the Offer of Settlement, the Committee considered the capital contribution Respondent voluntarily made to prevent losses of capital by the class B members of Arjent Capital Markets LLC ("Argent") when they withdrew from the firm.

**SO ORDERED**
**FOR THE COMMITTEE**

Dated:  **November 12, 2012**          By:  **/s/ Bruce Andrews**
                                             **Bruce Andrews**
                                             **Chairman**
                                             **Business Conduct Committee**

STATE OF VERMONT

SUPERIOR COURT                                    CIVIL DIVISION
Bennington Unit                                  Docket No. 97-4-16 Bncv.


CULINARY HEALTH INVESTORS, LLC.            :
DAVID BOLLINGER                            :
JOSEPH SHEPARD                             :
DAVID LAUB and                             :
HENRY S. SMITH REVOCABLE TRUST             :
                                           :
Plaintiffs                                 :
                                           :
v.                                         :
                                           :
CULINARY HEALTH INNOVATIONS, LLC,          :
RADIUS BRAND STRATEGIES, LLC.,             :
BRUCE SHALETT and                          :
SEAN MACPHERSON                            :
                                           :
Defendants                                 :
                                           :
AND DERIVATIVELY FOR                       :
CULINARY HEALTH INNOVATIONS, LLC           :
                                           :
v.                                         :
                                           :
RADIUS BRAND STRATEGIES, LLC               :
BRUCE SHALETT, Individually and            :
SEAN MACPHERSON, Individually              :

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR LACK OF PROPER VENUE

**NOW COMES** Culinary Health Innovations, LLC, Radius Brand Strategies, LLC., Bruce Shalett and Sean Macpherson, Defendants, by and through their counsel Pratt Vreeland Kennelly Martin & White, Ltd., and hereby moves for an Order dismissing the Complaint in this action due to lack of personal jurisdiction over the Defendants and for lack of proper venue. In support of this Motion, Defendants shall rely on the Memorandum of Law set forth below and the Exhibits and Affidavits submitted herewith.

### MEMORANDUM OF LAW

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

1

## PROCEDURAL POSTURE OF THE CASE

Plaintiffs filed this case on or about April 22, 2016. Defendants have removed this case to the U.S. Federal District Court for the District of Vermont and requested that the Federal District Court stay such proceedings pending the adjudication by this Court of two preliminary motions, including this motion, which may determine the outcome of this case. A motion, to disqualify plaintiffs' counsel, is being been filed contemporaneously herewith.

## HISTORICAL BACKGROUND

### A. The Bankruptcy Restructuring

Culinary Health Innovations, LLC ("CHIDE" or the "Company") is a Delaware limited liability company originally formed in 2011 as a wholly-owned subsidiary of the named company plaintiff, Culinary Health Investors, LLC ("CHIVT"). CHIVT is a Vermont limited liability company which has historically been solely managed and operated by its founder, David Thompson ("Thompson"). The primary business of the Company has been to develop and bring to market certain food products based upon proprietary and patented formulas and other intellectual property (collectively, the "Proprietary Information") acquired from a subsidiary of the Campbell Soup Company (referred to herein as "CIC"). Pursuant to a bankruptcy reorganization plan the Company and CHIVT were restructured in March 2013 resulting in CHIVT transferring all rights in the Proprietary Information to the Company and CHIVT becoming a common equity owner of the Company. Such bankruptcy reorganization plan also included a financial closing in March 2013 pursuant to which, among other things, named defendant Radius Brand Strategies, LLC ("RBS") invested over $2 million in new capital into the Company and certain existing CHIVT investors, including plaintiffs, agreed to convert outstanding loans to CHIVT into common equity interests in the Company. The plaintiffs

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
RUTLAND, VT
05702-0280

2

collectively converted $350,000 in promissory notes in return for Common Units of the Company (as defined in the Amended and Restated Limited Liability Company Operating Agreement of the Company dated as of March 13, 2013 and attached to plaintiffs' complaint as Exhibit A (the "Operating Agreement" or "OA") – capitalized terms not defined herein shall have meaning set forth in the OA. As of the time of the financial closing these Common Units equated to a 10.5% ownership interest in the Company. CHIVT did not put any additional capital into the Company as part of the financial closing but received a 40.26% interest in the Company in the form of Common Units. RBS is wholly owned by named defendant Bruce Shalett and his partner Todd Meister. RBS's $2 million plus investment in the Company was in return for Class A Preferred Units equating to a 43.76% ownership of the Company. These Class A Preferred Units entitle RBS to certain preferential rights not afforded to the Common Units.

None of the plaintiffs as Common Members have any anti-dilution protection as Common Members under the Operating Agreement. Affording these preferred rights to RBS as the sole Class A Preferred Member was negotiated and in recognition of, among other things, the fact that the Company would not have been able to emerge from bankruptcy without RBS's investment. In making its investment RBS relied on certain materials prepared by, or with the assistance of, CHIVT, Thompson (then CEO of CHIVT) and their affiliates, including without limitation a business plan and certain financial projections. In making its investment RBS relied on certain representations of CHIVT, Thompson and their affiliates, including without limitation the ability of the Company and Thompson to effectively utilize the Proprietary Information to develop, manufacture and bring to market the Company's products. Moreover, Thompson and attorneys Revo and Friedland (discussed *infra*) were the primary architects of the bankruptcy reorganization plan. Pursuant to the reorganization plan Thompson, Revo and Friedland included

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
RUTLAND, VT
05702-0280

3

2013 and terminated from all management positions in August 2013. Shalett and Meister presented opportunities to the remaining investors in the Company, including the individual plaintiffs, to invest additional capital, but by the end of 2013 only one CHIVT investor, Mr. Kim Lopdrup, agreed to additional financing. By May of 2014 the RBS principals and Mr. Lopdrup put in over $500,000 of additional capital in the form of loans evidenced by notes to keep the Company afloat.

Also during this period the Board attempted to hire a number of different chief executive officers to run the Company, but primarily because of a lack of capital the Board was unable to secure a permanent management solution to run the affairs of the Company. In fact during this period and beyond Messrs. Shalett and Meister contributed hundreds of hours of their own time to help manage the day-to-day operations and keep product development and marketing moving forward.

The Board and RBS continued their efforts to raise new capital to keep the Company going, and in the third quarter of 2014 engaged an investment house in New York to bring in new capital. New convertible notes were negotiated to be the investment vehicle for new capital. One of the terms required by the investment house in order to raise the new capital was that RBS and Lopdrup convert all of their outstanding promissory notes to Common Units so that the new money notes would not be subordinate to the outstanding debt. RBS and Lopdrup did in fact convert their notes to Common Units in October 2014, and from October 2014 through April 2015 the Company was successful in raising over $1,300,000 in new money.

During the 2013-2014 time frame when RBS was seeking additional investment from existing Company investors, Mr. Norman Friedland, an attorney, purported to represent the interests of several CHIVT investors and claimed he had access to significant new capital which

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

5

he would bring to the table in return for control of the Company. Despite numerous communications with Friedland on this matter he was never able to produce a bona fide investor and it became apparent that his true purpose was to restructure some of the CHIVT investors' investments to secure them a more favorable position in the Company. In order to clean up the capitalization table of the Company to facilitate raising new capital, the Board made offers to the minority investors in the Company and CHIVT to restructure their investment by either receiving a buyout of their position or converting into a different class of preferred equity security of the Company. Each time the members of the CHIDE Board felt they were close to agreeing on restructuring terms, Friedland scuttled the deal, holding out for more favorable terms for a few CHIVT investors he purported to represent.

During this same period Friedland was CHIVT's designee to the CHIDE Board, having been appointed by Thompson in accordance with §8.1 of the Operating Agreement. During 2013 and 2014 when the Company was attempting to raise additional capital from other CHIDE and CHIVT members as well as new investors, Friedland became increasingly disruptive to the Board and the Company's operations. Instead of exercising the requisite duties of loyalty and care as a Board member of CHIDE, Friedland carried out his own agenda of (i) championing a better position for a few (not all) of the CHIVT investors he purported to represent and (ii) attempting to frustrate new capital coming into the Company in favor of his own preferred "financing plan" which never materialized. During this period Friedland continually leaked confidential Company information he had acquired as a Board member to his CHIVT "clients" and also engaged in a public campaign of disparagement and harassment against RBS, its principals and the Company. Friedland went so far as to leak confidential Company information to Thompson's litigation attorney at a time when Thompson was threatening litigation against

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

6

the Company. The other Board members, through Company counsel, repeatedly communicated to Friedland that he had a material and irreconcilable conflict of interest, that he cease and desist his campaign of harassment and disparagement against the Company, RBS and its principals, and that he resign from the CHIDE Board.

At the request of the Board Thompson finally removed Friedland as the CHIVT designee to the CHIDE Board effective December 2, 2014 (See, email attached hereto as Exhibit A). In late April of 2015 the Board received an email from plaintiff Smith indicating that he was "Chair" at a "Members Meeting" of CHIVT at which "the members approved the election of Norman Friedland as the new Manager of CHIVT, replacing David Thompson." (See, Exhibit B to the Complaint). Shortly thereafter the Board received an email from Friedland indicating that he had appointed himself as a CHIVT designee to the CHIDE Board. (See, Exhibit B to the Complaint). In light of (i) Friedland's historical material conflict of interest resulting in his previous removal for cause as the CHIVT designee to the CHIDE Board, (ii) Friedland's campaign of disruption, disparagement and harassment against the Company, RBS and its principals, (iii) the unique voting requirements contained in the CHIVT operating agreement, including that Thompson affirmatively approve all actions and super majority voting on certain actions, and (iv) communications from Thompson's attorney that CHIVT had not received the requisite votes to implement these actions, the Board requested Company counsel to ask for verification from CHIVT as to legitimacy of these actions. Neither Friedland nor anyone from CHIVT ever provided any of the requested documentation or any other verifiable proof that these actions were properly authorized. Plaintiffs' attorney Stuart Revo forwarded the letter attached as Exhibit C to the Complaint, in which Revo expresses his "view as Secretary of CHIVT," again without supporting documentation, as to the authenticity of the actions taken.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
Rutland, VT
05702-0280

7

Mr. Revo has been intimately involved with CHIVT, Thompson and the Company from the beginning, acting as company counsel to CHIVT's predecessor, ostensibly acting as Thompson's counsel or advisor, and acting as counsel to CHIDE, holding himself out as "Company Counsel" from CHIDE's emergence from bankruptcy until approximately January 31, 2014.[1]

## LEGAL STANDARD

With respect to a motion to dismiss for lack of personal jurisdiction the party opposing the motion must make a *prima facie* showing of jurisdiction, or, in other words, ". . . demonstrate facts which would support a finding of jurisdiction." *See Godino v. Cleanthes*, 163 Vt. 237, 239, 656 A.2d 991, 992 (1995). The nonmoving party's prima facie showing must go beyond the pleadings and rely upon specific facts set forth in the record. *Schwartz v. Frankenhoff*, 169 Vt. 287, 295, 733 A.2d 74, 81 (1999).

"It is well settled that Vermont courts must have both statutory and constitutional power to exercise personal jurisdiction over a nonresident defendant. . . Because 'Vermont's long-arm statute, 12 V.S.A. § 913(b), permits state courts to exercise jurisdiction over nonresident defendants to the full extent permitted by the [federal] Due Process Clause,' our statutory and constitutional analyses are the same—the jurisdictional issue is resolved under federal constitutional law as interpreted by the U.S. Supreme Court. *State of Vermont v. Atlantic Richfield Company, et al.*, 2016 VT 22 (October Term, 2015), quoting *Schwartz, supra*; (internal quotation omitted); *see also N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 40-41, 572 A.2d 1382, 1385-86 (1990).

The Vermont Supreme Court in *State of Vermont* went on to discuss the relevant U.S. Supreme Court precedent regarding personal jurisdiction:

---

[1] Defendants have filed a motion to disqualify Mr. Revo contemporaneously herewith.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

8

> The Due Process Clause of the Fourteenth Amendment [to the United States Constitution] limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291 (1980). "[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *Id.* (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). The concept of minimum contacts not only "protects the defendant against the burdens of litigating in a distant or inconvenient forum," but also "acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen,* 444 U.S. at 291.

*Id.* at ¶12. "A court may exercise either general or specific jurisdiction over a nonresident defendant." *Fox v. Fox,* 2014 VT 100, ¶ 27, 197 Vt. 466, 106 A.3d 919. General jurisdiction "applies to suits not arising out of or related to the defendant's contacts with the forum state. . ." and ". . . specific jurisdiction . . . requires that "a defendant has 'purposefully directed . . . activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)); *see also Dearwater v. Bond Manufacturing Company,* 2007 WL 2745321 (D.Vt.)("General jurisdiction is based on a defendant's "general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.")(A copy of the *Dearwater* decision is attached hereto as Exhibit B). "Specific jurisdiction is satisfied when a defendant has "fair warning" that a particular activity may subject it to the jurisdiction of a state by virtue of the fact that the defendant "purposefully directed" its activities at residents of the forum state and that the litigation results from injuries arising out of or relating to those activities. *State of Vermont,* at ¶14, quoting *Burger King,* 471 U.S. at 472-73 (quotations omitted).

However, ". . . neither 'random, fortuitous, or attenuated contacts,' *Burger King,* 471 U.S. at 475 (quotations omitted), nor 'the mere unilateral activity of those who claim

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

9

some relationship with a nonresident can satisfy the requirement of contact with the forum State,' *World-Wide Volkswagen*, 444 U.S at 298 (quotation omitted)." *Id.* at ¶15. See also *Artec Distributing, Inc. v Video Playback, Inc.*, 799 F.Supp. 1558, 1560 (D. Vt. 1992) (quoting *World Wide Volkswagen, supra*, 444 U.S. at 298).

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on 'the relationship among the defendant, the forum, and the litigation.' *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984) (quoting *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977)). For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014). "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id., quoting Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 475 (1985). "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties. See *World-Wide Volkswagen Corp.*, *supra*, at 291–292. We have consistently rejected attempts to satisfy the defendant focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State. See *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction"). " *Walden* at 1121-1123.

The defendant must "reasonably anticipate being hauled into court" in the subject forum. *Anichini, Inc. v. Campbell*, 2005 WL 2464191, *1 (D.Vt. 2005) (Murtha, J.) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (emphasis added).)

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

"In Vermont, the oft-quoted standard ... is whether a defendant has committed an [i]ntentional and affirmative action constituting active planned participation in the Vermont market. (Citation omitted.) In that connection the Court looks to whether the defendant has engaged in a general course of conduct as purposefully directed toward Vermont and as inevitably affecting persons in this state." *Artec Distributing, Inc. v Video Playback, Inc.,* 799 F.Supp. 1558, 1560 (D. Vt. 1992) (emphasis added).

"[J]urisdiction usually is not proper unless the defendant actively initiate[s] contacts in a state, or creates continuing obligations between itself and a Vermont resident. (Citations omitted.)." *Bechard,* 810 F.Supp. 579, 583( D. Vt. 1992). Where "a defendant does not *actively initiate contacts* in a state, a court does not ordinarily exercise jurisdiction over that defendant, unless there is some other evidence of minimum contacts with the forum state." *Artec Distributing, Inc., supra* 799 F.Supp. at 1560.

The fact that a defendant's conduct might foreseeably affect a resident of the forum state does not, *ipso facto,* establish jurisdiction. ". . . [T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S., at 295, 100 S.Ct., at 567. In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court has stated that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235,253, 78 S.Ct. 1228, 1239-1240, 2 L.Ed.2d 1283 (1958). Such purposeful conduct provides a defendant with "fair warning" that he and his property may be subject to the

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

exercise of that forum state's power. *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, *J,* concurring in judgment), *cited with approval in, Burger King Corp. v. Rudzewicz,* 471 U.S. 462,472, 105 S.Ct. 2174,2181-82, 85 L.Ed.2d 528 (1985). The Due Process Clause provides this fair warning in order to confer "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

With respect to proper venue for this action, the U.S. Court of Appeals for the Second Circuit, in interpreting the "substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" provision contained in 28 U.S.C.A. § 1391, the federal district venue statute, stated that "[i]n doing so, however, we caution district courts to take seriously the adjective "substantial." We are required to construe the venue statute strictly. *See Olberding v. Illinois Cent. R.R.,* 346 U.S. 338, 340, 74 S.Ct. 83, 98 L.Ed. 39 (1953). That means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. It would be error, for instance, to treat the venue statute's "substantial part" test as mirroring the minimum contacts test employed in personal jurisdiction inquiries. *See Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1372 (11th Cir.2003); *Cottman Transmission Sys. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994); *cf. United States ex rel. Rudick v. Laird,* 412 F.2d 16, 20 (2d Cir.1969) ("The concepts of personal jurisdiction and venue are closely related but nonetheless distinct.")." *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005). In addition, derivative actions have been

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

12

dismissed based on improper venue where there was "no allegation that any officer or director did or failed to do anything" in [the forum state]." *Rathbone LLC v. XTO Energy Inc.*, case number CIV-08-1370-HE, 2010 WL 891634, at *3-4 (W.D. Okla. Mar. 9, 2010). Further Plaintiff has the burden of establishing that venue is proper in the forum district. *Id.* at *2.

ARGUMENT

### A. VERMONT LACKS PERSONAL JURISDICTION OVER ALL DEFENDANTS IN FEDERAL OR STATE COURT.

### 1. VERMONT LACKS PERSONAL JURISDICTION OVER DEFENDANT SHALETT.

As evidenced by the sworn affidavit of Bruce Shalett attached hereto as Exhibit C, Mr. Shalett has no jurisdictional contacts whatsoever with the State of Vermont. Mr. Shalett is a resident of New York. He has no real estate or other asset holdings in Vermont. He does not do any business in Vermont. He does not derive any revenue from Vermont. He does not maintain a telephone listing or advertise in Vermont. Plaintiffs cannot make a *prima facie* showing of "minimum contacts" of Mr. Shalett *himself* necessary to satisfy the requirements of *Burger King supra*. In the "Parties and Jurisdiction" section of the complaint, plaintiffs and Mr. Revo (using privileged or confidential knowledge he received while company counsel for CHIDE) attempt to "create" Vermont contacts for Mr. Shalett. In paragraph 28 of the complaint, it is alleged that "[s]ince the Closing on March 13, 2013, Defendant Shalett has engaged in hundreds of direct communications (by telephone, text and electronically) with Vermont residents, sending and receiving a very large number of responses to and from these residents of Vermont." As a threshold matter and as evidenced by paragraph 16 of Mr. Shalett's affidavit, defendants vehemently deny the *unsupported*, conclusory allegation that there were "hundreds of direct communications with Vermont residents." Mr. Shalett, in his capacity as Co-Chairman of CHIDE, did, on limited occasions, send communications to *all of CHIDE's common members*,

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

13

relating to updated business or restructuring information about the company. Under the *Burger King* standard discussed *supra*, Mr. Shalett did not "purposefully direct" these limited communications at Vermont residents in particular, any more than he purposefully directed these communications to CHIDE common members who happen to reside in New Jersey or Florida, he simply directed communications to *all CHIDE common members* regardless of where they resided. The fact that *a few* of CHIDE's common members happen to reside in Vermont is not of Mr. Shalett's doing, but rather represent "random, fortuitous, or attenuated contacts" which Mr. Shalett *himself* neither created nor controlled, and these contacts under *Burger King* are insufficient to overcome due process concerns. Similarly, Mr. Shalett did not *himself* create contacts with any of the other individuals mentioned in paragraph 28 of the complaint, he simply had limited communications with or responded to communications from, individuals who happen to reside or be present in Vermont at the time. Again, these represent "random, fortuitous, or attenuated contacts" which Mr. Shalett *himself* neither created nor controlled, and these contacts under *Burger King* are insufficient to overcome due process concerns.[2]

In paragraph 31 of the complaint, plaintiffs and Mr. Revo allege that "Upon the in-person testimony of Shalett in Burlington, Vermont, Defendant Innovations' Reorganization Plan (the "Plan") was confirmed by such Bankruptcy Court on December 19, 2012, and became final 30 days later." As indicated in Mr. Shalett's affidavit at ¶15, he in no way "purposely directed" this activity but rather was *requested by Attorney Revo* to testify in the bankruptcy proceeding in order to assure the Court that financing necessary to consummate the reorganization was in place. Mr. Shalett at such time neither created nor controlled such bankruptcy proceeding. As discussed *supra*, "[The] unilateral activity of another party or a third person is not an appropriate

---

[2] *See also* the *Dearwater* decision attached hereto as Exhibit B. In such case far more contacts than are evident in the present action were found to be insufficient to confer jurisdiction. In addition, general communication which happen to reach residents in the forum state were deemed to be *fortuitous*.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

consideration when determining whether a defendant has sufficient contacts with a forum State

to justify an assertion of jurisdiction." *Walden* at 1121-1123, quoting *Helicopteros Nacionales de*

*Colombia, S. A. v. Hall*, 466 U. S. 408, 417 (1984). Here the unilateral activity of Attorney Revo,

cannot be considered sufficient contacts for Mr. Shalett to justify the assertion of jurisdiction.  In

paragraphs 26-27 of the complaint, plaintiffs discuss a suit brought against CHIDE and allege

that "Mr. Shalett signed the final Release in that case and mailed it to Vermont counsel. . ." and

"[u]pon information and belief, Defendant Shalett authorized and approved two wires to a

Vermont bank account in furtherance of the settlement in that matter." The "suit" referenced in

these paragraphs is a legal fees lawsuit **brought by Attorney Revo** in Vermont State Court. Mr.

Shalett did not initiate this lawsuit. Again, Mr. Shalett in no way "purposely directed" this

activity but rather was obligated to sign a release on behalf of CHIDE when the matter settled

and have CHIDE wire settlement funds to the account specified by Mr. Revo. Here again the

unilateral activity of Attorney Revo cannot be considered sufficient contacts for Mr. Shalett to

justify the assertion of jurisdiction under the standard set forth in *Walden, supra.*

Plaintiffs arguments fair no better under the *Walden* standard discussed *supra* when

attempting to show that Mr. Shalett's "suit-related conduct creates a substantial connection with

Vermont." The complaint is extremely verbose and hard to decipher, but the following appear to

be the "acts" of which plaintiffs complain:

   a) "[RBS] loaned funds to Defendant Innovations (the "Radius loans") from time to time"
      (¶71 of the complaint);
   b) "Upon information and belief, contrary to the Operating Agreement, . . . Innovations . . .
      has purportedly converted the loans made by it to Defendant Innovations, resulting in
      purported dilution of Plaintiff's membership interests from a significant stake down to a
      tiny percentage of Innovations" (¶75 of the complaint);
   c) "Upon information and belief, the purported Radius loans and the conversion of these
      loans into additional equity were never approved" (¶88 of the complaint);
   d) "Beginning April 28, 2015, Defendant Innovations, under the control and domination of
      Radius and Shalett with the participation and assistance of MacPherson, has unilaterally

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

15

and spuriously rejected the appointment by Plaintiff CHI Vermont of its designated
Manager" (¶92 of the complaint);

e) "Upon information and belief, Defendant Innovations has violated the Operating
Agreement by not timely preparing all tax returns when due, or sending required tax
information to the members, including Plaintiffs" (¶101 of the complaint);

f) "Defendants unlawfully rejected such demand for information, in bad faith and violation
of both Delaware and Vermont law" (¶101 of the complaint).

The remainder of the counts in the complaint simply reassert these same "acts" under

different causes of action. As discussed supra, "[t]he inquiry whether a forum State may assert

specific jurisdiction over a nonresident defendant 'focuses on 'the relationship among the

defendant, the forum, and the litigation.' *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775

(1984) (quoting *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977)). For a State to exercise

jurisdiction consistent with due process, the defendant's suit-related conduct must create a

substantial connection with the forum State." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014).

"First, the relationship must arise out of contacts that the "defendant *himself*" creates with the

forum State." *Id., quoting Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 475 (1985). There is

nothing alleged in the complaint which does not have as its' basis something that *the defendants

did or didn't do*. As discussed in the affidavits attached to this memorandum as well as

elsewhere herein, *none of the defendants reside in or do business in Vermont*. As a result, ***none

of the alleged activities which underlie the claims in the complaint actually happened in

Vermont*** and ***none of the defendants themselves created any contacts upon which it can be

argued that the action is based***.  Based upon the U.S. Supreme Court precedent in *Walden* and

*Burger King* and the other cases cited herein, plaintiffs have failed to make a *prima facie*

showing that Mr. Shalett has sufficient minimum contacts with Vermont to justify assertion of

jurisdiction over him without violating due process.[3]

---

[3] In another section of the complaint plaintiffs apparently argue that Vermont has jurisdiction over Mr. Shalett
because CHIDE is "merely his alter ego." It is not at all clear what argument plaintiffs are actually making here, but

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

16

## 2.   VERMONT LACKS PERSONAL JURISDICTION OVER DEFENDANT RBS.

As evidenced by the sworn affidavit of Bruce Shalett attached hereto, RBS has no jurisdictional contacts whatsoever with the State of Vermont. RBS is a New York limited liability company doing business in New York. RBS has no real estate or other asset holdings in Vermont. RBS does not do any business in Vermont. RSB does not derive any revenue from Vermont. RBS does not maintain a telephone listing or advertise in Vermont. Plaintiffs cannot make a *prima facie* showing of "minimum contacts" of RBS *itself* necessary to satisfy the requirements of *Burger King supra*. Plaintiffs do not attempt to create additional "contacts" in the "Parties and Jurisdiction" section of the complaint.  As is the case with Mr. Shalett discussed *supra*, ***none of the alleged activities which underlie the claims in the complaint actually happened in Vermont*** and ***RBS itself did not create any contacts upon which it can be argued that the action is based***.  Based upon the U.S. Supreme Court precedent in *Walden* and *Burger King* and the other cases cited herein, plaintiffs have failed to make a *prima facie* showing that RBS has sufficient minimum contacts with Vermont to justify assertion of jurisdiction over it without violating due process.[4]

## 3.   VERMONT LACKS PERSONAL JURISDICTION OVER DEFENDANT MACPHERSON.

As evidenced by the sworn affidavit of Sean Macpherson attached hereto as Exhibit D, Mr. Macpherson has no jurisdictional contacts whatsoever with the State of Vermont. Mr. Macpherson is a resident of Connecticut. He has no real estate or other asset holdings in Vermont. He does not do any business in Vermont. He does not derive any revenue from Vermont. He does not maintain a telephone listing or advertise in Vermont. Plaintiffs cannot

---

to the extent they are arguing Vermont has jurisdiction over Shalett to the extent it has jurisdiction over CHIDE, this is addressed in Section A.4. *infra.*

[4] As discussed in fn. 2, to the extent plaintiffs are arguing Vermont has jurisdiction over RBS to the extent it has jurisdiction over CHIDE, this is addressed in Section A.4. *infra.*

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

17

make a *prima facie* showing of "minimum contacts" of Mr. Macpherson **himself** necessary to

satisfy the requirements of *Burger King supra*. In the "Parties and Jurisdiction" section of the

complaint, plaintiffs and Mr. Revo attempt to "create" Vermont contacts for Mr. Macpherson. In

paragraph 34 of the complaint, it is alleged that "[in his capacities as general counsel and

secretary of CHIDE] MacPherson has sent and received scores of communications to numerous

residents of Vermont, including those to Plaintiff CHI Vermont, Plaintiff Smith Trust, Attorney

Herb Ogden, Stuart Revo, (Ret.) Judge Arthur O' Day, former CEO Thompson of South

Burlington, Vermont, and others." As a threshold matter and as evidenced in paragraph 7 of Mr.

Macpherson's affidavit, defendants vehemently deny the *unsupported*, conclusory allegation that

there were "scores of communications to numerous residents of Vermont." Mr. Macpherson, in

his capacity as CHIDE counsel, did, on limited occasions, send communications to **all of**

**CHIDE's common members**, relating to restructuring information about the company. Under the

*Burger King* standard discussed *supra*, Mr. Macpherson did not "purposefully direct" these

limited communications at Vermont residents in particular, any more than he purposefully

directed these communications to CHIDE common members who happen to reside in New

Jersey or Florida, he simply directed communications to *all CHIDE common members* regardless

of where they resided. The fact that *a few* of CHIDE's common members happen to reside in

Vermont is not of Mr. Macpherson's doing, but rather represent "random, fortuitous, or

attenuated contacts" which Mr. Macpherson *himself* neither created nor controlled, and these

contacts under *Burger King* are insufficient to overcome due process concerns.[5] Similarly, Mr.

Macpherson did not *himself* create contacts with any of the other individuals mentioned in

paragraph 34 of the complaint, he simply had limited communications with or responded to

---

[5] *See also* the *Dearwater* decision attached hereto as Exhibit B. In such case far more contacts than are evident in the present action were found to be insufficient to confer jurisdiction. In addition, general communication which happen to reach residents in the forum state were deemed to be *fortuitous*.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

18

communications from, individuals who happen to reside or be present in Vermont at the time.
Moreover, to the extent Mr. Macpherson communicated with Attorney Herb Ogden, Stuart Revo,
(Ret.) or Judge Arthur O' Day, these were communications *necessitated by Mr. Revo filing a
lawsuit against CHIDE*. Again, these represent "random, fortuitous, or attenuated contacts"
which Mr. Macpherson *himself* neither created nor controlled, and these contacts under *Burger
King* are insufficient to overcome due process concerns. In addition, the unilateral activity of
Attorney Revo cannot be considered sufficient contacts for Mr. Macpherson to justify the
assertion of jurisdiction under the standard set forth in *Walden, supra.*

Plaintiffs' (and Mr. Revo's) allegations in paragraphs 35-36 of the complaint discuss the
lawsuit filed by Mr. Revo and allege that "MacPherson was also directly responsible for
managing the defense and settlement of the Vermont civil case," and that he "traveled to
Arlington, Vermont to personally attend the mediation session for the Vermont civil case," and
"MacPherson communicated directly with the plaintiff in that civil case," and "authorized and
approved two wires to a Vermont bank account in furtherance of the settlement," and "was
involved directly in drafting, revision and execution of the Releases exchanged in settling that
civil case." Mr. Macpherson did not initiate the lawsuit pursuant to which Mr. Revo attempted to
collect legal fees from CHIDE. Mr. Macpherson did not *himself* create any contacts in this
connection but rather reacted to the lawsuit *that Mr. Revo initiated*. Here again the unilateral
activity of Attorney Revo cannot be considered sufficient contacts for Mr. Macpherson to justify
the assertion of jurisdiction under the standard set forth in *Walden, supra.*

Based upon the U.S. Supreme Court precedent in *Walden* and *Burger King* and the other
cases cited herein, plaintiffs have failed to make a *prima facie* showing that Mr. Macpherson has

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

19

sufficient minimum contacts with Vermont to justify assertion of jurisdiction over him without violating due process.[6]

### 4. VERMONT LACKS PERSONAL JURISDICTION OVER DEFENDANT CHIDE.

As evidenced by the sworn affidavit of Bruce Shalett attached hereto, CHIDE has no jurisdictional contacts whatsoever with the State of Vermont. CHIDE is a Delaware limited liability company doing business solely in New York. CHIDE has no real estate or other asset holdings in Vermont. CHIDE does not do any business in Vermont. CHIDE does not maintain any offices in Vermont or employ any employees in Vermont. CHIDE does not derive any revenue from Vermont. CHIDE does not maintain a telephone listing or advertise in Vermont. Plaintiffs cannot make a *prima facie* showing of "minimum contacts" of CHIDE *itself* necessary to satisfy the requirements of *Burger King supra*. In the "Parties and Jurisdiction" section of the complaint, plaintiffs and Mr. Revo attempt to "create" Vermont contacts for CHIDE. In paragraph 20 of the complaint, it is alleged that "Defendant Innovations was formally qualified to do business in Vermont from its formation until March 16, 2015." As discussed *supra* with respect to Mr. Shalett and as indicated in Mr. Shalett's affidavit, CHIDE was not in fact doing business in Vermont after March 2013 and the *only* reason that CHIDE continued to be qualified to do business in Vermont is because Attorney Stuart Revo (the attorney bringing this action) continued to file annual qualification papers without authority and naming himself as "agent." In paragraph 21 of the complaint plaintiffs allege that "[f]rom March 3, 2011 through August 2013, when Defendant Innovations' original CEO, David Thompson ("Thompson"), resigned, Defendant Innovations' principal office was located in South Burlington, Vermont." Defendants vehemently deny this *unsupported*, conclusory allegation, and as indicated in Mr. Shalett's

---

[6] In another section of the complaint plaintiffs apparently argue that Vermont has jurisdiction over Mr. Shalett because CHIDE is "merely his alter ego." It is not at all clear what argument plaintiffs are actually making here, but to the extent they are arguing Vermont has jurisdiction over Shalett to the extent it has jurisdiction over CHIDE, this is addressed in Section A.4. *infra*.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

20

affidavit, after March 2013 CHIDE did not do any business in Vermont and any in person meetings of management, including Mr. Thompson, were held in New York, New York – as far as the majority of the CHIDE Board were concerned CHIDE's principal place of business after March 2013 was New York, New York. In paragraph 22 of the complaint plaintiffs allege that "[u]pon information and belief, Defendant Innovations continues to conduct business in Vermont through the present day, or has substantial contacts in Vermont." Defendants vehemently deny this *unsupported*, conclusory allegation, and as indicated in Mr. Shalett's affidavit, after March 2013 CHIDE did not do any business in Vermont and does not conduct any business in Vermont today.

In paragraph 23 of the complaint plaintiffs allege that "[u]pon information and belief, in 2014 and 2015 Defendant Innovations ordered the production of all of its IQ food samples from Mr. James S. Stillman of Fairfax, Vermont. Upon information and belief, some of these food samples were made by Mr. Stillman in Vermont, and shipped to Defendant Innovations (or other consignees) from Vermont. Upon information and belief, Defendant recently ordered additional samples of IQ food products from Mr. Stillman, or from Northern Culinary Brands, LLC, a Vermont-based limited liability company in which Mr. Stillman and three other Vermont residents are the sole members." Defendants vehemently deny this *unsupported*, conclusory allegation, and as indicated in ¶13 of Mr. Shalett's affidavit, CHIDE has never hired any employee or knowingly hired any independent contractor who has manufactured its food samples or products in Vermont, and CHIDE's management's belief that any such samples or products were either manufactured in New Jersey or Plattsburgh, New York. In paragraph 24 of the complaint, plaintiffs allege that "[u]pon information and belief, seven members of Defendant Innovations, including all but one of the Plaintiffs, are individual residents of or entities formed

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

21

in Vermont." Neither CHIDE nor anyone who controls CHIDE has any authority or control over where its' members reside, and certainly have not "purposely directed" where CHIDE members reside.  In paragraph 25 of the complaint, plaintiffs allege that "Defendant Innovations claims an interest in a bank account at The Bank of Bennington in Manchester, Vermont. Upon information and belief, Defendant Innovations shows the balance in such account as an asset on its Balance Sheet. Such account was opened by and continues to be maintained in trust by a licensed Vermont attorney." The "account" to which plaintiffs refer in this paragraph is an escrow account maintained by plaintiffs' attorney Stuart Revo. As indicated in a letter agreement attached hereto as Exhibit E neither CHIDE nor any of the other defendants have any interest in these escrowed funds. In fact this escrow account was set up by Mr. Revo and is maintained by Mr. Revo solely for his own benefit and the benefit of Mr. Friedland. The allegations in paragraph 26 of the complaint have been discussed supra in Section A. 1. The lawsuit referred to in this paragraph was initiated by Mr. Revo, not by CHIDE, and any actions taken by CHIDE were necessitated by defending itself, and certainly not "purposefully directed" at Vermont.

In paragraph 29 of the complaint, plaintiffs allege that [u]ntil January 2016, certain of Defendant Innovations company records were located in Vermont, in the possession of Defendant Innovations' former Corporate Secretary, (later the Assistant Secretary), a Vermont resident who served from the formation of Defendant Innovations until his resignation effective September 16, 2014." The "records" referred to in this paragraph are in fact CHIDE corporate records which Mr. Revo, the former company counsel and secretary of CHIDE, was holding for ransom in connection with his legal fees lawsuit discussed in the previous paragraph and elsewhere herein. Mr. Revo's actions in this regard were in direct violation of VBA ADVISORY ETHICS OPINION 91-03 and well settled practice in New York. Obviously CHIDE did not

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
RUTLAND, VT
05702-0280

22

dictate or "purposefully direct" where Mr. Revo kept company records in his capacity as secretary and/or company counsel. In paragraph 30 of the complaint, plaintiffs allege that "Defendant Innovations voluntarily filed a Petition for Chapter 11 Reorganization on June 14, 2012, in the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Vermont, in Rutland, being Case No. 12-10529 cab." CHIDE in its' current form with current management and ownership had no input or control where the bankruptcy was filed in 2012, and were indeed not even involved at such time. In fact Mr. Revo, Mr. Friedland and Mr. Thompson were in control and the architects of the CHIDE bankruptcy filing. All of the above discussed allegations regarding CHIDE are "acts" which CHIDE did not create or "purposefully direct" in any way to Vermont. In fact all of these "acts" are the "unilateral activity of another party or a third person." Based upon the U.S. Supreme Court precedent in *Walden* and *Burger King* and the other cases cited herein, plaintiffs have failed to make a *prima facie* showing that CHIDE has sufficient minimum contacts with Vermont to justify assertion of jurisdiction over it without violating due process.

Plaintiffs appear in paragraphs 38-66 of the complaint to argue that defendants RBS and Shalett are subject to Vermont personal jurisdiction because CHIDE is "merely their alter ego." Although these paragraphs are once again verbose and rambling, the crux of plaintiffs' argument appears to be that RBS and Shalett were running CHIDE for their own self-interest. Interestingly, the Delaware Chancery Court (the Operating Agreement is governed by Delaware law pursuant to §13.6 thereof) has ruled that personal jurisdiction based upon the "alter ego" theory does not exist where there is merely a showing the company defendant "was established by [the majority holder]; that [the majority holder's] purpose for establishing [the defendant company] was his self-interest; and that [the defendant company] is an entity through which [the majority holder]

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
RUTLAND, VT
05702-0280

23

pursues financial gain."[7] Moreover the Delaware Chancery Court held that under the alter ego

theory, the Plaintiffs had to show: "(1) that the out-of-state defendant over whom jurisdiction is

sought has *no real separate identity from a defendant* over whom jurisdiction *is clear based on*

*actual domicile or satisfaction of Delaware's long-arm statute*; *and* (2) the existence of acts in

Delaware which can be fairly imputed to the out-of-state defendant and which satisfy the long-

arm statute and/or federal due process requirements."[8] Even if plaintiffs are making an "alter

ego" argument which is not at all clear from the complaint, they failed to clear two major

jurisdictional hurdles, namely that (i) they have not made a *prima facie* showing that CHIDE is

subject to personal jurisdiction in Vermont at all much less established that jurisdiction *is clear*

based on actual domicile or other due process grounds and (ii) as discussed *supra* they have

failed to establish any acts in Vermont which can be imputed to RBS or Shalett.

### B. VERMONT IS AN IMPROPER VENUE FOR PLAINTIFFS' CLAIMS IN FEDERAL OR STATE COURT.

As the discussion in Section A above illustrates, none of the defendants have sufficient

minimum contacts with Vermont to justify haling them into court in Vermont. Moreover, none of

the acts underlying plaintiffs' claims actually occurred in Vermont. As discussed in *Gulf Ins.*

*Co., supra,* the "substantial" tests set forth in the Federal venue statute are not mirror images of,

*but in addition to*, the minimum contacts standards for personal jurisdiction. As plaintiffs have

failed to make a *prima facie* showing of "minimum contacts" they have by definition failed to

make a showing of proper venue. Moreover, as regards any derivative claims,[9] as in the

*Rathbone LLC* case cited *supra*, in the present action there is "no allegation that any officer or

---

[7] *See Connecticut General Life Insurance Company v. Pinkas*, C.A. No. 5724-VCN (Oct. 28, 2011).
[8] *Id.* (emphasis added).
[9] Many of plaintiffs' claims are actually derivative claims in disguise according to the standards set forth in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) and defendants reserve all rights to challenge these claims as such in subsequent briefings.

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. Box 280
RUTLAND, VT
05702-0280

24

director did or failed to do anything" in [Vermont]." As a result the plaintiffs' claims must be dismissed for lack of proper venue.

## CONCLUSION

For the reason set forth above and under applicable U.S. Supreme Court legal precedent, the plaintiffs have failed to make a *prima facie* showing of minimum contacts on the part of any of the defendants sufficient to confer jurisdiction in any Vermont Court which does not violate the Due Process clause of the U.S. Constitution. Defendants respectfully request that plaintiffs' complaint therefore be dismissed for lack of personal jurisdiction over any of the defendants. In addition, as discussed above, the plaintiffs' complaint must be dismissed for lack of proper venue.

**DATED** at Rutland, Vermont this 25th day of May, 2016.

Culinary Health Innovations, LLC
Radius Brand Strategies, LLC
Bruce Shalett and
Sean Macpherson,
Defendants,

By their Counsel

John J. Kennelly, Esq.
Matthew D. Anderson, Esq.
Pratt Vreeland Kennelly Martin & White, Ltd.
P.O. Box 280
Rutland, VT 05702-0280
Telephone:     (802) 775-7141
kennelly@vermontcounsel.com
mda@vermontcounsel.com

PRATT VREELAND
KENNELLY MARTIN
& WHITE, LTD.
P.O. BOX 280
RUTLAND, VT
05702-0280

25

**From:** "David Thompson" <drtchst@cs.com>
**To:** smaclaw@optonline.net, rjacobs@intelligentquisine.com
**Cc:** Neal@brickmanlaw.com, jkelley@ompmail.com
**Date:** 12/02/2014 04:14:45 PM
**Subject: CHIVT Representative to the CHIDE Board**

Mr. Jacobs and Mr. McPherson:

Please be advised that, as the sole Managing Member of CHIVT, effective today, I have replaced Norm Friedland with John Kelley as the CHIVT representative to the CHIDE Board. Mr. Kelley has agreed to this appointment. His contact information is as follows:

John Kelley
5410 Park Rd.
Unit #3
Ft. Myers, FL  33908

631-988-2271 (cell)

jkelley@ompmail.com

You should direct all further correspondence and communication regarding matters relating to CHIDE Board business directly to Mr. Kelley. For the foreseeable future, I intend to continue as the sole Managing Member of CHIVT. Any questions or concerns related to CHIVT should be directed to me.

David


=====================================================
David R. Thompson

Cell: 802-578-9098

Westlaw

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
D. Vermont.
Derek E. DEARWATER, Plaintiff
v.
BOND MANUFACTURING COMPANY, Defendant.
No. 1:06-CV-154.

Sept. 19, 2007.

Gary L. Franklin, Primmer Piper Eggleston & Cramer PC, Burlington, VT, for Plaintiff.

April E. Schwendler, Karen McAndrew, Dinse, Knapp & McAndrew, P.C ., Burlington, VT, Mitchell Chyette, Leland, Parachini, Steinberg, Matzger & Melnick, LLP, San Francisco, CA, for Defendant.

### ORDER

J. GARVAN MURTHA, United States District Judge.

**\*1** The Magistrate Judge's Report and Recommendation was filed August 29, 2007. (Paper 33). After *de novo* review and absent objection, the Report and Recommendation is AFFIRMED, APPROVED and ADOPTED. *See* 28 U.S.C. § 636(b)(1). Defendant's motion to dismiss (Paper 6) is GRANTED.

SO ORDERED.

### MAGISTRATE JUDGE'S REPORT & RECOMMENDATION (Paper 6)

JEROME J. NIEDERMEIER, United States Magistrate Judge.

Plaintiff Derek E. Dearwater filed this action against Bond Manufacturing Company ("Bond"), alleging breach of contract and breach of the covenant of good faith and fair dealing against Bond for wrongfully terminating his employment. The case is currently before the Court on Bond's motion to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2) and for improper venue under Fed.R.Civ.P. 12(b)(3).

For the following reasons, I recommend Bond's motion be **GRANTED** .

### I. BACKGROUND

The following facts are assumed to be true for the purpose of the pending motion. Bond is a California corporation with its principal place of business in Bay Point, California. (Paper 1-1, ¶ 4). Bond sells outdoor consumer products to lawn and garden retailers and distributors. (*Id.;* Paper 7, ¶ 3). Bond owns no property in Vermont, is not registered to do business in Vermont, has no Vermont telephone listing, and does not advertise in any Vermont-based publications. (Paper 6, at 2). Despite its nationwide sales, there are no Bond sales personnel in Vermont. (Paper 7, ¶ 5). Bond does have an East Coast sales representative whose sales region includes Vermont. (*Id.*). American Marketing Alliance, Inc. ("AMA") is Bond's sales representative in New England. (Paper 28, ¶ 3). The primary focus of Bond's sales efforts in New England is mass-marketing and chain retail stores such as Lowe's and BJ's. (*Id.*). Bond's marketing effort in Vermont is limited to the two AMA employees who take telephone calls from Vermont retailers, visit Vermont stores, and send out Bond catalogs when requested. (*Id.*).

Bond has made direct and indirect sales to Vermont customers in the past. Between 1999 and 2006, Bond has sold products to 28 Vermont customers. (Paper 23-3). Only one of those customers, Gardener's Supply, has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

purchased Bond products every year during that seven-year time span. (*Id.*). In 2006, four Vermont customers purchased Bond products. (*Id.*). Sales to Vermont customers have declined each year between 1999 and 2006 from 2.30% of Bond's total sales in 1999 to .03% in 2006.(*Id.*). Bond primarily sells its products to large national chain stores such as Home Depot, Target and BJs. It also sells its products to Massachusetts-based Aubuchon Hardware, which maintains 27 stores in Vermont. (Paper 23-4, ¶ 14).

Dearwater resides in Stowe, Vermont. (Paper 1-1). Dearwater located a job with Bond through a national advertisement on CareerBuilders.com. (Paper 23-5). The position, Vice President of Sales-Western Division, was also listed on the San Francisco Bay Area sub-site of Craigslist.com.[FN1] (Paper 6). The job posting required a Bachelors Degree, 8 ⬅ years of experience in sales management, including national accounts, and willingness to travel up to 25% of the time. (Paper 23-5). In addition, the job posting indicated that "Local candidates are strongly preferred, but not required!" (*Id.*).

> FN1. The Court notes that there are no access restrictions on Craigslist and that an individual in Vermont has access to any and all regional sub-sites.

**\*2** Although a Vermont resident, Dearwater sent his resume and PowerPoint presentation to Bond in California, but engaged in preliminary negotiations for employment from his home in Vermont. (Paper 23-4, ¶ 7). He then traveled to California for an interview with Bond. (Paper 6, at 3). Bond hired Dearwater in April 2006 with the understanding that Dearwater would relocate to California to work from Bond headquarters in Bay Point. (Paper 1-1, ¶ 10; Paper 6, at 4). In the interim, Dearwater worked from Vermont. (*Id.*). During Dearwater's employment, Bond supported a home office for Dearwater in Vermont, which included a phone, fax, DSL line and computer. (Paper 23-4, ¶ 10). In addition, although Dearwater was Vice President of the Western Division, upon the Bond's request he visited Gardener's Supply in Williston, Vermont. (*Id.* at ¶ 11).

The parties entered an employment Agreement effective April 10, 2006. (Paper 1-3). The Agreement was not executed, however, until June 2006. (Paper 23-4, ¶ 19). The document included a provision stating that it "shall be governed by and construed in accordance with the laws of the State of California." (Paper 7, ¶ 24).

Daryl Merritt, Bond's Chief Operating Officer, recommended to three other managing officers that Dearwater be terminated. (Paper 7, ¶ 30). The recommendation was made at Bond's offices in California. (*Id.* at ¶ 31). On July 5, 2006, Bond fired Dearwater via email before he relocated to California. (Paper 1-1, ¶ 11; Paper 23-4, ¶ 20). Dearwater alleges he was fired without notice or cause. (Paper 1-1, ¶¶ 11, 14-15).

On August 4, 2006, Dearwater filed this action for breach of contract and breach of the duty of good faith and fair dealing. On September 7, 2006, Bond filed a motion to dismiss for lack of personal jurisdiction and improper venue. On October 6, 2006, the Court granted a joint motion for extension of time for limited discovery on the jurisdictional issue, making Dearwater's response due on December 12, 2006 (30 days from discovery responses). On January 23, 2007, the parties moved jointly to continue the motion hearing to provide more time for discovery on the jurisdictional issue. (Paper 20). The Court granted the joint motion and Dearwater filed his opposition to Bond's motion to dismiss on March 5, 2007. (Paper 23). The parties then stipulated to an extension of time for Bond to reply to Dearwater's opposition. Bond filed its reply on March 27, 2007. (Paper 27). A hearing on Bond's motion to dismiss the complaint was held on August 7, 2007.

## II. *DISCUSSION*

### A. *Rule 12(b)(2)*-Lack of Personal Jurisdiction

In considering a Rule 12(b)(2) motion to dismiss, the Court takes all allegations in the light most favorable to the plaintiff. *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla,* 921 F.Supp. 1206, 1209 (D.Vt.1996). Nevertheless, the plaintiff bears the burden of establishing sufficient contacts with the forum state to give the court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

jurisdiction over the defendant. *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1025 (2d Cir.1997); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d. Cir. 1996); *Tom and Sally's Handmade Chocolates, Inc. v. Gasworks, Inc.*, 977 F.Supp. 297, 299 (D.Vt.1997). The plaintiff must make only a prima facie showing of jurisdiction through its own affidavits and supporting materials when there has been limited discovery on the jurisdictional issue, but no evidentiary hearing. *Ben & Jerry's Homemade*, 921 F.Supp. at 1209. The plaintiff has the burden to show jurisdiction by a preponderance of the evidence if an evidentiary hearing is held. *Metropolitan Life*, 84 F. 3d at 567. Here, where there has been discovery on the issue, but no evidentiary hearing, Dearwater need only make a prima facie showing.[FN2]

> FN2. Bond argues that this case is a "hybrid" and asks the Court to evaluate the case on uncontroverted facts in the affidavits rather than taking all allegations in the light most favorable to Dearwater. The Court declines to apply this elevated standard of review.

*3 In a diversity action, personal jurisdiction over a foreign corporation is determined in accordance with the law of the state in which the court sits, "with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Id.* Thus, in determining whether there is personal jurisdiction over the defendant, the court undertakes a two-part inquiry. *Id.* First, the court reviews the forum state's long-arm statute. *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997). If jurisdiction is proper under the state's long-arm statute, the court then reviews whether such jurisdiction comports with due process. *Id.* The Vermont Supreme Court has held, however, that the state's long-arm statute[FN3] allows a Vermont court to exercise jurisdiction over defendants "to the full extent permitted by the Due Process Clause." *Northern Aircraft, Inc. v. Reed*, 154 Vt. 36, 40 (1990). Therefore, the only inquiry here is whether due process permits a Vermont court to exercise jurisdiction over Bond.

> FN3. Vt. Stat. Ann. Tit. 12 § 913(b)(2002) provides in pertinent part:

Upon the service [of process on a party outside the state], and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state.

The Due Process Clause limits the power of a court to render judgments against nonresident defendants. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 108 (1987). A court has personal jurisdiction over a defendant only where defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 626 (2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotations and citations omitted). The Due Process jurisdictional analysis has been reduced to two parts. First, the court evaluates whether the defendant has sufficient "minimum contacts" with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Second, if sufficient contacts exist, the court must determine whether an assertion of personal jurisdiction is "reasonable under the circumstances of the particular case." *Metropolitan Life*, 84 F . 3d at 567.

*1. Minimum Contacts*

The guiding principle in evaluating the sufficiency of a defendant's contacts with the forum state is that in each case "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 475. Asserting personal jurisdiction over a defendant based on such action is justified because the defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Artec Distrib., Inc. v. Video Playback, Inc.*, 799 F.Supp. 1558, 1560 (D.Vt.1992). Accordingly, a court should not exercise jurisdiction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

unless a defendant "actively initiate[s] contacts in [the forum state] state," *Artec Distrib. Inc.,* 799 F.Supp. at 1560, or "has created 'continuing obligations' between itself and a Vermont resident." *Ben & Jerry's Homemade, Inc.,* 921 F.Supp. at 1209 (quoting *Burger King,* 471 U.S. at 476).

**\*4** The two types of personal jurisdiction a court may exercise are general jurisdiction and specific jurisdiction. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15 & n. 9 (1984). Dearwater contends that this Court has both specific and general jurisdiction over Bond. The Court will address each type in turn.

i. Specific Jurisdiction

Two factors must be present for a court to have specific jurisdiction over an out of state defendant. First, to meet the Due Process "fair warning" requirement, the defendant must have "purposefully directed" its activities at the forum. *Burger King Corp.,* 471 U.S. at 472. Second, the litigation must "arise out of or relate to" at least one of those activities. *Helicopteros,* 466 U.S. at 414; *Sollinger,* 655 F. Supp at 1388.

The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. *Burger King,* 471 U.S. at 475 (internal citations omitted). Rather, a defendant "avail[s] itself of the privilege of conducting business [in the forum]" when it "deliberately" engages in significant activities in a state. *Id.* at 476. The defendant need not be physically present in the forum "so long as [its] efforts are purposefully directed toward the residents of another State." *Id.*

Here, Bond has no physical presence in Vermont. There are no sales representatives or Bond offices in Vermont. Nevertheless, Bond has contacts with Vermont. Bond has Vermont customers to whom it sells products directly. Similarly, its sales to large chain stores with retail stores in Vermont places Bond products in the stream of commerce with the expectation that they will be purchased by Vermonters. *See World-Wide Volkswagen Corp.,* 444

U.S. at 297-98 (upholding personal jurisdiction on stream of commerce theory where product placed in stream of commerce injures forum customers). Aubuchon Hardware for example, has 27 retails stores in Vermont. (Paper 23-6). Bond's employment of Dearwater is also a contact with Vermont to the extent that Dearwater was physically present in Vermont and did call on one of Bond's Vermont clients on at least one occasion. Despite Bond's preference for a local candidate and intention for Dearwater to relocate to California, it purposefully entered into an employment contract with a Vermont resident and consented-perhaps reluctantly-to his working from Vermont for a period of time.

The job posting on Careerbuilder.com and Craigslist.com may have reached Dearwater in Vermont, but its advertisement was for a position in the Western United States. Therefore, it does not meet the "purposeful availment" requirement because Bond was not purposefully reaching into Vermont, but rather advertising nationally for a position to be based in California. That Dearwater could access the posting from an independent website, rather than Bond's own website, was fortuitous.

**\*5** Dearwater's argument for specific jurisdiction, however, falters in the requirement that the suit "aris[e] out of or relat[e] to" at least one of the above contacts. *Helicopteros,* 466 U.S. at 41. Here, the dispute is over Dearwater's employment contract. Thus, the only purposeful contact that can be considered in a specific jurisdiction inquiry is Dearwater's physical presence in Vermont and the extent to which his employment was directed at Vermont. The parties agree that Dearwater's position was Vice President of the Western Division. They also agree that Dearwater was supposed to be based in California and notwithstanding some national responsibilities, the focus of his efforts were to be on the western states. In fact, the employment agreement that Dearwater himself drafted designated California law to resolve any disputes. These facts indicate that the services Dearwater was intended to provide Bond pursuant to his employment contract were to take place outside of Vermont. Indeed, the focus of the contract was not in Vermont despite Dearwater's presence in Vermont and sales visit to a Vermont customer.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

Under these facts, the Court finds that the extent to which Bond took advantage of Dearwater's presence in Vermont does not meet the relatedness part of the specific jurisdiction inquiry. Indeed, Dearwater makes no proffer that his calls to Vermont customers were the cause of his termination. While this Court reaches no conclusion as to the cause of Dearwater's termination, it is clear based on the limited discovery thus far conducted, that it has nothing to do with Dearwater's visit to Gardener's Supply or any other of Bond's purposeful contacts with Vermont. Accordingly, the Court does not have specific jurisdiction over Bond.

i. General Jurisdiction

General jurisdiction exists when a defendant "maintain[s] continuous and systemic" contacts with the forum. *Helicopteros*, 466 U.S. at 414-16. General jurisdiction is based on a defendant's "general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Metropolitan Life*, 84 F. 3d at 568; *Burger King Corp.*, 471 U .S. at 473, n. 15, *Helicopteros*, 466 U.S. at 414, n. 9. Courts must impose the more stringent "continuous and systemic" minimum contacts test because general jurisdiction is not related to the events giving rise to the suit. *Metropolitan Life*, 84 F. 3d at 568. The Due Process fair warning requirement of purposeful availment, *a fortiori*, is also required for a court to have general jurisdiction over a defendant. *Burger King Corp.*, 471 U .S. at 472. In assessing Bond's contacts with Vermont, the Court should examine the contacts over a reasonable period of time up to the date Dearwater filed suit to assess whether Bond's contacts subject it to general jurisdiction. *Metropolitan Life*, 84 F. 3d at 569. In addition, the Court should examine the contacts as a whole, rather than individually. *Id. at 570*.

*6 Two Supreme Court cases provide a road map for the outer limits of what constitutes "continuous and systemic" business operations in a forum state sufficient for general jurisdiction. In *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445-46 (1952), the Supreme Court found that the defendant, a Philippine mining corporation, had sufficient general business operations in the forum state (Ohio) where "the general manager and president of

the company moved his officer to Ohio during the Japanese occupation of the Philippines during World War II, maintained records, held directors' meetings an generally 'carried on in Ohio a continuous and systemic supervision of the necessarily limited wartime activities of the **company**.' " *Metropolitan Life*, 84 F. 3d at 571 (quoting *Perkins*, 342 U.S. at 448). On the other hand, in *Helicopteros*, the Court found no general jurisdiction where "the defendant had purchased equipment from a company in the forum state, sent personnel to the forum state for training, and sent an officer of the corporation on a single trip to the forum for contract negotiations, but had never performed operations or solicited business within the state or sold any product that reached the forum state." *Metropolitan Life*, 84 F. 3d at 571 (explaining *Helicopteros* ). The Court noted that "mere purchases-even at regular intervals-and the related brief presence of employees, did not rise to the level of continuous and systemic general business contacts contemplated by the *Perkins* court. *Id.* (internal citations omitted).

Many cases fall between *Perkins* and *Helicopteros*. In *Metropolitan Life*, the defendant, Robertson, did not maintain an office in, or conduct any supervision from, Vermont. 84 F. 3d at 571. On the other hand, Robertson solicited business and sold products through Vermont dealers to Vermont customers. *Id.* Notwithstanding that "Robertson owned no property in Vermont, and exercised no control over its independent dealers, the contacts it did have with the state were more than sporadic and occasional." *Id.* at 572. Specifically, in addition to Robertson's $4 million in sales over seven years, which standing alone, may have been insufficient, Robertson's other contacts supported jurisdiction. *Id.* Specifically, its relationship with Vermont dealers and "authorized builders, its [over 150] visits to the dealers and builders, advertising and support available to Vermonters, and the deliberate targeting of Vermont architectural firms as sales prospects," provided general jurisdiction. *Id.* Similarly, in *Sollinger*, the court found that it had general jurisdiction over a defendant who entered, but never completed a sales transaction with a Vermont customer, but whose mail-order advertising and solicitation of Vermonters was a "continuous and systemic, but limited, part of its general business." 655 F.Supp. at 1389. Finally, in *Provident National Bank v. California Federal Savings & Loan*, 819 F.2d 434, 436 (3d Cir.1987), the court found continuous

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

and systemic contacts between the California bank and Pennsylvania even where the bank "maintained no Pennsylvania officer, employees, agents, mailing address, or telephone number and had not applied to do business in Pennsylvania, did no advertising in Pennsylvania, and paid no taxes there." *Metropolitan Life,* **84 F. 3d at 572** (quoting *Provident National Bank,* 819 F.2d at 436). The basis of general jurisdiction in Provident National Bank was that the small proportion of deposits and servicing of loans conducted on behalf of Pennsylvania customers "were central to Cal Fed's activities and because Cal Fed's maintenance of [a particular account held by a Pennsylvania bank] required Cal Fed to conduct substantial, ongoing, and systemic activity in Pennsylvania." *Id* . (internal citations omitted).

**\*7** Although the case at bar is close, Bond's contacts with Vermont fail to meet the stringent "continuous and systemic" test. Unlike *Metropolitan Life,* Bond does not have significant contacts with Vermont apart from its sales. There are no offices or regional sales people; only AMA independent contractors service Bond's Vermont customers from time to time and only when the Vermont customers request service. Dearwater was present in Vermont, but the focus of his responsibilities was in the western state and his single visit to Gardener's Supply is insignificant compared with the 150 visits Robertson made in *Metropolitan Life* that were found to justify jurisdiction. **84 F. 3d at 566.** Over a seven-year period, Bond's sales in Vermont have ranged between .03% and 2.30% of its total sales. This small fraction of sales in Vermont is not coupled with any significant advertising, solicitation as in *Sollinger,* or focus on Vermont as a forum in which Bond intended to operate its business. While the sales to Vermont customers may be ongoing, they cannot be deemed substantial as in *Provident National Bank.* Bond's contacts with Vermont are similar to those in *Chaiken* where the court found that it lacked general jurisdiction over an out of state publisher based on only four copies or .004% of the newspaper's total circulation reaching the forum state. 119 F.3d at 1029. The court held that "four copies per day, or even the 183 copies of the Sunday edition, [did not] constitute the 'substantial number of copies' that makes it fair to exercise jurisdiction over a non-resident publisher." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984)). Similarly, Bond's sales, standing alone, do meet the continuous and systemic standard to allow this Court to exercise general jurisdiction for a breach of contract action.

Further, according to the employment agreement, the parties agreed that California law would apply to jurisdiction and venue.**FN4** This suggests that both Dearwater and Bond understood the focus of Dearwater's employment would be in California and conflicts arising therefrom adjudicated under the laws of California. While a "substantial connection" to the forum state is possible in a single contact, by virtue of the undisputed intent that Dearwater's employment be based in California, his actions in Vermont while employed by Bond fail to meet the "continuous and systemic" business presence required for general jurisdiction. *See McGee v. International Life Insurance Co.,* 355 U.S. 220, 223 (1957)(finding jurisdiction from single contract).

FN4. Paragraph 10 of the agreement provides:

GOVERNING LAW, JURISDICTION AND VENUE. This agreement shall be governed by and construed in accordance with the laws of the State of California. (Paper 1-3, ¶ 10).

Moreover, Dearwater's access to Craigslist and/or Careerbuilder does not bring this case within the familiar *Zippo* spectrum analysis **FN5** because Bond merely submitted a job posting, rather than creating and maintaining the posting websites. That Dearwater was able to gain access to the job posting does not mean that Bond conducted general business relations in Vermont. In *Artec Distributing Inc.,* 799 F.Supp. at 1561, this Court held that it did not have personal jurisdiction over the defendant where it did not initiate the business relationship with the Vermont plaintiff despite purchasing products from, communicating with, and making payments to the plaintiff in Vermont. This Court found that Artec did not affirmatively seek to do business in Vermont and lacked sufficient contacts to support the Court's assertion of personal jurisdiction. *Id.* Dearwater similarly reached out to Bond in his Internet job search, contacted Bond on his own, traveled to California for interviews, and accepted the job on the condition that he relocate to California.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)
(Cite as: 2007 WL 2745321 (D.Vt.))

FN5. Cases involving the Internet exist along a spectrum. *Zippo Mfg Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997). At one end are those cases in which a defendant actively does business over the Internet. *Id.* at 1121, 1124, 1125-27 (entering contracts via computer, transmitting files, electronic news service downloads sufficient for jurisdiction); *see also CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1260, 1263 (6th Cir.1996) (jurisdiction proper where defendant transmitted software via Internet to forum state and used company in forum state as distribution center). At the other end are those cases in which a defendant merely posts information on its website. *Zippo,* 952 F.Supp. at 1124. Personal jurisdiction is improper in these "passive" web sites. *Id.*

2. Reasonableness

*8 Since Dearwater has not satisfied the first part of the Due Process inquiry by showing that Bond had sufficient minimum contacts with Vermont, the Court need not consider whether asserting personal jurisdiction based on those contacts is reasonable and does not offend "tradition notions of fair play and substantial justice." *See Burger King,* 471 U.S. at 478.

B. *Improper Venue*

Bond also moves to dismiss because of improper venue under Rule 12(b)(3). The plaintiff bears the burden of showing that its chosen venue is proper. *Country Home Products, Inc. v. Schiller-Pfeiffer,* 350 F.Supp.2d 561, 568 (D.Vt.2004). The proper venue for a diversity action is:

(1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..., or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a) (2003). Where, as here, the defendant is a corporation, the "corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction." *Id.* at § 1391(c).

Because Bond is not subject to personal jurisdiction in Vermont, it can not be deemed to "reside" in the state for purposes of venue. The only remaining basis for venue is if a substantial part of the decision to terminate Dearwater occurred in Vermont. However, based on the allegations in the Complaint and affidavits, it is undisputed that the decision to terminate his employment took place in California. Therefore venue in Vermont is improper.

*CONCLUSION*

For the foregoing reasons, I recommend that Bond's motion to dismiss be granted. (Paper 6).

D.Vt.,2007.
Dearwater v. Bond Mfg. Co.
Not Reported in F.Supp.2d, 2007 WL 2745321 (D.Vt.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Date of Printing: Nov 10, 2010

### KEYCITE

**C**  <u>Dearwater v. Bond Mfg. Co.,</u> **2007 WL 2745321 (D.Vt.,Sep 19, 2007) (NO. 1:06-CV-154)**
**History**
**Direct History**

=>      <u>1</u>  **Dearwater v. Bond Mfg. Co.,** 2007 WL 2745321 (D.Vt. Sep 19, 2007) (NO. 1:06-CV-154)

**Court Documents**
**Dockets (U.S.A.)**

**D.Vt.**

<u>2</u>  DEARWATER v. BOND MANUFACTURING COMPANY, NO. 1:06cv00154 (Docket) (D.Vt.
Aug. 4, 2006)

© 2010 Thomson Reuters. All rights reserved.

Westlaw Delivery Summary Report for MCMILLION,KIMBER

| | |
|---|---|
| Date/Time of Request: | Wednesday, November 10, 2010 09:02 Central |
| Client Identifier: | 3396.000 |
| Database: | KEYCITE-REFS |
| Citation Text: | 2007 WL 2745321 |
| Service: | KeyCite |
| Lines: | 78 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw

Date of Printing: Nov 10, 2010

### KEYCITE

C  <u>Dearwater v. Bond Mfg. Co.,</u> 2007 WL 2745321 (D.Vt. Sep 19, 2007) (NO. 1:06-CV-154)
Citing References
Positive Cases (U.S.A.)
★ ★ ★
Discussed

 1  Devost Enterprises, Inc. v. Allstate Can Corp., 2010 WL 1489981, *2+ (D.Vt. Apr 12, 2010) (NO. 1:09CV276) "

 2  Gaffney v. Play More, Inc., 2009 WL 2365333, *3+ (D.Vt. Jul 29, 2009) (NO. 1:08-CV-18) "

★ ★
Cited

▶  3  Kiobel v. Royal Dutch Petroleum Co., 2008 WL 591869, *6 (S.D.N.Y. Mar 04, 2008) (NO. 02 CIV. 7618 KMWHBP, 04 CIV. 2665 KMWHBP)

C  4  Viko v. World Vision, Inc., 2009 WL 2230919, *16 (D.Vt. Jul 24, 2009) (NO. 2:08-CV-221) "

Secondary Sources (U.S.A.)

C  5  Wright & Miller: Federal Prac. & Proc. s 1067.4, Volkswagen, Asahi, and Stream of Commerce Theory (2010)

C  6  Wright & Miller: Federal Prac. & Proc. s 1067.6, Procedural Aspects of Personal Jurisdiction (2010)

C  7  Wright & Miller: Federal Prac. & Proc. s 1069.8, Application of Modern Jurisdiction Principles--Illustrative Cases (2010)

C  8  Wright & Miller: Federal Prac. & Proc. s 1073.1, Personal Jurisdiction and the Internet (2010)

C  9  Wright & Miller: Federal Prac. & Proc. s 1352, Motions to Dismiss--Improper Venue (2010)

C  10  ZIPPO-ING THE WRONG WAY: HOW THE INTERNET HAS MISDIRECTED THE FEDERAL COURTS IN THEIR PERSONAL JURISDICTION ANALYSIS, 43 U.S.F. L. Rev. 559, 584+ (2009)

Court Documents
Appellate Court Documents (U.S.A.)

Appellate Briefs

 11  Ken WIWA, individually and on behalf of his deceased father, Ken Saro-Wiwa; Owens Wiwa, Blessing Kpuinen, individually and on behalf of her late husband John Kpuinen; Karololo Kogbara; Michael Tema Vizor; Lucky Doobee, individually and on behalf of his late brother Saturday Doobee; Friday Nuate, individually and on behalf of her late husband Felix Nuate; Monday Gbokoo, brother of the late Daniel Gbokoo; David Kiobel, individually and on behalf of his siblings Stella, 2008 WL 6638018, *6638018+ (Appellate Brief) (2nd Cir. Sep 11, 2008) **Reply Brief for Plaintiffs-Appellants** (NO. 08-1803-CV) * *

Trial Court Documents (U.S.A.)

© 2010 Thomson Reuters. All rights reserved.

**Trial Motions, Memoranda and Affidavits**

12  Paul VIKO, Plaintiff, v. WORLD VISION INTERNATIONAL and World Vision, Inc., Defendant.,
    2010 WL 1622102, *1622102 (Trial Motion, Memorandum and Affidavit) (S.D.N.Y. Feb 05, 2010)
    **Defendants' Motion to Dismiss Complaint and/or Transfer and Supporting Memorandum of
    Law (NO. 109CV10489)** ★ ★

13  DEVOST ENTERPRISES, INC. d/b/a New England Container Company, of Swanton, Franklin
    County, Plaintiff, v. ALLSTATE CAN CORPORATION, a Corporation with its principal place of
    business in the Town of Parsippany, County of Morris, and State of New Jersey, and David West, of
    the Town of Fallston, County of Harford, and State of Maryland, Defendants., 2010 WL 1814500,
    *1814500+ (Trial Motion, Memorandum and Affidavit) (D.Vt. Feb 01, 2010) **Defendant David
    West's Motion to Dismiss (NO. 109CV00276)** " ★ ★ ★ ★

14  JAMES MARONEY, INC., Plaintiff, v. FLURY & COMPANY, LTD., Defendant., 2009 WL
    5546919, *5546919+ (Trial Motion, Memorandum and Affidavit) (D.Vt. Dec 10, 2009)
    **Defendant's Motion to Dismiss Complaint with Incorporated Memorandum of Law (NO.
    109CV00252)** ★ ★

15  Patrick GAFFNEY, Plaintiff, v. PLAY MORE, INC. d/b/a Play More Music, D'ryan Green, Leitz
    Music Company, Inc. d/b/a Leitz Music, Leitz Music, LLC, Philip Leitz, Reel Music & Sound, Inc.,
    Christopher L. Leitz and Charles C. Cooley, Defendants., 2009 WL 2203340, *2203340+ (Trial
    Motion, Memorandum and Affidavit) (D.Vt. Apr 06, 2009) **Motion to Dismiss (NO. 108CV00018)**
    " ★ ★ ★

© 2010 Thomson Reuters. All rights reserved.

# STATE OF VERMONT

SUPERIOR COURT
Bennington Unit

CIVIL DIVISION
Docket No. 97-4-17 Bncv.

CULINARY HEALTH INVESTORS, LLC.  :
DAVID BOLLINGER                  :
JOSEPH SHEPARD                   :
DAVID LAUB and                   :
HENRY S. SMITH REVOCABLE TRUST   :
                                 :
Plaintiffs                       :
                                 :
v.                               :
                                 :
CULINARY HEALTH INNOVATIONS, LLC,  :
RADIUS BRAND STRATEGIES, LLC.,    :
BRUCE SHALETT and                :
SEAN MACPHERSON                  :
                                 :
Defendants                       :
                                 :
AND DERIVATIVELY FOR             :
CULINARY HEALTH INNOVATIONS, LLC :
                                 :
v.                               :
                                 :
RADIUS BRAND STRATEGIES, LLC     :
BRUCE SHALETT, Individually and  :
SEAN MACPHERSON, Individually    :

## AFFIDAVIT OF BRUCE SHALETT

STATE OF NEW YORK     :
                      : ss.
COUNTY OF NEW YORK    :

Bruce Shalett, having been duly sworn, does depose and says as follows:

1.     I am a manager and equity owner of Radius Brand Strategies, LLC ("RBS") and I have the

authority and knowledge to make statements on behalf of RBS.

2.   I am currently and since March 2013 a Manager and the Co-Chairman of the Board of Culinary Health Innovations, LLC, a Delaware limited liability company ("CHIDE") and I have the authority and knowledge to make statements on behalf of CHIDE.

3.   I am a resident of New York.

4.   RBS is a New York limited liability company doing business in New York.

5.   CHIDE is a Delaware limited liability company doing business in New York and Florida.

6.   RBS is not now, nor has it ever been, registered to do business in Vermont.

7.   Neither RBS nor I do any business of any kind in Vermont.

8.   Neither RBS nor I own any property or other assets located in Vermont.

9.   Neither RBS nor I derive any revenue from Vermont.

10.   Neither RBS nor I maintain any telephone listing or advertise in Vermont.

11.   CHIDE does not own property or any other assets in Vermont, does not derive any revenue from Vermont, and does not maintain a telephone listing or advertise in Vermont.

12.   Since RBS designees have controlled the CHIDE Board beginning in March 2013, CHIDE has not done business in Vermont. CHIDE's former CEO until August 2013, David Thompson, upon information and belief was a Vermont resident. However, even during Mr. Thompson's tenure as CEO, no business activities were conducted in Vermont and all in person meetings involving the business affairs of CHIDE were conducted in New York City or at CHIDE's Plattsburgh, NY facility.

13.   Since RBS designees have controlled the CHIDE Board beginning in March 2013, CHIDE has not hired any employees in Vermont. CHIDE has engaged independent contractors to assist in the development of CHIDE's products, but to my knowledge such developmental products were only manufactured in New Jersey or Plattsburgh, New York, never in

Vermont. If any such products were in fact manufactured in Vermont it was without the knowledge of the CHIDE Board and beyond the control of CHIDE management.

14.   From and after March 2013 CHIDE had no reason to qualify to do business in Vermont and the CHIDE Board did not authorize anyone to maintain such qualification. Apparently Attorney Stuart Revo, who was CHIDE's company counsel and secretary at the time and a resident of Vermont, unilaterally decided to keep CHIDE's Vermont qualification to do business active by continuing to make filings and listing himself as the company "agent." The CHIDE Board was unaware of this circumstance until Mr. Revo's resignation as company secretary in late 2014, at which time CHIDE refused to make any more filings in Vermont and allowed the qualification to do business to lapse. CHIDE is not currently qualified to do business in Vermont.

15.   In 2012 Attorney Stuart Revo requested that I testify in the bankruptcy proceedings of CHIDE in Vermont Bankruptcy Court for the purpose of assuring the Court that RBS was willing to provide an investment in CHIDE as part of its bankruptcy reorganization. Neither RBS nor I had any control over CHIDE at that time and I agreed to Mr. Revo's request to provide such testimony (which lasted 5-10 minutes) in furtherance of CHIDE's reorganization.

16.   In my capacity as Co-Chairman of CHIDE and in connection with communications regarding restructuring the CHIDE minority holders' positions, the limited meetings I had with any minority holders took place in New York City. I never spoke with or communicated with other minority holders other than through the limited communications I had with all CHIDE equity holders as a group.

17.   I make this affidavit in support of Defendants' motion to dismiss for lack of personal

jurisdiction.

Dated at New York, New York this 24th day of May, 2016

Bruce Shalett

SWORN TO AND SUBSCIBED before me this 24 day of May, 2016.

JOHN A. RUSSO
Notary Public, State of New York
Qualified in Dutchess County
Certified in Westchester County
No. 01RU6225091
My Commission Expires 07-19-20

STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| Bennington Unit | Docket No. 97-4-17 Bncv. |

CULINARY HEALTH INVESTORS, LLC.　　　:
DAVID BOLLINGER　　　　　　　　　　:
JOSEPH SHEPARD　　　　　　　　　　　:
DAVID LAUB and　　　　　　　　　　　:
HENRY S. SMITH REVOCABLE TRUST　　:
　　　　　　　　　　　　　　　　　　　:
Plaintiffs　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
CULINARY HEALTH INNOVATIONS, LLC,　:
RADIUS BRAND STRATEGIES, LLC.,　　　:
BRUCE SHALETT and　　　　　　　　　:
SEAN MACPHERSON　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
Defendants　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
AND DERIVATIVELY FOR　　　　　　　:
CULINARY HEALTH INNOVATIONS, LLC　:
　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
RADIUS BRAND STRATEGIES, LLC　　　:
BRUCE SHALETT, Individually and　　　:
SEAN MACPHERSON, Individually　　　　:

**AFFIDAVIT OF SEAN MACPHERSON**

STATE OF CONNECTICUT:
　　　　　　　　　　　: ss.
COUNTY OF FAIRFIELD　:

Sean Macpherson, having been duly sworn, does depose and says as follows:

1.　　I am a resident of Connecticut.

2.　　I do not conduct any business of any kind in Vermont.

3.　　I do not own any property or other assets located in Vermont.

4.　　I do not derive any revenue from Vermont.

5.     I do not maintain a telephone listing or advertise in Vermont.

6.     In late 2015 I travelled to Vermont to attend a mediation session necessitated by a lawsuit Attorney Stuart Revo had filed against my client Culinary Health Innovations, LLC ("CHIDE"). I did not choose the location of the mediation session, rather it was dictated by the location of the mediator. I drove in and out Vermont that day and did not stay in Vermont.

7.     In my capacity as counsel to CHIDE I sent limited general communications to all CHIDE equity holders at the request of management. These communications were in no way directed to only Vermont resident but to all CHIDE equity holders.

8.     I make this affidavit in support of Defendants' motion to dismiss for lack of personal jurisdiction.

Dated at Bethel, CT  this 24th day of  May, 2016

_____

Sean Macpherson

SWORN TO AND SUBSCIBED before me this 24 day of May, 2016.

_____

Notary Public

DELIA ESPINAL
Notary Public, State of Connecticut
My Commission Expires Oct. 31, 2016

March 5, 2013

Culinary Health Investors, LLC
27 Mockingbird Lane
S. Burlington, Vermont 05403

Radius Brand Strategies, LLC
595 Madison Avenue, 33rd Floor
New York, NY 10022

Re:   Escrowed Funds Attorney Trust Account f/b/o Campbell Investment Company

This letter refers to recent email and telephone communications between Stuart Revo ("Revo")
and Bruce Shalett of Radius Brand Strategies, LLC ("Radius"), and to recent telephone
conversations between and amongst Revo, Norman Friedland ("Friedland") and David
Thompson.   These communications relate to the payment of approximately $204,000 of funds
which were advanced by Campbell Soup Company/Campbell Investment Company
("Campbell") pursuant to a Secured Note dated October 29, 2009, and which funds are
currently held in escrow by Stuart Revo, Esq. pursuant to a Letter of Escrow dated October 29,
2009 (the "Escrow Funds").   In the event Campbell authorizes the release of the Escrow Funds,
Messrs. Revo and Friedland are seeking clearance and consent from Culinary Health Investors,
LLC ("CHI VT") and Radius to obtain such funds at such time pursuant to this letter. Radius has
indicated its concern with the foregoing, and wants to ensure that payment to Revo and
Friedland of such funds, at such time, would not violate any order, ruling or similar finding of
the United States Bankruptcy Court for the District of Vermont ("Bankruptcy Court"), which
presided over CHI DE's bankruptcy proceedings.   Accordingly, the following is hereby agreed:

1.   Subject to the Bankruptcy Court's issuance of a final decree in the CHI DE Chapter 11
     proceeding, Revo and Friedland hereby represent and warrant that as of the date hereof,
     there is no court order, ruling or similar finding from the Bankruptcy Court that prohibits or
     restricts release of the Escrow Funds to Revo/Friedland, or to any other person or entity.
     The legal opinion provided by Revo to Radius at the Initial Closing of the CHI-DE Equity
     Investment Agreement shall include this point.   This representation shall be deemed a
     continuing one, and shall survive until after the release of the Escrow Funds by Campbell,
     or December 31, 2013, whichever later occurs. Radius and CHI VT hereby agree that they
     shall take no action (directly or acting through CHI Delaware) contrary to the letter and
     spirit hereof, including but not limited to the initiation of any voluntary, unprompted or
     unrequired filing or communication with the United States Bankruptcy Court, with the

1

primary purpose of avoiding, delaying or reducing payment of the Escrow Funds to Revo and Friedland.

2. Conditioned only upon (i) the Bankruptcy Court's issuance of a final decree in the CHI DE Chapter 11 proceeding, (ii) Campbell's agreement that such funds can be released from escrow and (iii) bring-down of Revo/Friedland's representation set forth above, if requested at such time by Radius, Radius and CHI VT hereby agree to instruct their respective Manager designees to the CHI DE Board to effectuate a prompt transfer of the Escrow Funds to Revo/Friedland.

3. The parties hereby agree that release and payment to Revo and Friedland of the Escrow Funds shall be deemed consideration for the post Reorganization Plan Confirmation legal services provided to CHI Delaware in concluding the Radius transaction, obtaining Campbell's Consent to such transaction, reorganizing CHI Delaware pursuant to such transaction, and effectuating the Plan confirmed by the Bankruptcy Court.

4. Revo and/or Friedland may enforce this Agreement, if necessary, and if they substantially prevail, Radius and CHI VT shall immediately reimburse them for the cost of enforcing this Agreement, including the costs of such enforcement, including but not limited to reasonable attorney's fees.

5. Revo and Friedland shall jointly and severally indemnify and hold CHI DE, CHI VT and Radius harmless from and against all losses, claims, damages, judgments, assessments, costs, expenses and other liabilities ("Liabilities"), including reasonable legal fees, arising from or in any way related to any breach by Revo and Friedland of their representations made herein. Provided, however, that in no event shall Liabilities of Revo and Friedland (combined) pursuant to such indemnification exceed a maximum of the full amount of the Escrow Funds that are released by Campbell and paid in their entirety to Revo and Friedland.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

2

6. This Letter may be executed in counterparts by the parties, and signatures hereto may be exchanged by fax or electronically. The counterparts shall be taken together and deemed to construe a single original Letter. The fax or electronic versions shall be valid, binding and enforceable in accordance with the terms hereof unless and until hard copy, originals are exchanged amongst the parties.

Very truly yours,

Stuart W. Revo ("Revo")

Norman M. Friedland ("Friedland")

**Accepted and Agreed:**

Culinary Health Investors, LLC

David R. Thompson
President

Radius Brand Strategies, LLC

By:

Bruce Shalett
Manager

3